## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRADEN LINDSTROM, Individually and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>           v.<br><br>JAYUD GLOBAL LOGISTICS LIMITED; XIAOGANG GENG; ALAN TAN KHIM GUAN; LIN BAO; MENGMENG HU; FRIEDMAN, LLP; MARCUM ASIA CPAS, LLP,<br><br>                      Defendants. | Civil Action No. 1:25-cv-09662<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Braden Lindstrom ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Jayud Global Logistics Ltd. ("Jayud" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Jayud; and (c) review of other publicly available information concerning Jayud.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Jayud securities between April 21, 2023, and April 30, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against Jayud Global Logistics Limited, Xiaogang Geng, Alan Tan Khim Guan, Lin Bao, Mengmeng Hu, Friedman, LLP, and Marcum Asia CPAs, LLP (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      The Company claims to provide a range of worldwide cross-border supply chain solution services. Specifically, freight forwarding services, such as integrated cross-border logistics, fragmented logistics services, and chartered airline freight services. Also, supply chain management services, such as international trading and agent services; and other value-added services comprising custom brokerage and intelligent logistic IT systems are advertised on their website.

3.      The Company was founded in 2009 and is incorporated as an offshore holding company in the Cayman Islands.  Its principal place of business is located at Building 3, No. 7 Gangqiao Road, Li Lang Community, Nanwan Street, Longgang District, Shenzhen, China.

4.      This case arises from the sudden collapse of Jayud's stock in early April 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme.  In the weeks leading up to April 2025, Jayud's share price surged from roughly $1.00 to an all-time high of around $8.00 per share, despite no fundamental news from the Company to justify such a spike. Investigations and public reports have since revealed that Jayud used a primary vehicle for an illicit "pump-and-dump" promotion scheme.  Impersonators touted Jayud in online forums, chat groups, and social media posts with sensational but baseless claims to create a buying frenzy among retail investors.

5.      This sharp rise proved short-lived.  On April 2, 2025, Jayud's stock price abruptly crashed by approximately 95%, well below $1.00 per share.  Since then, the Company has completed a number of reverse stock splits to maintain NASDAQ listing compliance.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in its securities. Specifically, Defendants failed to disclose to investors: (1) that Jayud was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) that insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) that Jayud's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the stock price; and (4) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's agent for service of process and auditors are located in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Braden Lindstrom, as set forth in the accompanying certification, incorporated by reference herein, purchased Jayud securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Jayud is a Cayman Islands holding company with its principal executive offices located in Shenzhen, China.  The company's common stock trades on the NASDAQ exchange under the symbol "JYD."

13.     Defendant Xiaogang Geng ("Geng") was the Company's Chief Executive Officer and Co-Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Alan Tan Khim Guan ("Guan") was the Company's Co-Chief Executive Officer ("CEO") from December 2024 until July 2025.

15.     Defendant Lin Bao ("Bao") was the Company's Chief Financial Officer ("CFO") until March 2025.

16.     Defendant Mengmeng Hu ("Hu") was the Company's Chief Financial Officer ("CFO") from March 2025 onward.

17.     Defendant Friedman, LLP ("Friedman") was the Company's auditor until December 2022.

18.     Defendant Marcum Asia CPAs, LLP ("Marcum") was the Company's auditor from December 2022 until July 2025.

19.     Defendants Geng, Guan, Bao, and Hu (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (i.e., the market).  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

20.    Defendants Friedman and Marcum (collectively, the "Auditor Defendants") issued clean audit opinions on financial statements incorporated into the June 6, 2024 shelf-registration statement. Additionally, Defendant Marcum was Jayud's auditor throughout the Class Period and had access to material non-public information throughout that time. Because of their position, the Auditor Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading. Furthermore, due to their position, the Auditor Defendants had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, they are also liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

21.    The Class Period begins on April 21, 2023, when the Company filed an initial public offering ("IPO") prospectus permitting Jayud to issue 1,250,000 Class A ordinary shares at an initial offering price of $4.00/share for a total capital raise of $5,000,000. In the IPO, to describe their business, the Company stated:

> We are one of the leading Shenzhen-based end-to-end supply chain solution providers in China, with a focus on providing cross-border logistics services. According to the Frost & Sullivan Report, in 2021, we ranked fifth in terms of the revenues generated from providing end-to-end cross-border supply chain solution among all end-to-end supply chain solution providers based in Shenzhen. Headquartered in Shenzhen, a key component of the Guangdong-Hong Kong-Macau Greater Bay Area, or the Greater Bay Area, in China, we benefit from the unique geographical advantages of providing high degree of support for ocean, air and overland logistics. A well-connected transportation network enables us to significantly increase efficiency and reduce transportation costs. As one of the most

open and dynamic regions in China, Shenzhen is home to renowned enterprises and the gathering place of cross-border e-commerce market players, which provides us with a large customer base and enables us to develop long-term in-depth relationships with our customers. In addition, the sustained and steady growth of local economy and supportive government policies have backed up our development and brought us great convenience in daily operations.

According to the Frost & Sullivan Report, the global end-to-end cross-border supply chain solution market experienced a soaring growth during the past two years, with its total revenue surging from US$211.8 billion for the year ended December 31, 2020 to US$537.8 billion for the year ended December 31, 2021. In line with this increase, we experienced a rapid growth in 2020 and 2021 as well as the six months ended June 30, 2022. Our gross profit increased by RMB19.1 million, or 161.4%, from RMB11.8 million for the six months ended June 30, 2021 to RMB30.9 million (US$4.6 million) for the six months ended June 30, 2022. Our gross profit increased by RMB13.5 million, or 64.1%, from RMB21.0 million for the year ended December 31, 2020 to RMB34.5 million (US$5.4 million) for the year ended December 31, 2021. Our revenue generated from end-to-end cross-border logistics services increased from approximately RMB98.9 million for the six months ended June 30, 2021 to approximately RMB332.7 million (US$49.6 million) for the six months ended June 30, 2022, representing a period-to-period increase of 236.5%. Our revenue generated from end-to-end cross-border logistics services increased from approximately RMB210.8 million for the year ended December 31, 2020 to approximately RMB390.2 million (US$61.2 million) for the year ended December 31, 2021, representing a year-on-year increase of 85.1%.

We offer a comprehensive range of cross-border supply chain solution services, including: (i) freight forwarding services, (ii) supply chain management, and (iii) other value-added services.[1]

22.    The IPO also contained the following 2020, 2021, and 2022 financial results for each of its three stated revenue streams:

**Supply Chain Management**

Our supply chain management business primarily consists of two sub-segments, namely, (i) international trading business, where we engage in international trading directly, with our customers being the purchasers or sellers, and (ii) agent services, where we are engaged by customers as their international trade agent, for the purpose of further streamlining the customers' supply chain process. We believe our supply chain management business allows us to enhance the overall customer experience and to create vast cross-selling opportunities to drive customer retention, thus further differentiating us from our competitors. For the six months

---

[1]    Jayud Global Logistics Ltd., Prospectus (Apr. 21, 2023).

ended June 30, 2021 and 2022, revenues from our supply chain management business amounted to RMB24.8 million and RMB39.0 million (US$5.8 million), respectively, representing an increase of 57.1%. For the years ended December 31, 2020 and 2021, revenues from our supply chain management business amounted to RMB44.0 million and RMB53.5 million (US$8.4 million), respectively, representing a year-on-year increase of 21.8%.

### Other Value-added Services

We endeavor to differentiate our service offerings by, among other things, developing other value-added services. Our value added services primarily include (i) custom brokerage and (ii) intelligent logistic IT systems. For the six months ended June 30, 2021 and 2022, revenues from our other value-added services amounted to RMB1.9 million and RMB2.9 million (US$0.4 million), respectively, representing an increase of 52.4%. For the years ended December 31, 2020 and 2021, revenues from our other value-added services amounted to RMB2.8 million and RMB4.0 million (US$0.6 million), respectively, representing a year-on-year increase of 45.9%.

. . .

### Freight Forwarding Services

Our freight forwarding services primarily comprise (i) integrated cross-border logistics services, and (ii) fragmented logistics services. For the six months ended June 30, 2021 and 2022, revenues from our freight forwarding services amounted to RMB138.6 million and RMB412.2 million (US$61.4 million), respectively, representing an increase of 197.5%. For the years ended December 31, 2020 and 2021, revenues from our freight forwarding services amounted to RMB243.6 million and RMB488.0 million (US$76.5 million), respectively, representing a year-on-year increase of 100.3%.[2]

23.    Lastly, the IPO details the company's strengths and strategies that will support the

future growth of Jayud:

### OUR STRENGTHS

We believe the following strengths have contributed to our success and differentiate us from others:

- One of the leading end-to-end supply chain solution providers based in Shenzhen
- Strong and integrated logistic service capabilities

---

[2]    *Id.*

- Customized logistic solutions comprising a wide range of integrated logistics and freight forwarding services
- R&D capabilities in proprietary IT systems' development contributing to increased operational efficiency
- Long-standing relationships with a wide and diversified customer base
- Visionary and experienced management team with a proven track record

**OUR STRATEGIES**

We aim to execute the following business strategies:

- Further enhance our distribution network
- Adapt our logistic services and customized solutions to different industry verticals in China
- Further invest in our intelligent logistic IT systems
- Further invest in our human capital
- Develop our business and service capacities through investments or acquisitions[3]

24.    The structure of Jayud's public IPO was intentionally designed to facilitate an eventual pump-and-dump scheme.  Jayud conducted a low-float IPO, offering just 1.25 million shares to the public, less than 5% of total outstanding equity, while maintaining overwhelming insider control through Class B supervoting shares and offshore holding entities.

25.    The thin public float also made Jayud's stock uniquely susceptible to price manipulation, as even modest buying pressure could create explosive price moves.

26.    On May 15, 2023, the Company filed its Form 20-F with the SEC for the year ended December 31, 2022 (the "2022 20-F"), affirming the previously reported financial results, which were certified by Defendant Geng.[4]  Attached were certifications signed by Auditor Defendants attesting to the accuracy of the financial statements and their conformity to Generally Accepted

---

[3]    *Id.*
[4]    Jayud Global Logistics Ltd., Form 20-F (May 15, 2023).

Accounting Principles ("GAAP"), as well as Public Company Accounting Oversight Board ("PCAOB") standards for the years ended 2020, 2021, and 2022.[5]

27.    On July 12, 2023, the Company issued a press release announcing "the Engagement of Strategic Investor Relations LLC to lead investor engagement and Financial Communications Efforts."[6]  The stated goals of the engagement were "to craft and implement a comprehensive investor relations and corporate communications strategy to build greater investor awareness for the Company. The objectives of the new program are to expand Jayud's overall company messaging and corporate positioning, ensure its investment highlights are properly communicated, and increase the Company's visibility and engagement with the broader investment community."[7] Defendant Geng went on to personally comment:

> We believe that transparency and effective communication with our shareholders and stakeholders are key drivers of trust and long-term growth. That is why we have partnered with Strategic Investor Relations, an investor relations firm that aligns with our vision and values. By leveraging their expertise, we can enhance our ability to effectively engage with the investment community, articulate our strategic initiatives, and showcase the tremendous potential of our business. Together, we can create a bridge of understanding and collaboration, fostering a solid foundation for sustainable growth and unlocking opportunities on a global scale.

28.    On April 26, 2024, the Company filed its Form 20-F detailing financial results for the year ended December 31, 2023 (the "2023 20-F").[8]  The filing was again certified by Defendant Geng and reiterated the overview of the Company, its offerings, strengths, and strategies first highlighted in the IPO.  Among other financial and non-financial highlights, the 2023 20-F contained, the following comparative year-over-year revenue and gross margin disclosures:

**Revenues**

---

[5]    *Id.*

[6]    JAYUD GRP., *Jayud Global Logistics Limited Announces the Engagement of Strategic Investor Relations LLC to Lead Investor Engagement and Financial Communications Efforts* (Jul. 12, 2023), https://ir.jayud.com/pressreleases/detail/7d45f6a5-8d26-48ad-b98f-a2b18fe6fa32 [https://perma.cc/E5G3-AG65].

[7]    *Id.*

[8]    Jayud Global Logistics Ltd., Form 20-F (Apr. 26, 2024).

Total revenues decreased by approximately RMB154.1 million, or 23.6%, from approximately RMB652.0 million for the year ended December 31, 2022 to approximately RMB497.9 million (US$70.3 million) for the year ended December 31, 2023, primarily attributable to the decrease of revenues from our freight forwarding services and other value-added services offset by the increase of revenues from our supply chain management.

Revenues from our freight forwarding services decreased by RMB235.0 million, or 40.7%, from RMB577.6 million for the year ended December 31, 2022 to RMB342.6 million (US$48.4 million) for the year ended December 31, 2023. The decrease was mainly due to the significant decrease in the freight price, both in air and sea freight. In addition, the number of customers decreased by 2% from 1,879 customers for the year ended December 31, 2022 to 1,841 customers for the year ended December 31, 2023. Among the new customers acquired for the year ended December 31, 2023, 55.4% of them are relevant to e-commerce related logistics services. Total revenue from e-commerce related logistics services increased by 11.0% from RMB123.1 million for the year ended December 31, 2022 to RMB136.7 million (US$19.3 million) for the year ended December 31, 2023 reflecting significant growth of e-commerce related logistic services.

Revenues from our supply chain management increased by RMB83.6 million, or 121.1%, from RMB69.0 million for the year ended December 31, 2022 to RMB152.6 million (US$21.5 million) for the year ended December 31, 2023. In 2023, the Group stopped the international trading business of one subsidiary, mainly export product dealing, and set up a new subsidiary with 51% of equity interest, focusing on electronic devices and chips import. Revenue from our supply chain management in 2023 were almost all from this new subsidiary.

Revenues from our other value-added services decreased by RMB2.7 million, or 50.8%, from RMB5.4 million for the year ended December 31, 2022 to RMB2.7 million (US$0.4 million) for the year ended December 31, 2023. The decrease was due to the reduction of revenue from custom brokerage of RMB1.5 million (US$0.2 million) and from intelligent logistic IT services of RMB1.2 million (US$0.2 million).

**Cost of Revenues**

Our cost of revenues decreased by 16.4% from RMB614.6 million for the year ended December 31, 2022 to RMB513.7 million (US$72.5 million) for the year ended December 31, 2023.

Our cost of revenues for freight forwarding services decreased by approximately RMB182.6 million, or 33.7%, from approximately RMB542.6 million for the year ended December 31, 2022 to approximately RMB360.0 million (US$50.8 million) for the year ended December 31, 2023. Cost of freight charges, representing the

main source of our cost of revenue, decreased by RMB201.4 million, or 38.5%, from approximately RMB522.5 million for the year ended December 31, 2022 to approximately RMB321.1 million (US$45.3 million) for the year ended December 31, 2023. The main components of freight charges were the freight and the delivery fees paid to third-party carriers. As the Company decreased sales price more to maintain competitive at market, thus the decrease of cost was not completely in line with the decrease of revenue.

Our cost of revenues for supply chain management increased by approximately RMB82.9 million, or 120.9%, from approximately RMB68.5 million for the year ended December 31, 2022 to approximately RMB151.4 million (US$21.4 million) for the year ended December 31, 2023. The increase synchronized with the business growth of electronic devices and chips business.

Our cost of revenues for other value-added services decreased by approximately RMB1.1 million, or 30.6%, from approximately RMB3.5 million for the year ended December 31, 2022 to approximately RMB2.4 million (US$0.3 million) for the year ended December 31, 2023. The decrease was in line with the reduction of revenue from custom brokerage and IT services.

**Gross Profit**

Our gross profit (loss) decreased by RMB53.3 million, or 142.5%, from gross profit of RMB37.4 million for the year ended December 31, 2022 to gross loss of RMB15.9 million (US$2.2 million) for the year ended December 31, 2023. For the years ended December 31, 2022 and 2023, our overall gross profit margin was 5.8% and negative 3.2%, respectively.

Gross profit margin of freight forwarding services decreased from 6.1% for the year ended December 31, 2022 to negative 5.1% for the year ended December 31, 2023. The negative gross margin in 2023 was mainly due to gross loss of RMB16.0 million from warehousing services and RMB10.8 million from other logistics services due to insufficient demand and significant decrease in sales prices offset by the gross profit of RMB7.5 million from e-commerce related logistic services and RMB1.9 million of chartered carrier transport services. We are seeking to reduce our warehousing spaces in 2024 to mitigate the loss. At the same time, we will put more effort to further develop e-commerce related logistic services.

Gross profit margin of our supply chain management increased from 0.7% for the year ended December 31, 2022 to 0.8% for the year ended December 31, 2023, attributable to the electronic devices and chips business from our newly set up subsidiary in July 2023.

Gross profit margin of our other value-added services decreased from 36.0% for the year ended December 31, 2022 to 9.6% for the year ended December 31, 2023 mainly due to the significant decrease of the sales price of custom brokerage.[9]

29.    On May 3, 2024, the Company filed a Form 6-K press release detailing how it received a letter from NASDAQ indicating they were in violation of Rule 5550(b)(1) due to their stockholders equity balance falling below $2,500,000.  The letter went on to explain that the Company had 45 days to cure the deficiency or face delisting.  Lastly, the press release reiterated the Company's business and its competitive advantage:

> Jayud Global Logistics Limited is one of the leading Shenzhen-based end-to-end supply chain solution providers in China, focusing on cross-border logistics services. Headquartered in Shenzhen, the Company benefits from the unique geographical advantages of providing a high degree of support for ocean, air, and overland logistics. The Company has established a global operation nexus featuring logistic facilities throughout major transportation hubs in China and globally, with footprints in 12 provinces in Mainland China and 16 countries across six continents. Jayud offers a comprehensive range of cross-border supply chain solution services, including freight forwarding, supply chain management, and other value-added services. With its strong service capabilities and research and development capabilities in proprietary IT systems, the Company provides customized and efficient logistics solutions and develops long-standing customer relationships.[10]

30.    On June 7, 2024, the Company issued a press release detailing how it had received another notification letter from NASDAQ that the minimum bid price for their shares had fallen below $1.00 and they would face delisting if this remained the case for more than 30 days in accordance with Rule 5550(a)(2).  Again, the press release reiterated the Company's previously stated business description and competitive advantage in the marketplace.

31.    On July 22, 2024, the Company received a Comment Letter from the SEC ("2024 Comment Letter") relating to Note-3 Going Concern and 15-Equity from the 2023 20-F. Specifically, in Note-3 the SEC identified inconsistent language about the Company's ability and

---

[9]    *Id.*
[10]    Jayud Global Logistics Ltd., Form 6-K (May 5, 2024).

management's plans to "alleviate" concerns about the Company's ability to continue as a going concern. Additionally, for Note 15, the SEC requested accounting details and identities of recipients surrounding a RMB 35,000,000 reorganization payment.

32.    On September 23, 2024, the Company filed a Form 20-F/A amending the previously reported 2023 20-F to reflect the findings from the 2024 Comment Letter. The filing was again certified by Defendant Geng, reiterating the overview of the Company, its offerings, strengths, and strategies first highlighted in the IPO as well as the 2022 20-F. It also contained the signed, unqualified audit opinions of the Auditor Defendants.

33.    The above statements identified in ¶¶21-33 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, prospects, and promotion of the Company. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Auditor Defendant Allegations**

34.    The unqualified 2020, 2021, 2022, 2023, and 2024 audit opinions of Auditor Defendants were incorporated into the IPO, registration statements, prospectuses and other "offerings" of securities the Company filed during the Class Period. In each of those opinions, Auditor Defendants certified that, "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company" and that the audits were conducted "in conformity with accounting principles generally accepted in the United States of America" and "in accordance with the standards of the PCAOB" which "require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of

material misstatement, whether due to error or fraud." They go on to affirm the procedures they performed stating:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

35.    These unqualified audit reports incorporated into the IPO and other offerings were false and misleading because, as previously explained, Jayud's consolidated financial statements were not prepared in accordance with GAAP or PCAOB requirements.

36.    In issuing unqualified audit opinions on Jayud's financial statements—despite these GAAP and PCAOB violations—Auditor Defendants failed to comply with the professional standards dictated by the PCAOB. These standards required Auditor Defendants to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[11]

37.    In conducting its audits, Auditor Defendants had access to the files and key employees of the Company at all relevant times. As Jayud's auditor, Auditor Defendants had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review Jayud's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as Jayud's internal controls and structures.

---

[11]    PCAOB, *AS 1000: General Responsibilities of the Auditor in Conducting an Audit*, https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit [https://perma.cc/S4PV-DDED].

Accordingly, Auditor Defendants were aware of the significant deficiencies at the Company. Thus, had the Auditor Defendants complied with PCAOB standards, they would have determined that there was no reasonable basis for their unqualified audit reports because, among other things, Auditor Defendants were aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports and its conformity with GAAP and the Company's reported financial metrics.

<b>The Truth Begins to Emerge</b>

38.     On April 1, 2025, Jayud's stock reached a closing price of $7.97, with an intraday high of $8.00. At that time, the Company had approximately 90 million Class A shares outstanding, giving it a market capitalization of around $720 million.

39.     During aftermarket trading hours, on April 1, 2025, Jayud's stock price abruptly crashed by approximately 95%. Investigations and public reports have since revealed that Jayud's stock was used a primary vehicle for an illicit "pump-and-dump" promotion scheme. Impersonators touted Jayud in online forums, chat groups, and social media posts with sensational but baseless claims to create a buying frenzy among retail investors. The structure of Jayud's public listing and float made the scam possible.



With the success of this VIP short-term stock, our company will conduct the next VIP high-yield value investment in January, which is also the most anticipated investment method by investors. The listed company that is about to conduct value investment transactions has a good business operation and is preparing to cooperate with similar large enterprises in strategic restructuring in order to expand its main products on a larger scale. After Trump returns to the White House, favorable policy support will bring good development to some small and medium-sized companies. Therefore, our company expects the total investment return rate of this VIP value investment to be between 160-380%. If you invest 100k US dollars, you will get at least 160k-380k US dollars in profit. With the current good upward trend of the US stock market, we are fully confident to achieve this profit target.

10:55 AM



~Administrator                                                    +1 (304) 419-3395

🎉🎉🎉12.19 VIP short-term stock profit🎉🎉🎉

Stock code: JYD

Specified selling price: $1.93
Specified selling price: $1.93
Specified selling price: $1.93

Please all investors submit (limit order) to sell at the specified price of $1.93 to avoid large fluctuations in stock prices. After you submit (limit order) at the specified price of $1.93, wait patiently for the order to be executed

10:15 AM

This week, the VIP short-term US stocks we traded have successfully achieved our rising target. This VIP short-term trading has achieved a total return on investment of 11.5%, which means that if the funds you participate in are 100k US dollars, you have already made a profit of 11.5K US dollars. But this is only a small amount of funds we use to participate in the transaction. When we start to formally carry out VIP value investment, we will get a higher return on investment. However, this is a staged victory we have achieved so far. We should all congratulate the success of this VIP short-term US stock trading and look forward to the official start of VIP value investment.

10:45 AM



40.     On April 3, 2025, the Company issued a press release in response.  They stated:

*While it is the Company's practice not to comment on any stock movement, we must caution investors and all other persons to rely solely on statements and filings with the United States Securities and Exchange Commission issued by the Company itself or its authorized representatives. The Company does not intend to make further statements regarding this matter.*[12]

---

[12]     JAYUD GRP., *Jayud Global Logistics Issues Statement Regarding Market Activity* (Apr. 3, 2025), https://ir.jayud.com/pressreleases/detail/810188a1-4a3c-40f9-b468-d344cd25a4bb [https://perma.cc/6N53-WGQB].

The press released was signed by Matthew Abenante, President of Strategic Investor Relations, LLC, as the contact for the Company.

41.    On April 3, 2025, penny stock trader and blogger Timothy Sykes published the article "Jayud Global (JYD): Another Penny Stock Pump-and-Dump Fail" on his website detailing how the scam worked to educate investors on how to not fall for the next one.  Specifically, in the section "How the JYD Pump Worked" he explains:

> JYD was a low-float Chinese logistics penny stock that traded under $1 for most of late 2024.
>
> Then came the run.
>
> From December through March, JYD climbed slowly on the back of vague PRs and acquisition news — but the real pump didn't begin until late March 2025. That's when the stock started going vertical.
>
> It hit $8 on April 1, capping a 1,100% climb in 5 months.
>
> Volume surged. Discord servers, WhatsApp groups, and YouTube "analysts" started pushing wild price targets — $13, $20, even $27. These were fake projections made using Fibonacci extensions (not kidding) by people either completely clueless… or deeply involved in the scheme.
>
> Then the dump hit.
>
> After-hours on April 1, the bottom fell out. By the next morning, it was already down 79%. By market close on April 2, it had lost over 95% of its value.
>
> Just like CLEU [(another pump and dump stock scam)], this was a pump with zero real support and an inevitable crash baked in.[13]

42.    Sykes goes on to list the following characteristics as key evidence the stock price was manipulated by Defendants: (1) skyrocketing price with no justification; (2) massive insider ownership; and (3) no institutional support or analyst coverage.

---

[13]    Timothy Sykes, TIMOTHY SYKES, *Jayud Global (JYD): Another Penny Stock Pump-and-Dump Fail* (Apr. 3, 2025), https://www.timothysykes.com/news/jyd-stock-pump-2025_04_03/ [https://perma.cc/68XU-LXK8].

43.    During the Class Period, Jayud's stock price was artificially inflated through a coordinated social media campaign that disseminated materially false and misleading information. Through private investor chat groups on platforms like WhatsApp and Facebook, promoters impersonated credible financial advisors and circulated unfounded news to generate excitement and buying pressure.

44.    The statements had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing Jayud shares at inflated prices. By peddling fabricated prospects of imminent corporate success, the scheme misled investors about Jayud's value and created artificial demand for the stock. Jayud's public listing and float were designed to enable the fraudulent scheme to be effectuated.

45.    On April 22, 2025, the Company filed its Form 20-F detailing financial results for the year ended December 31, 2024 (the "2024 20-F"). In this filing, the Company expanded their "Risks Related to the Class A Ordinary Shares" in the 2024 20-F to include the following:

**Risks Related to the Class A Ordinary Shares**

. . .

Our Class A ordinary shares have recently experienced extreme price and volume volatility. Over the past two weeks, our share price has undergone periods of rapid appreciation followed by substantial and sudden declines. For example, the closing price of our shares was $7.97 on April 1, 2025 with approximately 7 million shares traded. On April 2, 2025, our stock traded as low as $0.35 with approximately 45.8 million shares traded. By contrast, our stock closed at $3.63 per share on March 3, 2025. To our knowledge, there have been no material changes to our financial condition, results of operations, or business fundamentals that would explain such extreme fluctuations in our stock price. We believe this volatility is not attributable to our operating performance or industry conditions. This disconnect between our share price and our actual business performance may expose investors to significant risk, particularly if the market price declines sharply without a corresponding change in our business. Investing in our shares under these conditions involves substantial risk, including the potential for rapid and significant losses.

In addition, unusual trading activity may have been influenced by short squeezes—situations where investors who have sold shares short are forced to repurchase shares at higher prices, potentially contributing to abnormal price increases followed by sharp declines. These market dynamics are not necessarily related to our company's performance and may harm investors who buy shares during or after such events.

In some cases, trading activity may be driven by speculation or misinformation disseminated through social media or messaging platforms, which are outside of the company's control and may mislead investors. Certain investors may have made investment decisions based on inaccurate or overly optimistic expectations regarding the future performance of our share. These expectations were not issued or endorsed by the Company.

We cannot guarantee that similar volatility or trading disruptions will not occur again. Continued volatility may result in reputational harm, potential regulatory inquiries, shareholder litigation, and reduced investor confidence, all of which could adversely impact our ability to raise capital or execute our business strategy.[14]

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Jayud securities between April 21, 2023, and April 30, 2025, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Jayud's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or

---

[14]      Jayud Global Logistics Limited, Form 20-F (Apr. 22, 2025).

thousands of members in the proposed Class. Millions of Jayud shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Jayud or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Jayud; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

51.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the

expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

52.     The market for Jayud's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Jayud's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Jayud's securities relying upon the integrity of the market price of the Company's securities and market information relating to Jayud and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Jayud's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Jayud's business, operations, and prospects as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jayud's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the

Company's securities to be overvalued and artificially inflated at all relevant times. Defendants'

materially false and/or misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing

the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

55.     Defendants' wrongful conduct, as alleged herein, directly and proximately

caused the economic loss suffered by Plaintiff and the Class.

56.     During the Class Period, Plaintiff and the Class purchased Jayud's securities

at artificially inflated prices and were damaged thereby. The price of the Company's securities

significantly declined when the misrepresentations made to the market, and/or the information

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

causing investors' losses.

## SCIENTER ALLEGATIONS

57.     As alleged herein, Defendants acted with scienter since Defendants: (1) knew that the

public documents and statements issued or disseminated in the name of the Company were materially

false and/or misleading; (2) knew that such statements or documents would be issued or disseminated

to the investing public; and (3) knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements or documents as primary violations of the federal

securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of

their receipt of information reflecting the true facts regarding Jayud, their control over, and/or

receipt and/or modification of Jayud's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning Jayud, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

58.     The market for Jayud's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Jayud's securities traded at artificially inflated prices during the Class Period.  On April 1, 2025, the Company's share price closed at a Class Period high of $7.97 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Jayud's securities and market information relating to the Company, and have been damaged thereby.

59.     During the Class Period, the artificial inflation of Jayud's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jayud's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Jayud and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

60.     At all relevant times, the market for Jayud's securities was an efficient market for the following reasons, among others:

(a)     Jayud shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Jayud filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Jayud regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Jayud was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

61.    As a result of the foregoing, the market for Jayud's securities promptly digested current information regarding Jayud from all publicly available sources and reflected such information in Jayud's share price.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Jayud's securities at artificially inflated prices and a presumption of reliance applies.

62.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of the Class

Period material misstatements and omissions set forth above, that requirement is satisfied here.

## <u>NO SAFE HARBOR</u>

63.    The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts

and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.  In

the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the speaker had actual

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-

looking statement was authorized or approved by an executive officer of Jayud who knew that the

statement was false when made.

## <u>FIRST CLAIM</u>
### <u>Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants</u>

64.    Plaintiff repeats and re-alleges each and every allegation contained above as

if fully set forth herein.

65.    During the Class Period, Defendants carried out a plan, scheme and course

of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Jayud's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

66.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Jayud's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jayud's financial well-being and prospects, as specified herein.

68.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jayud's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Jayud and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

69.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

70.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jayud's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jayud's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Jayud's securities during the Class Period at artificially high prices and were damaged thereby.

72.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Jayud was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Jayud securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

75.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.    Individual Defendants acted as controlling persons of Jayud within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.    As set forth above, Jayud and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)      determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 19, 2025        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/* Sean Masson
Sean Masson
The Helmsley Building
230 Park Ave, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
smasson@scott-scott.com

John T. Jasnoch (*pro hac vice* forthcoming)
Mollie Chadwick (*pro hac vice* forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Tom Grady (*pro hac vice* forthcoming)

GRADYLAW
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Counsel for Plaintiff and the Proposed Class*

## **CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

I, Braden Lindstrom, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorized Scott+Scott Attorneys at Law and Grady Law to file a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, shares of Jayud Global Logistics Ltd ("JYD").

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **November 1,** 2025 at **St. George, Utah**.


*Braden Lindstrom*
_____
Braden Lindstrom

**<u>SCHEDULE A</u>**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| BUY, **JYD** | **03/27/2025** | **7,397 at $6.5658** | **$48,567.02** |
| BUY, **JYD** | **03/31/2025** | **4,544 at $7.44** | **$33,807.36** |
| BUY | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |