**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE JAYUD GLOBAL LOGISTICS LIMITED SECURITIES LITIGATION | Case No. 1:25-cv-09662-VSB-KSP<br><br>CIVIL ACTION<br><br>AMENDED COMPLAINT |

1. Lead Plaintiff Karim Salem and additional named Plaintiff Robert Schuermann (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Jayud Global Logistics Ltd. ("Jayud" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of the Company's IPO prospectus, shelf registration statement on Form F-3, and prospectus supplements; (c) findings of Plaintiffs' investigator and forensic accountant; (d) review of press releases and media reports issued by Jayud; (e) review of other publicly available information concerning Jayud and the fraudulent scheme alleged herein; and (f) documents and information provided by more than 100 victims of the alleged fraudulent scheme. Plaintiffs also filed a Freedom of Information Act request with the SEC for relevant, non-public documents; that request is now pending.

## NATURE OF THE ACTION AND OVERVIEW

2. This is a class action on behalf of persons and entities that purchased or otherwise acquired Jayud securities between April 21, 2023, and April 2, 2025, inclusive (the "Class Period"). Plaintiffs pursue claims against Jayud, Xiaogang Geng ("Geng"), Alan Tan Khim Guan ("Guan"), Lin Bao ("Bao"), Mengmeng Hu ("Hu"), Dun Zhao ("Zhao"), Feiyong Li ("Li"), Steven Gu ("Gu"), Jian Wang ("Wang"), and Jianhong Huang ("Huang") (collectively, the "Individual Defendants"), Charles Tjang ("Tjang"), Heng Lip Huat ("Heng"), Leo Reggan ("Reggan"), Richard Lau Lik Chai ("Lau"), Tang Kok Yong ("Tang"), Loh Lik Ren ("Loh"), and Tong Tien Seng ("Tong") (collectively, the "December Placement Defendants"), The Benchmark Company, LLC ("Benchmark"), Friedman, LLP ("Friedman"), and Marcum Asia CPAs, LLP ("Marcum

Asia") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

3. The Company was founded in 2009 and is incorporated as an offshore holding company in the Cayman Islands. Its principal place of business is located at Building 3, No. 7 Gangqiao Road, Li Lang Community, Nanwan Street, Longgang District, Shenzhen, China. The Company's Class A ordinary shares trade on the NASDAQ exchange under the symbol "JYD." Jayud claims to provide "leading" cross-border supply-chain solution services stewarded by a "visionary and experienced management team with a proven track record."

4. This securities class action arises out of a multi-phase pump-and-dump scheme orchestrated by Jayud's Founder, Controlling Shareholder, and CEO, Defendant Geng, with the participation of the Company's officers, the Company's underwriter, its outside auditors, and a network of insider-connected purchasers. The scheme proceeded in identifiable phases: first, Geng deliberately engineered a low-float corporate and capital structure before the IPO, rendering the stock highly manipulable. Then, when the Company went public, Geng promoted Jayud based on materially false and misleading statements that obscured the Company's true operating reality. After the IPO, Geng and others then stockpiled approximately 68.5 million discounted Class A shares in insider-connected hands. Once concentrated, a WhatsApp "investment" groups-driven campaign pumped the price from under US$1 per share to a closing high of US$7.97 per share, which insider-connected holders used to monetize their positions. Just as quickly, the stock suffered a sudden, aftermarket-hours collapse when the insider-connected holders dumped their remaining holdings, sparking panic-selling by retail investors who had bought during the pump, wiping out approximately 95% of the Company's market capitalization in a single trading session.

As a result, the Class, consisting of investors who acquired JYD securities at prices artificially inflated by Defendants' conduct, suffered substantial losses.

5. In the first phase, insiders built a control structure and concealed insider arrangements that left public investors unable to police later misconduct. Defendant Geng engineered the Company's pre-IPO corporate and capital structure so that he had exclusive control of voting power and pre-IPO cash distributions. On September 6, 2022, the pre-existing shareholders in China of Jayud's main operating subsidiary transferred their equity interests to a newly-formed Cayman Islands holding company in exchange for shares routed through three British Virgin Islands shell entities registered to a single Tortola address, all owned by Jayud insiders, including Geng. Under the Company's new 10-to-1 dual-class supervoting structure, Geng controlled 58.5% of pre-offering voting power but only 14.1% of pre-offering economic ownership through one of those Tortola shells. The day after the reorganization, Geng signed two related-party arrangements that the IPO Registration Documents did not disclose: (i) a September 7, 2022 Supplemental Agreement obligating the Company to pay the Initial Shareholders RMB 35 million in cash if the IPO closed within twelve months, which the Company paid in January and February 2023, before the F-1/A was filed; and (ii) a September 7, 2022 personal commitment letter signed by Geng undertaking either to raise or personally contribute at least US$6 million to the Company within 3 years after the IPO. In its August 12, 2024 response to a July 22, 2024 SEC Comment Letter, the Company conceded in writing that the RMB 35 million payment arrangement "should have been disclosed."

6. On April 21, 2023, Jayud went public, touting the Company's strong financial foundation and long-term prospects. In that IPO, Jayud sold only 1,250,000 Class A ordinary shares to the public (approximately 7% of total outstanding equity but less than 2% of voting

power) at an offering price built on materially false financials. The IPO Registration Documents touted Jayud as a "leading" Shenzhen-based logistics provider with "long-standing relationships with a wide and diversified customer base" and a "visionary and experienced management team with a proven track record." In reality, as Plaintiffs' forensic accountant has determined, the IPO's underlying financial statements painted a materially false picture of the Company's finances and prospects, including by omitting key self-dealing transactions and misstating or obscuring its income statement in an effort to inflate revenues at any cost. In the weeks and months right after the IPO, the Company continued to issue false and misleading financials to maintain the illusion the IPO presented. These post-IPO filings prolonged the false narrative by masking liquidity problems, going-concern risk, and accounting inconsistencies that would have undermined the market's trust in Jayud.

7. Jayud also selected gatekeepers with histories of abdicating their duties to protect investors from this kind of fraud. Jayud's auditors (Friedman, Marcum Asia, and Marcum LLP, parent of Marcum Asia and successor by acquisition to Friedman) have PCAOB inspection records of systemic audit-quality failures. Jayud's sole underwriter, Benchmark, is a small-cap FINRA-registered investment bank whose business model depends on underwriting Chinese foreign-private-issuer IPOs of exactly the type Jayud represented. In addition, Jayud's U.S. registered agent (Cogency Global) has served in that role for many China- and Hong Kong-based foreign-private-issuer registrants later subject to securities-fraud claims. Jayud also hired a suspect investor relations firm, Strategic Investor Relations LLC (led by Matthew Abenante, who was associated with at least two other Chinese small-cap NASDAQ issuers that experienced dramatic stock-price declines following the firm's engagement) to hype the stock.

8. Between September 2024 and December 2024 (the four months immediately

preceding the price run-up) Defendant Geng caused the Company to concentrate approximately 68.5 million additional Class A shares with entities or individuals connected with insiders at steep discounts to the then-prevailing market price. This stockpile was assembled in four discrete tranches: (a) US$800,000 in September 2024 convertible debentures priced at approximately 52% of volume-weighted average price ("VWAP") to two undisclosed investors (later converted to 2,069,382 Class A shares); (b) approximately 7,290,267 Class A shares issued in October 2024 as consideration in a series of insider-connected acquisition transactions; (c) an October 2024 unregistered private placement of 14,793,335 Class A shares at US$0.45 per share to three buyers already connected to Jayud's U.S. operations; and (d) a December 3, 2024 registered direct offering of 50,000,000 Class A shares at US$0.20 per share---with no underwriter, no placement agent, and no public market access, to seven previously-unknown Southeast Asian buyers whose Schedule 13G filings on February 4, 2025 exhibit striking pattern markers of coordinated "group" action under Section 13(d)(3) of the Exchange Act. The December placement alone doubled Jayud's outstanding share count overnight and materially financed Defendant Geng's personal recovery of approximately US$1 million in loans he had made to the Company in September and November 2024. The discounted placements created the supply side of the dump: a large block of cheap shares in connected hands that could be sold once retail demand was manufactured.

9. After this stockpile, JYD's share price was driven from around US$0.20 per share to a closing high of US$7.97 per share—a *4,000%* run-up over four months, with no public business catalyst. To the contrary, the H1 2024 Form 6-K disclosed that the Company's gross margin had moved from -0.4% to -1.0% and that the Company had recognized additional impairments of long-lived assets. Instead, the price action was driven by a coordinated promotion campaign in which impersonators posing as financial advisors touted JYD stock in WhatsApp

groups, providing explicit buy instructions and promising returns of 150% to 380%. On April 1, 2025, JYD reached a closing price high of US$7.97 per share.

10. Immediately after, on April 2, 2025, in a single day ***45.8 million*** Jayud shares were sold off at this artificially high price. As a result, the stock ***collapsed 95%*** in aftermarket hours, wiping out the bulk of public investors' capital in a single trading day. Tellingly, this 45.8 million volume figure approximated the entire 50-million-share December 2024 placement, indicating that the December 3, 2024 buyers exited their positions into the crash. Despite the magnitude of those dispositions, not one of the seven February 4, 2025 Schedule 13G filers has filed a Schedule 13G/A amendment reporting the sale of their holdings, suggesting that they were connected to Company insiders and coordinated their selling as a "group."

11. Shortly after the crash, analysts and industry commentators confirmed the Jayud scheme as a textbook pump-and-dump ploy. Penny-stock blogger Timothy Sykes published the article "Jayud Global (JYD): Another Penny Stock Pump-and-Dump Fail" identifying skyrocketing price with no business catalyst, massive insider ownership, and no institutional or analyst coverage as the defining markers, and Khac Phu Nguyen of GuruFocus catalogued Jayud as part of an industry-wide "$480 Million Scam Playbook" of Chinese microcap pump-and-dump frauds operating as WhatsApp impersonators of financial advisors.

12. Indeed, the pump-and-dump scheme alleged here was not an isolated incident. Federal prosecutors and the SEC have brought enforcement actions against the operators of two structurally identical pump-and-dump schemes targeting other Chinese-issuer NASDAQ stocks during the same general period: the China Liberal Education Holdings, Ltd. ("CLEU") pump-and-dump scheme (the subject of a federal indictment of five Malaysians and two Taiwanese defendants in conduct that closed roughly three months before the JYD scheme) and the Ostin

Technology Group Co., Ltd. ("OST") pump-and-dump scheme (a $110 USD million scheme the U.S. Attorney for the Eastern District of Virginia indicted on September 10, 2025 in *United States v. Zhao*, No. 1:25-cr-00259-MSN). Each features the same characteristic markers present here: a Cayman Islands holding company with operations in the People's Republic of China ("PRC"), an exceptionally thin pre-pump public float, a series of discounted private placements to insider-connected buyers, a fraudulent promotion campaign with no business catalyst, and a sudden, aftermarket-hours collapse following coordinated dumping. The regulatory response to those substantially identical schemes corroborates Jayud's scheme theory and rebuts any suggestion that the JYD price action was the product of ordinary market forces.

## JURISDICTION AND VENUE

13. The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). The Securities Act claims arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act. The Company's registered agent for service of process, Cogency Global Inc., is located at 122 East 42nd Street, 18th Floor, New York, NY 10168. Defendant Benchmark's principal office is located in New York. Defendants Friedman and Marcum Asia are located in New York. Substantial acts in furtherance of the alleged fraud, including the dissemination of materially false and misleading information and the execution of abusive and manipulative trading activity on the NASDAQ

exchange, occurred in this District.

16. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

**PARTIES**

17. Lead Plaintiff Karim Salem purchased Jayud Class A ordinary shares during the Class Period, as set forth in his previously filed certification (ECF No. 37-3), and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Plaintiff Robert Schuermann purchased Jayud Class A ordinary shares during the Class Period, as set forth in his previously filed certification (ECF No. 32-3), and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Jayud Global Logistics Limited is a Cayman Islands holding company with its principal executive offices located at Building 3, No. 7 Gangqiao Road, Li Lang Community, Nanwan Street, Longgang District, Shenzhen, China. Jayud's Class A ordinary shares trade on the NASDAQ Capital Market under the symbol "JYD." Jayud was the issuer of all securities at issue in this action and is the primary obligor for all claims asserted herein.

20. Defendant Xiaogang Geng served as the Company's Chief Executive Officer and, from December 2024, as Co-Chief Executive Officer, throughout the Class Period. Geng signed and certified the Company's IPO prospectus, the 2022 Form 20-F, the 2023 Form 20-F, and the 2024 Form 20-F, as well as the December 2024 registered direct offering prospectus supplement. Geng holds his equity stake in Jayud through Europa Investment Holding Limited, a British Virgin

Islands company wholly owned by him and registered at Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. As of the December 2024 offering, Geng held 1,000,000 Class A ordinary shares and 5,409,600 Class B ordinary shares, representing 58.5% of total voting power prior to that offering. Geng also loaned the Company approximately RMB 7,487,100 (approximately $1 million) in September and November 2024, which loans were repaid from the proceeds of the December 2024 registered direct offering.

21. Defendant Alan Tan Khim Guan ("Guan") served as the Company's Co-Chief Executive Officer from December 2024 until July 2025. Guan participated in the management and direction of the Company during the critical pre-crash period and had access to material non-public information about the Company's financial condition and the trading activity in its securities.

22. Defendant Lin Bao ("Bao") served as the Company's Chief Financial Officer until March 2025. Bao was responsible for the Company's financial reporting and public disclosures through that date, including during the period when the Company's going concern doubts were disclosed in private offering documents but not adequately disclosed in public annual reports.

23. Defendant Mengmeng Hu ("Hu") served as the Company's Chief Financial Officer from March 2025 onward, including during the crash of the Company's stock price in April 2025.

24. Defendant Dun Zhao ("Zhao") has served as a director and Chief Marketing Officer of Jayud since March 31, 2023, including throughout the entirety of the Class Period. Zhao signed the IPO Registration Statement on Form F-1, as filed on March 21, 2023 and as declared effective by the SEC on April 18, 2023, in his capacity as a director and Chief Marketing Officer of the Company. As a signatory of the IPO Registration Statement and a director of the Company at the time the IPO Registration Statement became effective, Zhao is a statutory defendant under

Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), for material misstatements and omissions contained in the IPO Registration Statement and is also a control person of the Company under Section 15 of the Securities Act, 15 U.S.C. § 77o. Zhao holds his equity stake in Jayud through James Webb Holding Limited, a British Virgin Islands company wholly owned by him and registered at Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands—the same Tortola address used by Defendant Geng's Europa Investment Holding Limited and Defendant Huang's Tucana Investment Holding Limited. As of the IPO, James Webb Holding Limited held 500,000 Class A ordinary shares, representing approximately 1.1% pre-offering economic ownership and 0.5% pre-offering voting power. Zhao is also identified by name in the IPO Registration Statement's related-party transactions note in connection with the Cargo Link Logistics HK Company Limited and Sky Pacific Logistics HK Company Limited relationships.

25. Defendant Jianhong Huang ("Huang") has served as Chief Operating Officer of Jayud since March 31, 2023, including throughout the entirety of the Class Period. Huang is identified in the IPO Registration Statement as the Company's Chief Operating Officer upon the registration statement's effectiveness. Huang holds her equity stake in Jayud through Tucana Investment Holding Limited, a British Virgin Islands company wholly owned by her and registered at Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands—the same Tortola address used by Defendant Geng's Europa Investment Holding Limited and Defendant Zhao's James Webb Holding Limited. As of the IPO, Tucana Investment Holding Limited held 3,600,000 Class A ordinary shares, representing approximately 7.9% pre-offering economic ownership and 3.8% pre-offering voting power, the second-largest pre-offering equity holding after Defendant Geng. By virtue of her senior officer position, her continuous stock ownership of Tucana

throughout the Class Period, and her common-address holding-entity structure with Defendants Geng and Zhao, Huang was at all relevant times a controlling person of Jayud within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o.

26. Defendant Feiyong Li ("Li") has served as a director of Jayud since March 31, 2023, including throughout the entirety of the Class Period. Li signed the IPO Registration Statement on Form F-1, as filed on March 21, 2023 and as declared effective by the SEC on April 18, 2023, in his capacity as a director. As a signatory of the IPO Registration Statement and a director of the Company at the time the IPO Registration Statement became effective, Li is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), for material misstatements and omissions contained in the IPO Registration Statement and is also a control person of the Company under Section 15 of the Securities Act, 15 U.S.C. § 77o.

27. Defendant Steven Gu ("Gu") has served as a director of Jayud since March 31, 2023, including throughout the entirety of the Class Period. Gu signed the IPO Registration Statement on Form F-1, as filed on March 21, 2023 and as declared effective by the SEC on April 18, 2023, in his capacity as a director. As a signatory of the IPO Registration Statement and a director of the Company at the time the IPO Registration Statement became effective, Gu is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), for material misstatements and omissions contained in the IPO Registration Statement and is also a control person of the Company under Section 15 of the Securities Act, 15 U.S.C. § 77o.

28. Defendant Jian Wang ("Wang") has served as a director of Jayud since March 31, 2023, including throughout the entirety of the Class Period. Wang signed the IPO Registration Statement on Form F-1, as filed on March 21, 2023 and as declared effective by the SEC on April 18, 2023, in his capacity as a director. As a signatory of the IPO Registration Statement and a

director of the Company at the time the IPO Registration Statement became effective, Wang is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), for material misstatements and omissions contained in the IPO Registration Statement and is also a control person of the Company under Section 15 of the Securities Act, 15 U.S.C. § 77o.

29. Defendant Charles Tjang ("Tjang") is an individual citizen of Indonesia residing in Singkawang, West Kalimantan, Indonesia. On December 4, 2024, Tjang acquired 6,000,000 Class A ordinary shares of Jayud (6.66% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Tjang filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Tjang is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

30. Defendant Heng Lip Huat ("Heng") is an individual citizen of Indonesia residing in Jakarta Timur, Indonesia. On December 4, 2024, Heng acquired 7,000,000 Class A ordinary shares of Jayud (7.77% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Heng filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Heng is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

31. Defendant Leo Reggan ("Reggan") is an individual citizen of Indonesia residing in

Singkawang, West Kalimantan, Indonesia. On December 4, 2024, Reggan acquired 6,000,000 Class A ordinary shares of Jayud (6.66% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Reggan filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Reggan is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

32. Defendant Richard Lau Lik Chai ("Lau") is an individual citizen of Malaysia residing in Sibu, Sarawak, Malaysia. On December 4, 2024, Lau acquired 8,000,000 Class A ordinary shares of Jayud (8.88% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Lau filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Lau is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

33. Defendant Tang Kok Yong ("Tang") is an individual citizen of Malaysia residing in Selangor, Malaysia. On December 4, 2024, Tang acquired 7,000,000 Class A ordinary shares of Jayud (7.77% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Tang filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Tang is named as a defendant on the First Claim for Relief

under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

34. Defendant Loh Lik Ren ("Loh") is an individual citizen of Malaysia residing in Sibu, Sarawak, Malaysia. On December 4, 2024, Loh acquired 8,000,000 Class A ordinary shares of Jayud (8.88% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Loh filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Loh is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

35. Defendant Tong Tien Seng ("Tong") is an individual citizen of Malaysia residing in Selangor, Malaysia. On December 4, 2024, Tong acquired 8,000,000 Class A ordinary shares of Jayud (8.88% of the then-outstanding Class A ordinary shares) in the Company's December 3, 2024 registered direct offering at the discounted purchase price of US$0.20 per share. On February 4, 2025, Tong filed a Schedule 13G with the SEC reporting that beneficial ownership, and has filed no Schedule 13G/A amendment since. Tong is named as a defendant on the First Claim for Relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as a primary violator on a scheme-liability theory and as a member of the coordinated Section 13(d)(3) group identified below.

36. Defendants Tjang, Heng, Reggan, Lau, Tang, Loh, and Tong are collectively referred to herein as the "December Placement Defendants." Each acquired Class A ordinary

shares of Jayud in the December 3, 2024 registered direct offering as one of seven coordinated Southeast Asian purchasers whose beneficial-ownership reports were filed together on February 4, 2025 in identical Schedule 13G template format, each reporting an identical December 4, 2024 event date and an identical outstanding-share denominator of 90,112,868 Class A ordinary shares, with share counts limited to round-million increments and reported percentages calibrated to visually uniform repeating-digit values (6.66%, 7.77%, 8.88%). Their combined beneficial ownership as of the December 4, 2024 event date---50,000,000 Class A ordinary shares, equal to 55.49% of the then-outstanding Class A ordinary shares—constituted a controlling-block-sized stake that, if held by a Section 13(d)(3) "group," would have required filing on a single joint Schedule 13D rather than seven separate Schedule 13Gs, with corresponding group-designation and Joint Filing Agreement disclosures. The pattern of their acquisitions and filings supports the inference that the December Placement Defendants acted as a "group" within the meaning of Section 13(d)(3) of the Exchange Act, 15 U.S.C. § 78m(d)(3), in coordinated participation in the scheme to acquire and resell discounted Jayud shares.

37. Defendants Geng, Guan, Bao, Hu, Zhao, Huang, Li, Gu, and Wang are collectively referred to herein as the "Individual Defendants." Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other public statements. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Each Individual Defendant knew or recklessly disregarded the adverse facts specified herein.

38. Defendant The Benchmark Company, LLC ("Benchmark") is an investment

banking and securities firm with its principal offices at 150 East 58th Street, 17th Floor, New York, NY 10155. Benchmark served as the sole underwriter of Jayud's April 2023 IPO. As underwriter, Benchmark conducted due diligence on Jayud and consented to its name appearing as underwriter in the IPO registration statement and prospectus. Benchmark is named as a defendant solely with respect to the Section 11 claim arising out of the IPO registration statement.

39. Defendant Friedman, LLP ("Friedman") is an accounting firm formerly located at 1700 Broadway, New York, NY 10019. Friedman served as Jayud's independent registered public accounting firm and issued unqualified audit opinions on the Company's consolidated financial statements for fiscal years 2020 and 2021. Those audit opinions were incorporated into the IPO registration statement and the June 2024 shelf registration statement on Form F-3. Friedman consented to the incorporation of its audit report in the F-3 shelf registration statement by filing a signed consent dated May 24, 2024.

40. Defendant Marcum Asia CPAs, LLP ("Marcum Asia") is an accounting firm with its registered business address at 7 Penn Plaza, Suite 830, New York, NY 10001. Marcum Asia served as Jayud's independent registered public accounting firm from December 2022 until July 2025 and issued unqualified audit opinions on the Company's consolidated financial statements for fiscal years 2022, 2023, and 2024. Those audit opinions were incorporated into the June 2024 shelf registration statement on Form F-3, and the December 2024 registered direct offering prospectus supplement. As Jayud's auditor, Marcum Asia had continuous access to the Company's confidential internal, corporate, financial, operating, and business information.

41. Defendants Friedman and Marcum Asia are collectively referred to herein as the "Auditor Defendants."

42. Defendant Cogency Global Inc. ("Cogency Global") is a registered agent services

company with its principal offices at 122 East 42nd Street, 18th Floor, New York, NY 10168. Cogency Global served as Jayud's registered agent for service of process in the United States and is identified as such in both the IPO Registration Statement on Form F-1 and the Shelf Registration Statement on Form F-3. Colleen De Vries, an employee and Senior Vice President of Cogency Global, is identified as Jayud's authorized U.S. representative in both registration statements and signed both the IPO Registration Statement and the Shelf Registration Statement on behalf of Jayud in that capacity. By permitting its employee to sign those registration statements and by serving as Jayud's U.S. representative in connection with those public offerings, Cogency Global participated directly in the offering process and is subject to liability under Sections 11 and 15 of the Securities Act for material misstatements and omissions contained therein. Cogency Global is named as a defendant solely with respect to the Section 11 and Section 15 claims.

43. Defendant Colleen De Vries ("De Vries") is a Senior Vice President of Cogency Global Inc. De Vries served as Jayud's authorized U.S. representative and signed the IPO Registration Statement on Form F-1 and the Shelf Registration Statement on Form F-3 in that capacity, making her a statutory signatory under Section 11 of the Securities Act, 15 U.S.C. § 77k(a)(1). As a signatory to both registration statements, De Vries bears strict liability under Section 11 for material misstatements and omissions contained therein, without regard to scienter. De Vries is named as a defendant solely with respect to the Section 11 and Section 15 claims.

44. Benchmark, Friedman, Marcum Asia, Cogency Global, and De Vries are collectively referred to herein as the "Offering Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Before The IPO, The Insiders Engineered Jayud's IPO with Less Than 2% Public Voting Power to Make the Stock Manipulable.

45. Jayud's insiders built the Company's IPO structure to leave public investors with

minimal voting power while insiders retained control over the shares, cash flows, and disclosures that made later manipulation possible.

46. Before the IPO, Defendant Geng primed Jayud for price manipulation by engineering the Company's corporate and capital structure to exclusively control the Company's voting power and cash flow. As set forth below, the September 2022 reorganization concentrated voting control in three British Virgin Islands ("BVI") shell holding entities registered to a single Tortola address; the April 2023 IPO sold only 1.25 million Class A shares to the public, accounting for approximately 7% of total outstanding equity but less than 2% of voting power. On the day after the reorganization, Defendant Geng signed two related-party arrangements, one a Supplemental Agreement obligating the Company to pay the Initial Shareholders (as defined below) RMB 35 million if the IPO closed within twelve months, and a second, personal commitment letter undertaking Geng to raise or contribute US$6 million to Jayud within 3 years of the IPO. Neither of those agreements were disclosed in the IPO Registration Documents—an omission the Company has since conceded to the SEC should have been disclosed.

### A. The September 2022 Reorganization Concentrated Voting Control in Three BVI Holding Entities at a Common Tortola Address Owned by Jayud Insiders.

47. On September 6, 2022, the pre-existing PRC shareholders of Shenzhen Jayud Logistics Technology Co., Ltd., the Company's main operating subsidiary (the "Initial Shareholders"), transferred their equity interests to Jayud Global Logistics (Hong Kong) Limited in exchange for 15,829,600 ordinary shares of the newly-formed Cayman Islands holding company, Jayud Global Logistics Limited.

48. The September 6, 2022 reorganization was structured to concentrate voting control in three British Virgin Islands shell holding entities, each registered to the same Tortola address

(Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands), that were 100% owned by Jayud insiders:

(1) Europa Investment Holding Limited (100% owned by Defendant Geng) held 1,000,000 Class A ordinary shares and 5,409,600 Class B ordinary shares. Under the Company's 10-to-1 dual-class supervoting structure. Class B carries ten votes per share, and Class A carries one. Thus, Europa's holdings translated to 58.5% of pre-offering voting power on only 14.1% pre-offering economic ownership.

(2) Tucana Investment Holding Limited (100% owned by Defendant Jianhong Huang) held 3,600,000 Class A ordinary shares (a 7.9% pre-offering economic ownership; 3.8% pre-offering voting power).

(3) James Webb Holding Limited (100% owned by Defendant Dun Zhao) held 500,000 Class A ordinary shares (a 1.1% pre-offering economic ownership; 0.5% pre-offering voting power).

49. Defendant Geng's pre-offering voting concentration of 58.5% on 14.1% economic ownership is documented in the December 3, 2024 Form 424B5 prospectus supplement's Principal Shareholders table. By design, the 10-to-1 Class B supervoting structure delivered Defendant Geng nearly absolute pre-offering voting control of the Company while exposing him to a fraction of its economic risk. Public investors who purchased Class A ordinary shares in the IPO acquired no meaningful voting power to challenge management decisions and no governance lever capable of constraining Defendant Geng's subsequent conduct. Thus, control was separated from economic risk, allowing insiders to dominate corporate decisions while public investors later bore the downside.

### B. Defendant Geng Signed Two September 7, 2022 Insider Arrangements That the IPO Documents Concealed.

50. The day after the reorganization, on September 7, 2022, Defendant Geng signed two separate insider arrangements, neither of which was disclosed in the IPO Registration Statement, the IPO prospectus, or the 2022 Form 20-F filed three weeks after the IPO.

51. First, Defendant Geng signed a Supplemental Agreement between the Company

and the Initial Shareholders obligating the Company to pay the Initial Shareholders RMB 35,000,000 in cash if (and only if) the IPO was successfully completed within twelve months of the September 6, 2022 reorganization. As Jayud subsequently admitted to the SEC, the Company made the RMB 35,000,000 payment in January and February 2023, "in anticipation of the imminent completion of the IPO," before the F-1/A was filed on March 21, 2023.

52. Second, Defendant Geng executed a personal commitment letter as Controlling Shareholder, undertaking either (i) to assist the Company in raising at least US$6 million within 36 months after the IPO, or (ii) to personally contribute at least US$6 million to the Company and its subsidiaries for operational use without receiving any consideration in return.

53. Defendant Geng was the Controlling Shareholder of JYD WLKJ (Shenzhen Jayud Logistics Technology Co., Ltd.) before the September 6, 2022 reorganization. On information and belief, by reason of that controlling position, Defendant Geng was himself among the Initial Shareholders who received both the new Cayman holding-company shares in the reorganization and a share of the RMB 35,000,000 payment that the Company made in January and February 2023 "in anticipation of the imminent completion of the IPO." The Company has at no point disclosed the individual identities of the Initial Shareholders who received the RMB 35,000,000 payment, despite an express SEC request for those identities.

54. On July 22, 2024, the SEC's Division of Corporation Finance issued a Comment Letter to the Company demanding that the Company explain the reorganization payments, identify their recipients, and confirm whether any additional payments might be owed. In its August 2 and August 12, 2024 written responses, the Company conceded that the RMB 35,000,000 payment arrangement "should have been disclosed" in the F-1/A and in the 2022 Form 20-F, agreed to file an amended 2023 Form 20-F renaming the payment from "reorganization payment" to "Payment

to the Initial Shareholders," and committed to disclose for the first time Defendant Geng's separate $6 million personal commitment letter. The Company filed the 2023 Form 20-F/A on September 23, 2024, which was seventeen months after the IPO and over two years after Defendant Geng had signed both September 7, 2022 arrangements.

55. Defendant Geng's deliberate concealment of both September 7, 2022 arrangements from the IPO documents and his deliberate non-disclosure of his individual identity as a recipient of the RMB 35,000,000 payment, combined with the SEC's forced extraction of the corrective disclosure in September 2024, establish that the Company's pre-IPO disclosure framework was systematically incomplete with respect to insider-self-dealing arrangements involving Defendant Geng.

### C. The April 2023 IPO Sold Only 1.25 Million Class A Shares to the Public — Approximately 7% of Total Outstanding Equity but Less Than 2% of Voting Power.

56. On April 18, 2023, the SEC declared the Company's Form F-1 Registration Statement effective. On April 21, 2023, Jayud completed its initial public offering at $4.00 per share, selling only 1,250,000 Class A ordinary shares to the public (the "IPO"). Benchmark served as sole underwriter.

57. The IPO's 1,250,000-share float represented approximately 7% of the Company's total outstanding ordinary shares immediately after the IPO closed, however, because of the Class B 10-to-1 supervoting structure, the IPO shares represented less than 2% of the Company's total voting power. The combination of (a) a deliberately small public float, (b) a 10-to-1 dual-class supervoting structure, and (c) BVI holding-entity ownership through entities at a common offshore address was the structural foundation for the manipulation that followed. Indeed, a thin float is uniquely susceptible to price manipulation because even modest coordinated buying or

selling pressure produces explosive price movements. Thus, the supervoting structure ensured that the public investors who later absorbed the manipulation's losses had no governance mechanism to challenge the insider conduct that produced it.

## II. **<u>During the IPO, Defendant Geng Touted Jayud's Long-Term Success While Obfuscating the Company's Poor Financial Performance</u>.**

58. Having engineered the corporate and capital structure described above, Defendants then exploited that structure by selling the IPO on a false picture of the Company's business and finances. The Company then continued to suffer more financial strain incongruous to the strong foundational finances outlined in the IPO Offering.

### A. The Offering Documents Touted Jayud's Strong Financial Position, Customer Base, and Growth Potential.

59. In connection with the April 21, 2023 IPO, the Company filed on March 21, 2023 a Form F-1/A Pre-Effective Amendment to its registration statement (the "F-1/A"), and on April 21, 2023 a final prospectus filed pursuant to Rule 424(b)(4) (the "Prospectus" and, together with the F-1/A, the "IPO Registration Documents"). The IPO Registration Documents were signed by Defendant Geng on behalf of the Company; incorporated an audit report issued by Defendant Friedman (for the fiscal year 2020 and 2021 financial statements) and were underwritten by Defendant Benchmark.

60. The Prospectus characterized Jayud as "one of the leading Shenzhen-based end-to-end supply chain solution providers in China," and represented that the Company had "long-standing relationships with a wide and diversified customer base" and a "visionary and experienced management team with a proven track record." As the Prospectus lauded, "the global end-to-end cross-border supply chain solution market experienced a soaring growth during the past two years," and "[i]n line with this increase, [the Company] experienced a rapid growth in 2020

and 2021 as well as the six months ended June 30, 2022."

61. The Prospectus listed impressive revenue statistics showcasing this meteoric rise:

> Our gross profit increased by RMB19.1 million, or 161.4%, from RMB11.8 million for the six months ended June 30, 2021 to RMB30.9 million (US$4.6 million) for the six months ended June 30, 2022. Our gross profit increased by RMB13.5 million, or 64.1%, from RMB21.0 million for the year ended December 31, 2020 to RMB34.5 million (US$5.4 million) for the year ended December 31, 2021.
>
> Our revenue generated from end-to-end crossborder logistics services increased from approximately RMB98.9 million for the six months ended June 30, 2021 to approximately RMB332.7 million (US$49.6 million) for the six months ended June 30, 2022, representing a period-to-period increase of 236.5%.
>
> Our revenue generated from end-to-end cross-border logistics services increased from approximately RMB210.8 million for the year ended December 31, 2020 to approximately RMB390.2 million (US$61.2 million) for the year ended December 31, 2021, representing a year-on-year increase of 85.1%.

**B. Unknown to Investors, The Offering Documents Misrepresented The Financial Strength, Growth Potential, and Risk of Insider Enrichment Underlying Jayud's Business**

62. Unknown to investors, however, Jayud's business prospects were built on a false foundation that obscured its true, poor financial condition. Before and after Jayud's IPO, the Company hid serious problems with its business, including insider payments, related-party transactions, weak cash flow, accounting problems, and even doubts about whether the Company could continue operating

<u>1. Jayud Hid RMB 35 Million Initial Shareholders Payment and the $6 Million Geng Commitment Letter.</u>

63. The IPO Registration Documents touted the fact that the Company was well capitalized as of June 30, 2022 as a result of receiving RMB 24,680,000 from two of its shareholders (Defendant Geng and his spouse, Xiaohua Jia). However, IPO Registration Documents failed to disclose the September 7, 2022 Supplemental Agreement obligating Jayud to

pay the Initial Shareholders RMB 35,000,000 within twelve months of the IPO closing and that the Company had made the RMB 35,000,000 payment in January and February 2023 before the F-1/A was filed on March 21, 2023.

64. The omission was material: a reasonable IPO investor evaluating Jayud's liquidity, related-party arrangements, and management's alignment with public-investor interests would have considered material the fact that approximately RMB 35,000,000 (which the Company coincidentally touted as the size of Shenzhen Jayud Logistics Technology Co., Ltd.'s total paid-in), had recently been paid out of the Company's cash to the same Initial Shareholders who were retaining controlling voting interests through the BVI holding entities.

65. The IPO Registration Documents likewise omitted disclosure of Defendant Geng's September 7, 2022 personal commitment letter---a contingent, personal undertaking by the Controlling Shareholder for up to $6 million in personal contributions to the Company.

66. The omitted commitment was material because (a) it constituted a contingent personal liability of the Controlling Shareholder, the existence of which was relevant to a reasonable investor's assessment of the Company's financial dependence on its Controlling Shareholder; and (b) it was one of several pre-IPO arrangements between the Company and Defendant Geng, alongside the RMB 35 million Initial Shareholders payment, that the Company structured and chose not to disclose to the investing public until SEC intervention forced disclosure.

67. On July 22, 2024, the Company received a comment letter from the SEC questioning the Company's disclosures of the reorganization payments totaling RMB 35 million:[1]

> Please revise your disclosures to clarify whether the reorganization payments made in January and February 2023 correspond to the reorganization payments mentioned in referring to the acquisition of JYD WLKJ by JYD HK, stating the

[1] The SEC also questioned the Company's assessment of its going concern in its 2023 Form 20-F.

transaction "resulted in payment of RMB 35Mil for share purchase from initial shareholders."

**Tell us why this transaction is not mentioned in the corresponding disclosures about the reorganization on page F-10 of the Form F-1/A filed on March 21, 2023, or page F-8** of the Form 20-F filed on May 15, 2023, and if settlement did not occur until 2023, why you did not report a reorganization payment liability on the balance sheets that were presented on a combined/common control basis for dates prior to settlement.

Please submit the accounting and disclosure revisions that you propose to provide clarification or to otherwise address the concerns outlined above and that would provide the following additional information.

• The terms of the arrangements under which reorganization payments were made, including the extent to which reorganization payments constitute a return of principal on loans made to the company or its subsidiaries by investors, return of capital related to prior equity investments, or share purchase consideration.

• The terms that would govern any incremental payments to shareholders or prior investors, regardless of the manner by which the payments would be characterized, or clarification if there are no other arrangements that could reasonably result in additional payments, other than in settlement of liabilities that have been appropriately recognized and reported in your financial statements.

• The identities of the recipients of the reorganization payments along with an indication of their relationship with the consolidated entity and its consolidated subsidiaries, to include the extent of any ongoing ownership interests and any change in their interests made in conjunction with the reorganization payments. [Emphasis added.]

68. In its response, the Company admitted that the reorganization payments should have been disclosed as a subsequent event in the Form F-1/A:

**The Company acknowledges that it should have disclosed the RMB 35 million payment arrangements in Note 17, "Subsequent Events," of the Form F-1/A filed on March 21, 2023,** and in the Form 20-F filed on May 15, 2023. The Company proposes the following revisions in the 2023 Form 20-F Amendment:

- To rename the RMB 35 million payment from "reorganization payment" to "Payment to the Initial Shareholders" throughout the document to avoid confusion;
- To revise the description of "Financing activities" on page 91 of the 2023 Form 20-F as follows:

***In September 2022, Jayud Global Logistic (Hong Kong) Limited ("JYD HK") directly invested in Shenzhen Jayud Logistics Technology Co., Ltd. ("JYD WLKJ") as its direct wholly-owned subsidiary. On September 6, 2022, the Company and the shareholders of JYD WLKJ, collectively referred to as the "Initial Shareholders," entered into certain reorganization agreements (the "Agreements"). On September 6, 2022, the Initial Shareholders transferred their equity interests in JYD WLKJ to JYD HK, a wholly owned subsidiary of the Company in exchange for 15,829,600 ordinary shares issued by the Company to the Initial Shareholders.***

***Therefore, September 6, 2022, was established as the date on which the reorganization was completed.***

***The Company entered into a supplemental agreement (the "Supplemental Agreement") with the Initial Shareholders on September 7, 2022. This Supplemental Agreement stipulated that if the IPO was successfully completed within one year of the reorganization date, the Company would pay RMB 35 million to the Initial Shareholders; otherwise, no payment would be made.***

***In January and February 2023, anticipating the imminent completion of the IPO, the Company voluntarily settled and made the payment of RMB 35 million to the Initial Shareholders pursuant to the Agreements and the Supplemental Agreement. There are no other arrangements that could reasonably result in additional payments beyond those related to liabilities that have been appropriately recognized and reported in the financial statements.***

- To add the description in the third paragraph of "Liquidity and Capital Resources" on page 88 of the 2023 Form 20-F as follows:

***On September 7, 2022, the Controlling Shareholder of the Company signed a commitment letter agreeing to assist the Company in raising at least $6 million within 36 months after the IPO. Otherwise, he would contribute at least $6 million to the Company and its subsidiaries for operational use without receiving any consideration.***

[Emphasis added and in the original.]

69. The materiality framework, which is primarily summarized in the SEC Staff Accounting Bulletins 99, focuses on whether there is a substantial likelihood that a reasonable investor would consider the omitted information important. As Plaintiffs' forensic accountant concluded, omission of the disclosure of the RMB 35 million transfer was material because it hid from investors the fact that, at the time of the offering, the Company was not as well capitalized as the IPO Registration Documents presented it to be. In fact, the substantial "Capital injection"

made into the Company during the first half of 2022 by its Initial Shareholders turned out to be part of a circular transaction and had already been paid back to the same Initial Shareholders. But for the SEC comment letter, investors stood no chance of connecting the dots and identifying this circular transaction. The subsequently filed September 1, 2023 H1 2023 Form 6-K did not include a statement of cash flows or a statement of changes in shareholders equity where such transactions would have been presented. Moreover, the H1 2023 Form 6-K omitted any meaningful disclosures. Furthermore, in addition to omitting the required disclosures, the originally filed 2023 Form 20-F, depicted the RMB 24,680,000 "Capital injection" as a 2022 event and the RMB 35 million repayment as an unrelated 2023 event seemingly funded by the proceeds from issuance of new IPO shares

70. Hiding the controlling shareholder's commitment to assist the Company in raising $6 million or himself contributing this amount to the Company was also a material omission because it deprived the IPO investors from having a complete picture of the Company's capital structure and liquidity. Jayud thus failed to disclose a major pre-IPO cash payment to prior owners and a separate insider financing commitment that bore directly on liquidity, self-dealing, and the true purpose of the IPO.

<u>2. Jayud Obscured RMB 402.8 Million in Cumulative Related-Party Losses.</u>

71. The Company's financial statements for fiscal years 2020 through June 2022 included in the IPO Registration Documents disclosed related-party transactions in aggregated form without revealing the material economic reality that the Company was sustaining substantial losses on related-party business year after year. Jayud reported:

| **Year** | **Revenues – related parties** | **Cost of revenues – related parties** | **Gross profit (loss) from related parties** |
|---|---|---|---|
| 2020 | 28,587,482 | 159,273,345 | 28,587,482 – 159,273,345 = **(130,685,863)** |
| 2021 | 14,141,548 | 193,046,047 | 14,141,548 – 193,046,047 = **(178,904,499)** |
| H1 2022 | 240,885 | 93,435,340 | 240,885 – 93,435,340 = **(93,194,455)** |
| Total | | | **(402,784,817)** |

72. As Plaintiffs' forensic accountant found, crucially, the Company did not segregate third-party from related-party revenues and cost of revenues on the income statement in the IPO Registration Documents as required by Regulation S-X Rule 4-08(k); the related-party losses were buried in related-party footnotes. Jayud first segregated third-party and related-party revenues and cost of revenues on the face of the income statement only in the 2022 Form 20-F filed May 15, 2023, i.e., after the IPO had closed. A reasonable IPO investor reading the F-1/A would have understood the Company's aggregate top-line revenue figures to reflect arm's length commercial activity---not knowing it included revenues from related parties generated at substantial economic loss to the Company year after year.

73. As a growth-oriented logistics Company establishing its track record in the public markets, Jayud's reported revenue levels and revenue growth rates played an outsized role in how the market assessed Jayud's scale, competitive position, and prospects. Key performance

indicators, covenant calculations, and benchmarking against peers often rely on revenue figures alone, so inflating revenues would mislead investors about the Company's competitive position and business momentum. Therefore, presenting an obscured reality of Jayud's revenues materially misstated the Company's financial statements by creating a significant misrepresentation of the Company's scale and growth that a reasonable investor would consider important.

74. Moreover, during the six months ended June 30, 2022 (during the immediate pre-IPO period) the Company paid approximately RMB 40 million to Cargo Link Logistics HK Company Limited ("Cargo Link"), an entity the IPO Registration Documents identified as a related party in the related-party transactions footnote. The H1 2022 Consolidated Statement of Cash Flows presented this approximately RMB 40 million outflow within an aggregated line item for "Accounts payable--related parties" without identifying Cargo Link as the counter-party to that payment or quantifying the portion of the aggregated line attributable to Cargo Link. While investors could see that Cargo Link existed and was related, but could not discern that RMB 40 million in cash had moved to Cargo Link in the six months immediately before the IPO.

### 3. The Company Understated the Allowance for Credit Losses, Thus Inflating Net Income.

75. Plaintiffs' forensic accountant also concluded that the Company's pre-IPO allowance for credit losses, as included in the IPO Registration Documents, was materially understated. The 2022 Form 20-F reported a provision for credit losses of approximately RMB 0.9 million for fiscal year 2022, which was already twice the provision reported in the prior year. The rate of allowance for doubtful account as compared to accounts receivable increased more than four times from 0.7% to 0.8% at the end of 2020 and 2021 to the end of 2022. The 2023 Form 20-F reported, for fiscal year 2023, a provision for credit losses of RMB 18.2 million, representing nearly a *twentyfold increase* from the prior year.

76. The 2023 charge consisted in significant part of items for which the Company should have already been providing an allowance for doubtful accounts in the prior periods: RMB 3.4 million for accounts receivable with aging over 180 days, RMB 6.2 million for additional overdue accounts receivable, and RMB 3.8 million for a loan from a third party. The Company needed to record higher provision for credit losses to make up for understating its allowance for doubtful accounts for pre-IPO periods.

77. The magnitude of just how much Jayud understated its allowance for doubtful accounts becomes readily apparent when comparing the allowance for doubtful accounts and credit losses between IPO Registration Documents and post-IPO filings:

| | Pre-IPO Information | | |
|---|---|---|---|
| **Description** | **31-Dec-20** | **31-Dec-21** | **30-Jun-22** |
| Accounts receivable (gross) | ¥34,635,967 | ¥88,228,296 | ¥55,451,419 |
| Allowance for doubtful accounts | (240,199) | (682,905) | (810,188) |
| Accounts receivable, net | ¥34,395,768 | ¥87,545,391 | ¥54,641,231 |
| Allowance as % of gross AR | 0.7% | 0.8% | 1.5% |

| | Post-IPO Information | | |
|---|---|---|---|
| **Description** | **31-Dec-22** | **31-Dec-23** | **31-Dec-24** |
| Accounts receivable (gross) | ¥32,098,662 | ¥51,478,092 | ¥57,799,537 |
| Allowance for doubtful accounts | (1,185,328) | (10,196,104) | (19,102,954) |
| Accounts receivable, net | ¥30,913,334 | ¥41,281,988 | ¥38,696,583 |
| Allowance as % of gross AR | 3.7% | 19.8% | 33.1% |

78. The Company's failure to record an appropriate allowance for credit losses in 2022 and in the prior periods incorporated into the IPO Registration Documents inflated reported net income for those periods at the expense of post-IPO periods. If Jayud had reserved only 10% of its gross receivables (half of the rate of allowance for doubtful account at the end of 2023), it would have had to record an additional RMB 3.2 million provision for credit losses in 2020 and a

RMB 4.9 million additional provision in 2021. Such charges would have reduced Jayud's 2020 and 2021 pre-tax income by 68.8% and 41.2%, respectively. Therefore, Jayud's failure to record the appropriate provision for allowance for credit losses was material to the audited financial statements included in the IPO Registration Documents, rendering such financial statements materially misstated.

4. Jayud Based Its 2021 Revenues on Supplier Invoices the Chinese Tax Authorities Subsequently Determined Were "Forged."

79. On March 21, 2025, nearly two years after the IPO closed, the Company disclosed on Form 6-K that Chinese tax authorities had issued Tax Matter Notices to Shenzhen Jia Yu Da Trading Co., Ltd. ("JYD SM") seeking the recovery of refunded and exempted tax payments of approximately RMB 10.77 million attributable to fiscal year 2021. On April 22, 2025, the Company's Form 20-F for the fiscal year ended December 31, 2024 (the "2024 Form 20-F") disclosed that the Tax Matter Notices covered fiscal years 2018 and 2021, and that the basis for the clawback was, in the Company's own words, that "the VAT invoices issued by certain third-party supplier are forged."

80. Chinese export VAT refunds are issued for documented international trading transactions. A tax-bureau clawback based on the determination that the supplier invoices supporting the refunds were "forged" indicates either (a) that the underlying export transactions were fictitious or substantially overstated, or (b) that the reported revenues were backed by fraudulent documentation. On information and belief, the RMB 10.77 million in clawed-back refunds relates to revenue recognized in JYD SM's 2021 financial statements; those 2021 financial statements were certified by Defendant Friedman and incorporated into the IPO Registration Documents. The 2024 Form 20-F's "forged" VAT invoices admission acknowledges that the basis for the IPO-anchor 2021 export revenues was, in significant part, false.

81. As Plaintiffs' forensic accountant concluded, to the extent the underlying 2021 export transactions were fictitious or inflated, the 2021 revenue, gross profit, and net-income figures reported in the IPO Registration Documents were materially overstated, and the corresponding contingent liability for refund recovery should have been disclosed in the IPO Registration Documents under ASC 450-20. This information goes to the reliability of the historical revenues and tax refunds investors used to evaluate Jayud's IPO and whether the Company had a contingent liability that should have been disclosed, all of which bears critically on Jayud's financial foundation. Thus, investors were unaware of a sizeable contingency which existed at the time of the IPO. Using the SAB 99 framework for evaluating omissions and misstatements, such significant omission would likely impact the judgment of a reasonable investor and its absence rendered the IPO Registration Documents' financial statements materially misstated.

5. Jayud Omitted Disclosure of the Manipulation-Enabling Capital Structure and Subsequent Placements.

82. The IPO documents did not warn investors that Jayud's low-float, supervoting structure, and the later discounted placements made the Company's stock particularly (and deliberately) susceptible to manipulation. The Registration Documents disclosed the basic share counts (1,250,000 Class A sold to the public; insider control through Class B supervoting shares and three commonly-addressed BVI holding entities at Wickhams Cay II, Road Town, Tortola), and general risks about low-float, Chinese-issue stocks, but failed to disclose either that this engineered low-float and / 10:1 supervoting structure (combined with the undisclosed related party self-dealing and false financials) made the Company uniquely susceptible to price manipulation, or that Jayud insiders intended to place tens of millions of additional shares with undisclosed investors at deep discounts in the months following the IPO—conduct Jayud insiders carried out

through the September, October, and December 2024 placements totaling 68.5 million Class A ordinary shares to insider-connected individuals and entities at prices as low as $0.20. Investors, however, were not told that the same structure being sold as ordinary corporate governance created the conditions for later share concentration and price manipulation.

6. Defendant Friedman's Audit of the 2020 and 2021 Financial Statements Failed to Detect or Disclose the Foregoing.

83. Defendant Friedman audited the Company's consolidated financial statements for the fiscal years 2020 and 2021 included in the IPO Registration Documents and consented to incorporation of its audit report into the IPO Registration Documents. However, Defendant Friedman failed to identify or disclose the pre-IPO financial-statement and subsequent-event problems.

84. As Plaintiffs' forensic accountant concluded, Defendant Friedman's opinion was materially false and misleading because the 2020 and 2021 financial statements it certified were themselves materially misleading in the respects alleged above, including the undisclosed subsequent events (reorganization agreements with the Initial Shareholders and controlling shareholder's commitment letter),[2] buried related-party revenues and losses, the understated allowance for credit losses (confirmed by the rate of allowance for doubtful accounts for accounts receivable increasing more than four times and provision for credit losses doubling in 2022 as compared to 2021, followed by nearly a twentyfold 2023 catch-up provision for credit losses compared to 2022), and the prepaid-expenses and other current asset presentation in violation of GAAP.

[2] PCAOB standards define subsequent events as events or transactions which occur subsequent to the balance-sheet date [December 31, 2021], but prior to the issuance of the financial statements [September 21, 2022, the date of Friedman's audit opinion], that have a material effect on the financial statements and therefore require adjustment or disclosure in the financial statements. PCAOB AS 2801.01.

85. As stated, the Company admitted that it failed to disclose the reorganization payments totaling RMB 35 million in the Subsequent Events note to the 2021 (and the June 30, 2022 unaudited) financial statements. Friedman had the responsibility to update its subsequent-events procedures to a date as close as reasonably practicable to the registration statement's effective date or the relevant incorporation-by-reference date, as required by PCAOB Auditing Standard 4101, Responsibilities Regarding Filings Under Federal Securities Statutes.

86. Friedman thus further failed to perform the required procedures for auditing related-party transactions and the subsequent-events procedures, including subsequent events procedures for filings under federal securities statutes, required by PCAOB AS 2410, AS 2801, and AS 4101 that would have disclosed to investors the January and February 2023 RMB 35,000,000 Payment to the Initial Shareholders as subsequent events in the IPO Registration Documents.

87. Friedman's clean audit opinions thus gave credibility to the same financial statements and omissions that formed the false basis for the IPO. As a result, investors were not told the facts necessary to judge whether Jayud's reported growth, liquidity, and profits were real, sustainable, or tainted by related-party and accounting issues.

7. Other IPO Gatekeepers Failed Investors.

88. Defendant Benchmark, as Jayud's sole underwriter, and Defendants Cogency Global Inc. and Colleen De Vries, as Jayud's registered agent and authorized U.S. representative, failed to perform the statutory gatekeeper role the Securities Act assigned to each.

89. Defendant Benchmark served as the sole underwriter of Jayud's April 21, 2023 IPO. As sole underwriter, Benchmark was identified by name in the IPO Registration Statement and the final prospectus, consented to that identification, and sold Jayud's Class A ordinary shares to the public on the basis of the IPO Registration Statement. As the only underwriter and the only

investment-banking firm responsible for verifying the offering documents' accuracy, Benchmark cannot defer to any co-managing or syndicate underwriter and bore the full underwriter due-diligence obligation.

90. Each of the foregoing material misstatements and omissions was detectable through customary underwriter due-diligence procedures available to Benchmark in advance of the IPO. By consenting to the use of its name as sole underwriter, and by selling the IPO Class A shares to the public on the basis of an IPO Registration Statement containing material misstatements and omissions that ordinary underwriter due-diligence would have identified, Benchmark put the misstatements before the investing public. Benchmark cannot, on the facts alleged here, satisfy its burden under Section 11(b)(3)(A) of the Securities Act to establish the affirmative defense that it "after reasonable investigation, [had] reasonable ground to believe and did believe" that the IPO Registration Statement's statements were true and that no material fact had been omitted.

91. A reasonable underwriter in Benchmark's position would have performed the customary underwriter due-diligence review of the offering documents, the Company's financial records, and publicly available corporate-registry information sufficient to identify, challenge, and require correction of each of the material misstatements and omissions identified. On information and belief, Benchmark failed to perform that review.

92. Defendants Cogency Global and De Vries served, respectively, as Jayud's registered agent for service of process in the United States and as Jayud's authorized U.S. representative for purposes of the IPO. Defendant De Vries signed the IPO Registration Statement on Form F-1, as well as the June 2024 Shelf Registration Statement on Form F-3, in her capacity as Jayud's authorized U.S. representative. Cogency Global, as the registered-agent and corporate-services entity whose employee (De Vries) signed the IPO Registration Statement in that capacity

and whose name and role appear in the IPO Registration Statement, participated in the offering process and is subject to liability under Section 11.

93. On information and belief, Defendants Cogency Global and De Vries performed no independent investigation of any of the material disclosures in the IPO Registration Statement before De Vries signed it. Cogency Global's business model is the provision of registered-agent and corporate-services products to foreign issuers seeking U.S. capital-markets access without independent U.S. presence; the fee Cogency Global charges Jayud for that service is not built around the kind of substantive due-diligence inquiry that a Section 11 signatory's affirmative defense requires. Specifically, on information and belief, Cogency Global and De Vries did not: (i) verify the existence of each Chinese subsidiary identified in the IPO Registration Statement's corporate-structure chart by searching the PRC corporate registries; (ii) verify the accuracy or completeness of the related-party transactions disclosure or the identity of the related-party counter-parties; (iii) review the September 7, 2022 Supplemental Agreement, the corresponding RMB 35 million payment, or any other reorganization-period contractual arrangements; (iv) review the GAAP-compliance of the financial-statement presentations; or (v) review the adequacy of the disclosed allowance for credit losses. Cogency Global and De Vries' failure to perform any such investigation precludes either from establishing the affirmative defense of due-diligence reasonableness.

94. The Company's outside auditor (Defendant Friedman and, by successor relationship, Defendant Marcum Asia), the Company's sole underwriter (Defendant Benchmark), the Company's U.S. registered agent (Defendant Cogency Global), and the Company's authorized U.S. representative (Defendant De Vries) each failed, separately and collectively, to perform the verification, review, and gatekeeper-investigative duties the Securities Act assigns to each in

connection with an effective public offering.

8. Jayud Employs Suspect Investor Relations Firm Shortly After the IPO.

95. On July 12, 2023, the Company issued a press release announcing "the Engagement of Strategic Investor Relations LLC to lead investor engagement and Financial Communications Efforts." The stated goals of the engagement were "to craft and implement a comprehensive investor relations and corporate communications strategy to build greater investor awareness for the Company. The objectives of the new program are to expand Jayud's overall company messaging and corporate positioning, ensure its investment highlights are properly communicated, and increase the Company's visibility and engagement with the broader investment community."

96. Defendant Geng went on to comment:

> We believe that transparency and effective communication with our shareholders and stakeholders are key drivers of trust and long-term growth. That is why we have partnered with Strategic Investor Relations, an investor relations firm that aligns with our vision and values. By leveraging their expertise, we can enhance our ability to effectively engage with the investment community, articulate our strategic initiatives, and showcase the tremendous potential of our business. Together, we can create a bridge of understanding and collaboration, fostering a solid foundation for sustainable growth and unlocking opportunities on a global scale.

97. Strategic Investor Relations LLC has been associated with at least two other Chinese small-cap NASDAQ issuers that experienced dramatic stock-price declines following the firm's engagement: VisionSys AI Inc. (Nasdaq: VSA), engaged September 30, 2025, which fell from approximately $170 to under $1 in the following months; and Curanex Pharmaceuticals Inc. (Nasdaq: CURX), engaged October 22, 2025. Strategic Investor Relations' own website advertises (without identifying the underlying clients) an "Average Volume Increase" of 320% and an "Average Price Appreciation" of 132%, with "100% Client Satisfaction Rate." However, it did not list the specific companies' names that it had helped accomplish these performances. These

are stock-promotion metrics, measuring trading-volume and share-price outcomes, rather than disclosure or governance services.

**D. Weeks After the IPO, the 2022 Form 20-F Compounded the IPO-Era Misstatements and Added the False "Sufficient Working Capital" Representation.**

98. Three weeks after the IPO closed, on May 15, 2023, the Company filed its Form 20-F for fiscal year 2022 (the "2022 Form 20-F"), signed by Defendant Geng on behalf of the Company. The 2022 Form 20-F included a clean audit opinion issued by Defendant Marcum Asia[3] on the 2022 financial statements. The 2022 Form 20-F was subsequently incorporated by reference into the June 2024 Form F-3 Shelf Registration Statement under which the Company conducted its December 2024 registered direct offering at $0.20 per share. The 2022 Form 20-F repeated and expanded the IPO-era misstatements shortly after the offering closed.

<u>1. The 2022 Form 20-F's "Sufficient Working Capital" Representation Was False Given the Company's Own Cash Flow Statement and FX Gain.</u>

99. The 2022 Form 20-F represented, in the Liquidity and Capital Resources section, that:

> As of December 31, 2022, we had cash of RMB28.4 million (US$4.1 million) and working capital of approximately RMB0.4 million (US$0.1 million). We believe our current working capital is sufficient to support our operations for the next twelve months. (2022

3 The Company's stated change of auditor from Defendant Friedman to Defendant Marcum Asia was, as a matter of audit-firm continuity, a name change only. In or about September 2022, Friedman combined its accounting practice with Marcum LLP, with Marcum acquiring substantially all of Friedman's non-attest assets and the integrated firm thereafter operating as Marcum LLP. Marcum Asia CPAs LLP (the China-practice affiliate of the post-merger Marcum brand, formerly known as Marcum Bernstein & Pinchuk LLP) succeeded to Friedman's audit relationship with Jayud and issued the unqualified audit opinions on the Company's 2022, 2023, and 2024 financial statements. Personnel, work papers, and institutional understanding of Jayud's accounting positions were retained across the rebranding. Defendant Marcum Asia therefore inherited from Defendant Friedman a full understanding of the Company's pre-IPO related-party transactions, allowance-for-credit-losses methodology, prepaid-expenses-and-other-current-assets accounting presentation, reorganization-payment timing, and persistent ICFR material weaknesses. Notwithstanding that knowledge, Defendant Marcum Asia certified the 2022 financial statements incorporated by reference into the IPO Registration Documents without correcting the GAAP-noncompliant presentations and without addressing the going-concern indicators.

Form 20-F, Item 5.B, at 73.)

100. Plaintiffs' forensic accountant found that the 2022 Form 20-F's representation that the Company's "current working capital is sufficient to support our operations for the next twelve months" was materially false:

101. First, the Company had failed to generate positive cash flow from operations in fiscal year 2022. The Consolidated Statement of Cash Flows included in the 2022 Form 20-F reports Net cash used in operating activities of RMB (15,231,895) for fiscal year 2022, which was a reversal from positive operating cash flow of RMB 4,239,582 in fiscal year 2021. A representation that working capital is sufficient to fund "operations" for the next twelve months is materially inconsistent with the Company's immediately-prior-fiscal-year inability to generate operating cash to fund those very operations.

102. Second, at the time when the Company filed its 2022 Form 20-F, five-and-a-half months into the next year, Defendants knew or should have known that the Company continued to lose money from operations, which the Company confirmed by reporting RMB 41,525,937 in funds used in operating activities during the first six months of 2023. The Company made this admission in H1 2024 Form 6-K and not in the H1 2023 Form 6-K, which inexplicably omitted statements of cash flows altogether.

103. A reasonable investor would have understood "sufficient working capital to support our operations for the next twelve months" to refer to being able to meet future obligations by either having sufficient working capital on hand or being able to obtain financing on acceptable terms. and being able to generate funds from the core, recurring operations. Jayud could provide no such assurances as its working capital was almost nil, its core operations failed to produce sustainable earnings, it's past "success" was solely due to an unpredictable windfall in the form of

a currency-translation gain, and, as the Company admitted, it could not assure investors "that financing will be available in amounts or on terms acceptable to us, if at all" to refer to sustainable, business-generated liquidity, not a currency-translation accounting result.

104. Defendant Geng signed and certified the 2022 Form 20-F. As CEO and Controlling Shareholder of the Company since incorporation, he had personal knowledge both of the Company's negative operating cash flow for fiscal year 2022 and of the magnitude of the foreign-currency gain that had carried reported net income into the positive column. Defendant Marcum Asia, as the Company's independent auditor, had performed the audit work required to identify both facts. The "sufficient working capital" representation was knowingly false or made with deliberate recklessness as to its falsity by both Defendant Geng and Defendant Marcum Asia.

105. This information is material because investors would have cared whether Jayud could fund operations from actual business performance rather than from transitory accounting gains and external financing.

2. Marcum Asia's 2022 Audit Opinion Omitted the Going-Concern Explanatory Paragraph PCAOB AS 2415 Required.

106. Marcum Asia's 2022 clean audit opinion omitted a going-concern warning despite obvious liquidity and operating-cash-flow red flags.

107. Plaintiffs' forensic accountant noted that Defendant Marcum Asia's unqualified audit opinion on the Company's 2022 financial statements included in the 2022 Form 20-F omitted the going-concern explanatory paragraph that PCAOB Auditing Standard 2415 ("Consideration of an Entity's Ability to Continue as a Going Concern") required, given the insolvency indicators in the Company's 2022 financial statements: (a) working capital at December 31, 2022 of approximately RMB 0.4 million (effectively at break-even); (b) net cash used in operating activities of approximately RMB (15.2) million for fiscal year 2022; (c) pre-tax income entirely

covered by the transitory RMB 4.4 million foreign-currency gain; (d) negative gross profit on related-party revenues (meaning revenues from related parties were generated at substantial loss); (e) financing-activities dependence to fund operations and (f) continuing losses from operations through the date of auditor's report (May 15, 2023). PCAOB AS 2415.03(c) required Marcum Asia, after evaluating management's plans, to "include an explanatory paragraph (immediately following the opinion paragraph) in his audit report to reflect his conclusion" if substantial doubt about Jayud's ability to continue as a going concern remained.

108. By December 31, 2023, Marcum Asia included a going-concern explanatory paragraph in its 2023 audit opinion. Notably, Marcum Asia also included a going concern explanatory paragraph in its 2024 audit opinion, citing among other things, "a significant working capital deficiency," which did not exist at the end of 2024 (Jayud had a positive working capital of RMB 44,211,654 as of December 31, 2024). Thus, Marcum Asia disregarded an essentially break-even working capital in 2022, when it did not express a going concern but warned of going concern when working capital approximated $6.15 million. In other words, in 2024, Marcum's decision to include a going concern paragraph in its opinion established another benchmark for the level of working capital which should raise a doubt about the Company's ability to continue as a going concern. In 2023, that benchmark was negative working capital; in 2024, that benchmark was positive working capital of RMB 44,211,654 (or $6.15 million). Therefore, a working capital of essentially zero (or break even) should have raised Marcum's concern in 2022 but it did not.

109. The conditions Marcum Asia ultimately identified in 2023 were already substantially present in 2022. A 2022 going-concern paragraph, issued before the promotional campaign began in late 2024 and before the discounted-share placements of September through December 2024, would have placed investors and analysts on notice of the substantial doubt the

Company faced about its ability to continue operations. That notice would have impaired Defendants' subsequent ability to execute the discounted-share-placement and price-promotion scheme. Marcum Asia's failure to include the going-concern paragraph in 2022, considered together with its subsequent addition of the same paragraph in 2023 based on conditions materially similar to those present in 2022, was a knowing or reckless violation of PCAOB AS 2415.

### 3. The 2022 Form 20-F Repeated the Same Material Omissions and GAAP Violations from the IPO Registration Documents.

110. As Plaintiffs' forensic accountant found, the 2022 Form 20-F repeated the material omissions and GAAP violations from the IPO Registration Documents alleged above.

111. Specifically, it continued to omit disclosure of the September 7, 2022 Supplemental Agreement requiring Jayud to pay RMB 35,000,000 to the Initial Shareholders and the January–February 2023 payment of that RMB 35,000,000. As alleged above, the Company in August 2024 conceded to the SEC that the RMB 35 million payment arrangement "should have been disclosed" in the May 15, 2023 Form 20-F.

112. It also continued to omit disclosure of Defendant Geng's September 7, 2022 personal commitment letter, contradicting the very representation in the 2022 Form 20-F that the Company had "sufficient working capital" because the Controlling Shareholder's contingent personal obligation to contribute up to US$6 million to operations was a material element of the Company's actual liquidity picture.

113. It continued to present prepaid expenses and other current assets (including supplier advances, tax refunds, deposits, and other receivables) under a single combined balance-sheet caption without the appropriate write-downs to the carrying values and with a single "allowance of doubtful accounts" in violation of GAAP;

114. It continued to report a materially understated allowance for credit losses, as

confirmed by the twentyfold provision catch-up in the 2023 financial statements;

115. It continued to disclose the same three material weaknesses in internal control over financial reporting first disclosed in the IPO Registration Documents and represented the Company was in the process of remediating them or planned to remediate them—even though the weaknesses persisted unremediated, through five subsequent annual reports.

116. It continued to incorporate the 2020 and 2021 financial statements that included approximately RMB 10.77 million in 2021 export VAT refunds based on supplier invoices the Chinese tax authorities subsequently determined were "forged" without disclosing the existence of a loss contingency.

### E. In the Months After the IPO, the Company Continued to Suffer Massive Losses Incongruous with Its Positive IPO Statements.

117. Plaintiffs' forensic accountant also documented how the positive IPO statements were unsupportable against the Company's subsequent operating trajectory.

1. <u>Jayud's Post-IPO Financial Results Contradicted the Positive Business Story Sold to Investors at the IPO.</u>

118. On September 1, 2023, the Company filed a Form 6-K containing its unaudited balance sheet and statement of operations for the first six months of 2023. These statements revealed that Jayud's revenue had declined 63% from prior year and its gross profit margin declined from a positive 6.8% to a negative 0.4%. Thus, less than five months after the IPO, the Company was losing money on all the revenues it generated, not just the related parties. The Company did not include a statement of cash flows in the Form 6-K, which would have shown that the Company continued to lose funds from operations, using RMB 41,525,937 for operations in the first six months of 2023.

119. Less than eight months after the IPO, Jayud filed its 2023 Form 20-F on April 26,

2024. The 2023 Form 20-F confirmed an RMB 15.9 million gross loss and a negative 3.2% overall gross margin for full fiscal year 2023. The 2022 financial statements were accompanied by a clean audit opinion from Marcum Asia which included a going concern paragraph:[4]

> Going Concern
>
> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 3, the Company has a significant working capital deficiency, has incurred significant losses and needs to raise additional funds to meet its obligations and sustain its operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 3. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

120. As the SEC pointed out in its aforementioned July 22, 2024 comment letter, the auditor's opinion and the Company's disclosure in the notes to the financial statements, which both expressed doubt about the Company's ability to continue as a going concern, did not match its disclosure in other parts of the report which represented that such doubt was alleviated by management's plans:

> We note that your auditor includes an explanatory paragraph in the audit opinion indicating there is substantial doubt about your ability to continue as a going concern, which would be based in part on the auditor's consideration of management's plans to mitigate the underlying conditions or events pursuant to AS 2415.
>
> You provide corresponding disclosures in Note 3, regarding the evaluations that management performed of the conditions or events that raise substantial doubt about your ability to continue as a going concern, and of management's plans to mitigate the underlying conditions or events, to address the requirements in FASB ASC 205-40.
>
> However, you have disclosure on page 88 that is contrary to the views of the auditor and management as referenced above. Please address the inconsistency between your disclosure on page F-26, stating that management's plan cannot alleviate substantial doubt of your ability to continue as a going concern, and disclosure on page 88, stating that substantial doubt *is alleviated* by management's plan.

[4] The filing also included Friedman's audit opinion on the previously issued 2021 – 2020 financial statements.

[Emphasis in the original.]

121. Although Marcum Asia only audited the Company's financial statements, PCAOB standards required it to read the entire Form 20-F filing to ensure there were not any inconsistencies with the audited information:

> The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document. However, he should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements. AS 2710.04

122. The 2023 financial statements disclosed that during 2023, Jayud recognized a significant provision for credit losses, thereby increasing the ratio of reserved receivables. Although, as stated above, in 2023, the Company adopted a new standard for estimating the allowance for doubtful accounts the magnitude of the provision and the Company's explanation thereof suggest that a large provision was needed to make up for understating the allowance and the related bad debt expense in the prior periods:

> Provision for credit losses
>
> Provision for credit losses consisted of bad debt allowance net of reversal, against (i) accounts receivable, (ii) contract assets and (iii) prepaid expenses and other current asset, net. We adopted ASU 2020-03, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments starting from January 1, 2023. Based on the new standard, we used expected loss model to assess the provision of bad debt allowance against accounts receivables, other receivables and contract assets. As a result, we recorded bad debt allowance of RMB18.2 million (US$2.6 million) for the year ended December 31, 2023, which mainly consisted of allowance of (i) RMB3.4 million (US$0.5 million) of accounts receivable with aging over 180 days; (ii) RMB6.2 million (US$0.9 million) of over due accounts receivable and RMB3.7 million (US$0.5 million) deposit with a customer; (iii) RMB3.8 million (US$0.5 million) loan from a third party. For the year ended December 31, 2022, we recorded RMB0.9 million of bad debt allowance.

123. As stated above, GAAP does not allow recording allowance for credit losses against

non-financial instruments, such as prepaid expenses. Any impairments should be applied directly to the carrying value of such assets. The Company incorrectly applied the credit loss guidance, incorrectly presented prepaid assets and other current assets in the notes to the financial statements, which Marcum Asia failed to require Jayud to correct prior to expressing an unqualified opinion on its financial statements.

124. The Company also recognized impairments of long-lived assets during 2023:

> Impairment charges on long-lived assets
>
> Impairment charges on long-lived assets consisted of impairment of property and equipment of RMB2.4 million (US$0.3 million) and operating right-of-use assets of RMB3.2 million (US$0.5 million). During the year ended December 31, 2023, there was a triggering event of negative cash flows and operating losses that indicated the carrying amounts of our long-lived assets may not have been recoverable. We performed an assessment and recognized the impairment charges on long-lived assets for the amount by which the carrying value of the asset group's long-lived assets exceeded their estimated fair value. No impairments of long-lived assets were recognized as of December 31, 2022.

125. However, the Company failed to reduce the carrying values of the impaired long-lived assets and report the adjusted carrying amounts of these long-lived assets as their new cost basis, as required by GAAP. ASC 360-10-35-20. This error, which was similar in fashion to the Company's failure to adjust the carrying amounts of its prepaid expenses, allowed the Company to reverse a previously recognized impairment loss by simply adjusting the cumulative impairment allowance, which is exactly what the Company did during 2024, in violation of GAAP. ASC 360-10-35-20. Plaintiffs' forensic accountant also noted it was unlikely that these impairments had not occurred prior to the date of the IPO.

126. In violation of PCAOB AS 3105, Marcum Asia failed to qualify its 2023 audit opinion due to the errors in Jayud's accounting for impairment of its prepaid expenses and long-lived assets which resulted in misleading disclosures in the notes to the financial statements and

left the door open for the Company to manipulate its future earnings, which it did during 2024.

127. On July 22, 2024, the Company received a comment letter from the SEC questioning the Company's assessment of its going concern and its disclosures of the reorganization payments totaling RMB 35 million in its 2023 Form 20-F.

128. The Company responded with an explanation and proposed to revise its 2023 Form 20-F to fully disclose the reorganization payments and resolve an inconsistency about management's plans to address going concern:

> Response: The Company respectfully acknowledges the Staff's comment and proposes to file an amendment to the 2023 Form 20-F (the "20-F Amendment") with revised disclosure on page 88 as follows:

129. Based on the approved management plan and shareholder financing, the Company concluded that substantial doubt is raised but is alleviated by management's Plans. Based on the approved management plan and shareholder financing, the Company concluded that substantial doubt is raised and cannot be alleviated by management's Plans.[5]

130. The rapid deterioration in revenue, margins, credit losses, impairment charges, and going-concern disclosures supports the inference that the IPO statements lacked a reasonable basis when made and identify the false financial foundation on which investors bought Jayud shares and on which Defendants later built the stockpile-and-promotion scheme.

2. Jayud Receives Several Minimum-Bid Deficiency Warnings.

131. On May 3, 2024, the Company filed a Form 6-K press release detailing how it received a letter from NASDAQ indicating they were in violation of Rule 5550(b)(1) due to their stockholders' equity balance falling below $2,500,000. The letter went on to explain that the Company had 45 days to cure the deficiency or face delisting. Lastly, the press release reiterated

[5] See the Company's response filed on August 12, 2024 for a complete list of revisions to the 2023 Form 20-F proposed by the Company.

the Company's business and its competitive advantage:

> Jayud Global Logistics Limited is one of the leading Shenzhen-based end-to-end supply chain solution providers in China, focusing on cross-border logistics services. Headquartered in Shenzhen, the Company benefits from the unique geographical advantages of providing a high degree of support for ocean, air, and overland logistics. The Company has established a global operation nexus featuring logistic facilities throughout major transportation hubs in China and globally, with footprints in 12 provinces in Mainland China and 16 countries across six continents. Jayud offers a comprehensive range of cross-border supply chain solution services, including freight forwarding, supply chain management, and other value-added services. With its strong service capabilities and research and development capabilities in proprietary IT systems, the Company provides customized and efficient logistics solutions and develops long-standing customer relationships.

132. On June 7, 2024, the Company issued a press release detailing how it had received another notification letter from NASDAQ that the minimum bid price for their shares had fallen below $1.00 and they would face delisting if this remained the case for more than 30 days in accordance with Rule 5550(a)(2).[6] Again, the press release reiterated the Company's previously stated business description and competitive advantage in the marketplace.

133. These deficiencies suggest that Jayud's business never supported the rosy IPO valuations.

### III. <u>Geng Concentrated 68.5 Million Discounted Shares in Insider-Connected Hands in Four Months</u>.

134. After the IPO, Defendants placed tens of millions of discounted shares into connected or undisclosed hands immediately before the stock-price run-up.

135. Having raised approximately $5 million USD in the April 2023 IPO on the false financial foundation, Defendants spent the next sixteen months allowing the stock to languish below its IPO price, then in the four months between September 2024 and December 2024—the

[6] It is likely the May 1, 2024 stockholders'-equity deficiency under Nasdaq Listing Rule 5550(b)(1) was cured between October 21 and October 28, 2024 through a coordinated package of seven transactions disclosed in the October 28, 2024 Form 6-K, a cure that on the public record looks less like an operational recovery and more like a Nasdaq-listing-driven balance-sheet construction using insider-affiliated counter-parties and freshly issued shares.

critical period immediately preceding the price run-up and dump—Jayud concentrated 68.5 million additional Class A shares in insider-connected hands at steep discounts to the prevailing market price. As detailed below, this stockpile was assembled in four discrete tranches: (a) the September 2024 convertible debentures of US$800,000 priced at 52% of VWAP to two undisclosed investors; (b) the October 2024 PIPE of 14,793,335 Class A shares at US$0.45 to three buyers already connected to Jayud's U.S. operations through HYTX Warehouse No. 1, LLC; (c) the October 2024 acquisition cluster of 7,290,267 Class A shares issued in a series of insider-connected acquisition transaction; and (d) the December 3, 2024 registered direct offering of 50 million shares at US$0.20 to seven previously-unknown Southeast Asian buyers whose Schedule 13G filings on February 4, 2025 exhibit striking pattern markers of coordinated "group" action.

### A. The September 2024 Convertible Debentures: $800,000 at 52% of VWAP to Two Undisclosed Investors.

136. The first share-stockpile tranche consisted of discounted convertible debentures issued to undisclosed investors. On September 13, 2024, the Company entered into Securities Purchase Agreements with two undisclosed accredited investors for convertible debentures with an aggregate principal amount of $800,000, with closings occurring on September 13, September 27, and October 8, 2024. The debentures bore interest at 6% per annum and were convertible into the Company's Class A ordinary shares at 52% of the five-day average VWAP of the Class A ordinary shares, meaning the debenture holders were contractually guaranteed shares at a 48% discount to the prevailing market price at the time of conversion. The debentures were subsequently converted into 2,069,382 Class A ordinary shares.

137. The two purchasers were never identified in any SEC filing, and no Schedule 13G

or 13D was filed in connection with the issuance or conversion of the debentures. The debentures thus created low-cost shares for unidentified holders immediately before the price run-up, increasing dilution and supplying potential trading inventory.

**B. The October 2024 PIPE: 14,793,335 Class A Shares at $0.45 to Three Buyers Already Connected to Jayud's U.S. Operations.**

138. The October private investment in public equity ("PIPE") placed millions of discounted shares with investors tied to Jayud's U.S. operations.

1. The Mechanics of the October PIPE.

139. Under Share Purchase Agreements dated October 19, 21, and 24, 2024 (collectively, the "October SPAs"), the Company sold 14,793,335 Class A ordinary shares at $0.45 per share (gross proceeds $6,657,000) to "certain accredited investors" in a private placement (the "October PIPE"). The placement closed on October 28, 2024, and was made pursuant to the Section 4(a)(2) exemption, with the Company committing to file a resale registration statement on Form F-1 or F-3. Defendant Geng executed each of the October SPAs as CEO.

2. Three October PIPE Buyers Identified by Schedule 13G Filings.

140. Three October PIPE participants filed Schedule 13G beneficial ownership reports identifying themselves. All three are U.S.-resident individuals or entities located in Southern California or Texas. None has filed any 13G/A amendment to reflect material subsequent changes in beneficial ownership:

141. (1) Echo Cheng filed Schedule 13G on October 28, 2024 reporting beneficial ownership of 2,120,381 Class A ordinary shares (11.0% of 19,308,211 outstanding) at the address 5358 Fulmer Ct., Jurupa Valley, CA 91752.

142. (2) Weiliang Zhang filed Schedule 13G on October 28, 2024 reporting beneficial

ownership of 1,128,092 Class A ordinary shares (5.8%) at the address 9116 Lantana Dr., Corona, CA 92883.

143. (3) Lisheng Yu and Long Hing Wholesale Express, LLC (a Texas LLC of which Yu is the sole owner) filed a joint Schedule 13G on November 8, 2024 reporting Yu's beneficial ownership of 2,664,273 Class A ordinary shares (6.6% of 40,095,605 outstanding), an amount comprising 2,219,828 shares held directly by Yu plus 444,445 shares held by Long Hing, at the shared address 13366 Murphy Road, Stafford, TX 77477. The Yu/Long Hing filing included a Joint Filing Agreement, and both filers checked Item 2(b) on the cover page disclosing the sole-ownership relationship.

### 3. Two of the Three October PIPE Buyers Were Already Co-Managing a California Warehouse Entity with Jayud's Own U.S. Subsidiary.

144. Plaintiffs' investigation establishes that two of the three October PIPE participants—Echo Cheng and Weiliang Zhang—were not arm's length investors. They were already co-managing a California limited liability company, HYTX Warehouse No 10 LLC, with the Company's wholly owned U.S. subsidiary Joyed Logistics Services Inc. ("Joyed Logistics") and had been doing so for more than two years before the October PIPE. The Statement of Information identifies four Managers of HYTX Warehouse No. 10 LLC: Echo Cheng (Jurupa Valley); Weiliang Zhang (Corona); HYTX Logistics LLC (Azusa); and Joyed Logistics Services Inc. (the Company's wholly owned U.S. subsidiary). The Registered Agent is Haiyong Geng, operating from 1033 N Todd Avenue, Azusa, CA 91702.

145. Jayud acquired a 49% equity interest in HYTX Warehouse No. 10 LLC on October 21, 2024 for 1,568,457 Class A ordinary shares of Jayud as consideration. On its face, the transaction was an Item 404 / Item 7.B related-party transaction: Jayud purchased an equity stake in an entity that Jayud's own subsidiary co-managed with two persons who would, within

days, become 13G-reporting beneficial owners of Jayud through participation in the October PIPE. The October 28, 2024 Form 6-K disclosing the acquisitions did not disclose the related-party character of the October PIPE buyer-side participation.

146. The 1033 N Todd Avenue, Azusa, California address operates as the physical hub of an extensive connected-party network. Plaintiffs' investigator's California Secretary of State and Los Angeles County business-registry searches identify at least ten entities registered at 1033 N Todd Avenue, including HYTX Inc., Hytx Investment LLC, HYTX Warehouse No. 1 LLC, HYTX DEAL LLC, HYTX Warehouse No. 17 LLC, HOLODAO LLC, OO Live LLC, Hy New Media LLC, CHEFIO LLC, and the Hebei General Chamber of Commerce USA. Haiyong Geng is the officer, member, or registered agent on most HYTX-branded entities. The Secretary and registered agent of the Hebei General Chamber of Commerce USA at the same address is identified as "SKY GENG." Three persons surnamed "Geng"—Defendant Xiaogang Geng (CEO of the Company, whose wholly-owned subsidiary Joyed Logistics is a Manager of HYTX Warehouse No. 10 LLC at the same address); Haiyong Geng (the HYTX-network principal); and Sky Geng (the Hebei General Chamber of Commerce USA secretary)—are thus documented at or connected to this single Azusa address. None of these relationships has been disclosed in any of the Company's SEC filings.

<u>4. Lisheng Yu Was Simultaneously a PIPE Buyer and the Seller of Yukon Flooring Bellaire LLC.</u>

147. Yu was also the seller of the Yukon Flooring Bellaire warehouse Jayud purchased on October 25, 2024. The December Prospectus Supplement's Recent Developments section discloses:

> On October 25, 2024, the Company acquired a 95% equity interest in Yukon Flooring Bellaire LLC, which owns a 28,320 sq.ft. warehouse and the related land located in Houston, Texas. The Company issued 2,219,828 Class A ordinary shares

as consideration for the acquisition.

148. The 2,219,828 Class A ordinary shares issued as consideration for the Yukon Flooring Bellaire LLC acquisition match—to the share—the directly-held holdings Yu reported on his joint Schedule 13G filed six business days later on November 8, 2024 (Yu directly 2,219,828; Long Hing 444,445). On a six-significant-digit non-round-figure share count, the probability of two unrelated transactions producing identical numbers is vanishingly small. Rather, the most plausible explanation is that the consideration shares for the Yukon Flooring Bellaire LLC acquisition were issued directly to Lisheng Yu, placing Yu on both sides of the October 2024 transaction window as both October PIPE buyer (through Long Hing) and October acquisition counterparty (as seller of Yukon Flooring Bellaire LLC).

149. Three months after the April 2025 crash, on July 28, 2025, Echo Cheng formed Labelbridge Logistics LLC, a California limited liability company. The August 1, 2025 Statement of Information identifies JPEC Enterprises, Inc. and Joyed Logistics Services Inc. (Jayud's U.S. subsidiary) as Managers and Cheng as CEO and Registered Agent. The continued post-crash business relationship between an October PIPE participant and the Company's U.S. subsidiary corroborates the inference that the October PIPE was not an arm's length capital raise, but a placement of discounted Jayud shares to pre-existing business associates of the Company's U.S. operations. This links another October buyer to Jayud's acquisition consideration and supports the inference that the October share issuances were coordinated with connected counterparties.

<u>5. The October SPA's Express Short-Selling Carveout.</u>

150. The October SPAs included an express short-selling carveout (Sections 3.2(q) and 4.11) permitting the October buyers to borrow Jayud shares for the purpose of effecting short sales or similar transactions after the transaction was publicly announced.

151. A legitimate accredited-investor private placement does not contain a carveout

authorizing the buyer to short-sell the issuer's stock following announcement; standard PIPE documentation in the private-placement market universally restricts the buyer from short-selling, because a buyer who can short-sell can lock in profits from any post-placement price decline.

152. By executing the October SPAs' short-selling carveout, there is an inference that Defendant Geng knew the October PIPE buyers (who included persons co-managing warehouse entities with Jayud's own U.S. subsidiary and an entity-seller paid in Jayud equity) were trading-oriented actors intending to profit from market activity in Jayud's stock, not passive accredited investors purchasing for investment. A carveout allowing trading against the issuer's stock shows that the placement terms exposed public investors to adverse trading by low-cost share recipients and supports the inference that Jayud was not raising capital from arm's-length investors, but was concentrating cheap shares with connected counterparties before the promotional run-up.

### C. The October 2024 Acquisition Cluster: 7,290,267 Class A Shares Issued to Insider-Connected Sellers.

153. Within the same window as the October PIPE (i.e., between October 21 and October 26, 2024) Jayud closed five acquisitions and minority stake purchases for which it issued 7,290,267 Class A ordinary shares as non-cash consideration: (a) HYTX Warehouse No. 3 LLC (20% equity, October 21, 2024)—1,680,016 Class A shares; (b) HYTX Warehouse No. 10 LLC (49% equity, October 21, 2024)—1,568,457 Class A shares; (c) HYTX Warehouse No. 11 LLC (20% equity, October 26, 2024)—1,704,851 Class A shares; (d) LD Global Logistics Inc. (10% equity, October 21, 2024)—117,115 Class A shares; and (e) Yukon Flooring Bellaire LLC (95% equity, October 25, 2024)—2,219,828 Class A shares.

154. The October 28, 2024 Form 6-K bundling seven 'Transactions' consummated between October 21 and 28, 2024 (the five acquisitions plus the $6.657 million October PIPE and

the convertible-debenture conversion) represented that the Company had restored stockholders' equity compliance under Nasdaq Listing Rule 5550(b)(1). The Company's characterization thus framed the October placements and acquisitions as Nasdaq-compliance vehicles rather than as arm's length capital-raise or expansion transactions. Both HYTX No. 10 (Joyed Logistics co-management) and Yukon Flooring (Lisheng Yu acquisition-counterparty) transactions within this cluster are connected to Jayud insiders.

155. In addition, the HYTX acquisitions were structurally suspect. The April 30, 2024 Form 6-K announcing the original HYTX Acquisition Agreement (a 51% stake by Joyed Logistics in "HYTX Warehouse Inc.") referred to that target as "a prominent logistics company headquartered in Azusa, California." The March 2025 termination Form 6-K subsequently identified "HYTX WAREHOUSE INC." as a Nevada corporation formed only on January 26, 2024—three months before the April 30, 2024 acquisition announcement—with Haiyong Geng as president and treasurer. Jayud also referred to a separate California entity, "HYTX INC.," which is also controlled by Haiyong Geng.

156. The disclosed confusion between two HYTX entities (California vs. Nevada), the three-month gap between the Nevada target's formation and the acquisition announcement, and the consideration structure that deferred ultimate valuation by nearly three years ("purchase price based on HYTX's actual annual average net profit from the acquisition closing date to December 31, 2026") are consistent with the HYTX acquisitions functioning as vehicles for issuing Jayud equity to Haiyong Geng-controlled entities rather than as bona fide expansion transactions.

**D. The December 3, 2024 Registered Direct Offering: 50 Million Shares at $0.20 to Seven Previously-Unknown Southeast Asian Buyers.**

157. The largest stockpile tranche was the December 2024 registered direct offering of 50 million shares at $0.20 (a 70% discount) to undisclosed buyers.

1. The December Placement Was Made to Undisclosed Buyers with Pre-Existing Relationships to Jayud Insiders.

158. On December 3, 2024, the Company filed a Form 6-K disclosing a Share Purchase Agreement (the "December SPA") for the sale of 50,000,000 Class A ordinary shares at $0.20 per share with an aggregate purchase price $10,000,000 USD (the "December Placement"). The transaction was structured as a registered direct offering under the Company's F-3 Shelf. Defendant Geng signed the December SPA on behalf of the Company as CEO.

159. Jayud filed the December SPA in blank form, concealing buyer identities and investment amounts. The December SPA was filed with the SEC as Exhibit 10.1 to the December 6, 2024 Form 6-K in "Form of" template format. The purchaser signature pages, names, addresses, email addresses, investment amounts, and number-of-shares fields were entirely blank. The bank-account designation for the wire of the $10 million USD purchase price was left blank ([●]"). Item 601 of Regulation S-K, 17 C.F.R. § 229.601(a), generally requires issuers to file the executed versions of material agreements as exhibits, subject only to the confidential treatment process under Rule 24b-2, which would have created a publicly visible CT Order entry on EDGAR if invoked. The Company did not seek confidential treatment of the buyer identities through that process; it simply filed the SPA blank.

160. The December 3, 2024 Form 6-K and Form 424B5 prospectus supplement stated that the offering was made "directly to investors without a placement agent or underwriter," and that the Company was "not paying placement agent fees or underwriting discounts." The

December 3, 2024 Form 6-K identified the buyers only as "certain accredited investors."

161. The December SPA, however, confirmed pre-existing relationships between Jayud and the undisclosed purchasers. The December SPA contained the following representations that: "The contact between the Company and each Purchaser was made directly through an existing relationship." The December SPA also included a gag clause requiring that "Such Purchaser shall not make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement or otherwise communicate with any news media without the prior written consent of the Company."

162. Defendant Geng signed the December SPA on behalf of the Company. By accepting and filing the December SPA in this "Form of" configuration, Defendant Geng, who under the December SPA's own "existing relationship" representation had personal relationships with each purchaser, withheld the identities and investment amounts of every buyer from the investing public. Indeed, the public filings' generic reference to accredited investors obscured the Company's contractual admission that the buyers had existing relationships with Jayud. Hiding the buyers prevented investors from evaluating whether the placement was arm's-length, related-party, coordinated, or connected to later trading.

2. Seven February 4, 2025 Schedule 13G Filers Are Likely The December Placement Purchasers

163. On February 4, 2025, seven individuals filed separate Schedule 13G beneficial ownership reports for Jayud, each reporting an identical event date of December 4, 2024 and an identical outstanding-share denominator of 90,112,868 Class A ordinary shares. The seven filers' combined holdings (totaling 50,000,000 Class A ordinary shares) equal exactly the aggregate share count of the December SPA. The arithmetic reconciles: 50,000,000 shares × $0.20 = $10,000,000. The seven filers are the previously-undisclosed Purchasers in the December SPA:

- Charles Tjang (Indonesia, Singkawang) — 6,000,000 shares (6.66%). (13G Filing 25-010199.)
- Heng Lip Huat (Indonesia, Jakarta Timur) — 7,000,000 shares (7.77%). (13G Filing 25-010200.)
- Leo Reggan (Indonesia, Singkawang) — 6,000,000 shares (6.66%). (13G Filing 25-010201.)
- Richard Lau Lik Chai (Malaysia, Sibu, Sarawak) — 8,000,000 shares (8.88%). (13G Filing 25-010202.)
- Tang Kok Yong (Malaysia, Selangor) — 7,000,000 shares (7.77%). (13G Filing 25-010203.)
- Loh Lik Ren (Malaysia, Sibu, Sarawak) — 8,000,000 shares (8.88%). (13G Filing 25-010204.)
- Tong Tien Seng (Malaysia, Selangor) — 8,000,000 shares (8.88%). (13G Filing 25-010205.)

164. Matching the 50 million shares to the seven filers identifies who received the discounted block and supports the inference that the block was coordinated.

3. The Seven Filings Exhibit Fingerprints of Coordination, Not Independence.

165. Pattern markers suggest that the seven December 13G filers were coordinated rather than independent investors.

166. The seven February 4, 2025 Schedule 13G filings exhibit structural characteristics inconsistent with the conduct of seven independent accredited investors and consistent with a coordinated placement organized by a common arranger acting on behalf of the Company or its insiders:

167. *Round-million share counts only*. Three filers reported holdings of 6 million, two reported holdings of 7 million, and three reported holdings of 8 million. Arm's-length placements at a fixed per-share price typically produce irregular share counts driven by purchase-amount math; pre-agreed dollar-ticket sizes do not.

168. *Repeating-digit percentages*. The reported percentages—6.66%, 7.77%, and

8.88%—are calibrated to produce visually uniform, repeating-digit values.

169. *Geographic clustering in matched pairs*. Two of three Indonesian filers (Tjang and Reggan) are from the small West Kalimantan city of Singkawang. Two of four Malaysian filers (Lau and Loh) are from the small Sarawak city of Sibu. Two more Malaysian filers (Tang and Tong) are from Selangor. Three of seven possible matched-pair geographic clusterings are populated.

170. *No U.S. nexus, no intermediary, no joint filing, no prior EDGAR appearance*. All seven filers are Southeast Asian; none is a U.S. citizen or U.S. resident; none filed through a broker, nominee, or institutional intermediary; none filed jointly with any other filer; and none appears anywhere else in the EDGAR record for Jayud. Rather, the February 4, 2025 13Gs are each filer's first EDGAR submission.

171. *Identical event date and outstanding-share denominator*. All seven 13Gs report the December 4, 2024 event date and the 90,112,868 outstanding-share denominator even though the underlying December 3, 2024 Form 6-K disclosed the closing as expected "on or about December 10, 2024."

172. *Single coordinated filing date*. All seven 13Gs were submitted to EDGAR on February 4, 2025 in identical XSL-rendered XML format using the identical Schedule 13G template.

173. *Uniform contractual representations*. All seven were bound by the identical short-selling-and-hedging prohibition (Section 3.1), the identical "existing relationship" representation (Section 2.2(f)(iv)), and the identical gag clause (Section 3.13), which is further evidence of common drafting and common documentation.

174. The symmetry in share counts, percentages, geography, filing dates, and

documentation supports the inference of a common arranger or undisclosed group.

4. The Seven Filers Did Not Designate As A Group.

175. The December filers' failure to report as a group implicates the beneficial-ownership rules. Section 13(d)(3) of the Securities Exchange Act provides that "when two or more persons act as a … group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of" the Section 13(d) reporting framework. SEC Rule 13d-1(k) provides for joint filing of a single Schedule 13G by group members with a Joint Filing Agreement disclosing the group relationship. The October PIPE filers Lisheng Yu and Long Hing Wholesale Express, LLC followed the textbook Rule 13d-1(k) compliance pattern, filing a joint Schedule 13G on November 8, 2024 with a Joint Filing Agreement as Exhibit 99.1 and both reporting persons checking Item 2(b) on the cover page. The seven December cohort filers, by contrast, filed seven separate Schedule 13Gs, none checked the Item 2 group box, none was accompanied by a Joint Filing Agreement, and each answered "Not Applicable" to Item 8. The aggregate combined ownership of the seven filers was 55.49% of the December 4, 2024 outstanding Class A shares—amounting to a controlling-block-sized stake that, if held by a Section 13(d) group, would have required a Schedule 13D rather than seven separate Schedule 13Gs.

176. Thus, if the seven December purchasers were not a Section 13(d)(3) group, the structural symmetry across seven geographically dispersed Southeast Asian individuals—and with no broker, no placement agent, no nominee, no documented prior relationship to the Company or its insiders, and no prior EDGAR appearance—cannot be explained by ordinary investor behavior and supports the inference that the seven were placed into the December SPA by a common arranger or controlling person acting on the Company's or Defendant Geng's behalf. On the other

hand, if the seven December purchasers did constitute a Section 13(d)(3) group, the failure to file a Schedule 13D, to check the Item 2 group box, and to file a Joint Filing Agreement are themselves disclosure violations under Section 13(d).

**E. The December Placement Materially Financed Defendant Geng's Personal-Loan Recovery from the Company.**

177. The December placement funded repayment of Defendant Geng's personal loans to Jayud.

178. The December Prospectus Supplement's Recent Developments section discloses:

> In July 2024, the Company borrowed an interest-free loan of RMB738,000 (US$103,553) from one of its officers. This loan is due in July 2025. In September and November 2024, the Company borrowed a total of RMB2,712,100 (US$ 380,549) and RMB 4,775,000 (US$ 670,006) from Xiaogang Geng, respectively. These loans bear an annual interest rate of 6% and were fully repaid as of the date of this prospectus supplement.

179. Aggregating the September and November 2024 Geng loans yields RMB 7,487,100, which is approximately $1,050,555 USD at the prospectus's stated translation rate of RMB 7.1268 per $1.00 USD.

180. The December Prospectus Supplement's "Use of Proceeds" section discloses that approximately 30% of the net proceeds, which is approximately $2.97 million USD of the $9.9 million net proceeds, was earmarked for "repayment of outstanding loans, which had annual interest rates ranging from zero to 6% and maturity dates from December 2024 to September 2025." The disclosed interest-rate band "zero to 6%" captures exactly Defendant Geng's 6% loans and the unnamed officer's interest-free July 2024 loan.

181. The December Placement therefore materially financed Defendant Geng's recovery of his personal loans to the Company. The structural transfer effectuated by the December Placement was: (a) Defendant Geng personally lent funds to the Company in September and

November 2024 at 6% interest; (b) the Company then sold 50 million Class A ordinary shares at $0.20 per share to seven undisclosed Southeast Asian individuals with no documented prior business relationship to the Company; (c) approximately 30% of the resulting cash proceeds was used to repay Defendant Geng's loans "as of the date of" the December Prospectus Supplement; and (d) the Company's balance sheet was thereby converted from a $5.1 million USD pre-offering shareholders' deficit to approximately $17.0 million USD pro-forma shareholders' equity. The Company functioned as a mere pass-through; the substance of the December Placement was the transfer of value from the seven undisclosed Purchasers to Defendant Geng.

182. This supplies a personal financial motive for Geng and shows that the discounted offering transferred value through the Company back to its controlling insider, Geng, and the discounted share stockpile supplied the inventory that connected holders could monetize once retail demand was created through the later fraudulent promotion campaign.

### F. While the Company Was Raising Money and Pumping Its Stock, It Was Funneling Funds to Related Parties.

183. Jayud also continued to route substantial funds to related parties or insider-linked Hong Kong vendors under the guise of purchasing of logistic services. Throughout the Class Period, two Hong Kong vendors absorbed substantial percentages of the Company's cost of revenues. Cargo Link Logistics HK Company Limited (whose director is Tak Yi Lam and whose 100% upstream shareholder is Cargo Link Holdings Company Limited, also controlled by Tak Yi Lam) accounted for approximately 12.1% of cost-of-revenues in fiscal year 2023, 8.8% in fiscal year 2024, and 10.4% in fiscal year 2025.

184. Hongkong Boyatong Supply Chain Management Corporation Limited (whose director is Qiang Li and whose shareholder is Hiu Ming Yeung) absorbed approximately 24.8%

of cost of revenues in fiscal 2024, 30.4% of cost of revenues in fiscal year 2025 alone, with no Boyatong transactions in fiscal year 2023.

185. The Company identified both Cargo Link and Boyatong as related parties in the related party transactions notes to its annual financial statements, with dollar amounts and percentage-of-cost-of-goods-sold figures disclosed in the concentrations note.[7] But the Company has at no point disclosed the ownership of either related party, i.e., which Jayud insider or insiders the relationship runs through. Under Item 7.A of Form 20-F, the names of major (greater than 5%) shareholders must be disclosed. Counsel's investigation has further established that Cargo Link Holdings Company Limited (through its 100% ownership of Cargo Link Logistics HK) owns a 33% equity stake in Sky Pacific Logistics HK Company Limited, one of the Company's consolidated subsidiaries. Thus, the Tak Yi Lam-controlled Cargo Link Holdings is simultaneously the upstream owner of a Hong Kong vendor receiving approximately 10% of Jayud's annual cost of revenues and a one-third equity holder of non-controlling interest in one of Jayud's own subsidiaries; however, his relationship to Jayud insiders has not been disclosed.

### G. Jayud's Public Filings Contain An Unverifiable Related Party Subsidiary.

186. The 2024 Form 20-F filed April 22, 2025 and the 2025 Form 20-F filed April 20, 2026 each disclose a purported 51%-owned PRC subsidiary of Jayud's principal PRC operating entity, Shenzhen Jayud Logistics Technology Co., Ltd. ("JYD WLKJ"), acquired January 18, 2024 from Mr. Guojun Niu. Within the same Forms 20-F, the consolidated-subsidiaries tables identify that subsidiary as "Shenzhen JNT International Logistics Co., Ltd." while the Equity and Non-Controlling Interests notes call it "Shenzhen Jiniu International Logistics Co., Ltd."—two different

[7] The concentration note to the financial statements in the 2024 Form 20-F did not identify Boyatong by name and did not disclose the percentage of cost of goods sold for Cargo Link.

names sharing the abbreviation "JNT." The Forms 20-F report consolidated results attributable to JNT, including an operating loss of RMB 156,621 in fiscal year 2024 and operating income of approximately RMB 105,921 (US$15,070) in fiscal year 2025, flowing into Jayud's audited consolidated financial statements.

187. This subsidiary, however, does not exist in any relevant database. Plaintiffs' investigator searched both names and phonetic equivalents of "JNT International Logistics" in Mandarin against (i) the Qichacha corporate-information database, (ii) the Tianyancha corporate-information database, (iii) the public records of the Shenzhen Administration for Market Regulation, and (iv) the National Enterprise Credit Information Publicity System maintained by the State Administration for Market Regulation, and could not locate any registered PRC entity matching either disclosed name. Plaintiffs' investigator further confirmed that JYD WLKJ does not appear in those registries as a 51% registered shareholder of any entity bearing the JNT name.

188. Because every PRC limited liability company is required by the PRC Company Law to be registered with, and have its shareholder and equity-change history recorded by, the State Administration for Market Regulation, the absence of any matching registration supports the inference that JNT either does not exist as a PRC operating entity, or is registered under a name materially different from the names Jayud has disclosed. Either inference renders the Company's consolidated-subsidiary disclosures and consolidated financial statements materially misleading.

189. In addition, the same individual—identified in Jayud's filings as both "Mr. Guojun Niu" and "Mr. Niu Guojun"—is disclosed as the non-controlling shareholder of two separate "newly acquired" freight-forwarding subsidiaries within three months of each other: 51% of Shenzhen JNT International Logistics Co., Ltd. (acquired January 18, 2024) and 49% of HK (FASTFLY) International Logistics Co., Limited (acquired April 2024). Mr. Niu appears to have

no disclosed business profile, no other appearance in Jayud's public filings, and no independent corporate footprint identifiable in the PRC corporate registries. His recurrence as the structurally identical 49%/51% counter-party in two consecutive freight-forwarding "acquisitions" (both of which involved trivial capital injections totaling less than US$30,000 over two years) supports the inference that Mr. Niu is serving as a nominee for one or more Individual Defendants, i.e., someone whose name is being used to provide the *appearance* of a third-party counter-party while the underlying control sits with a Jayud insider.

## IV. **Promoters Drove JYD from Under $1 to $7.97 in Five Months on No Business Catalyst.**

190. With stockpiled shares in place, the fraudulent WhatsApp campaign drove retail buying---even as Jayud had no public business catalyst that could justify the stock's extraordinary appreciation.

### A. A Coordinated Campaign Drove the Retail Buying.

191. Between late December 2024 and April 1, 2025, persons operating through WhatsApp groups coordinated a promotional campaign to drive up the price of JYD stock through fake investment clubs purportedly affiliated with celebrities, well-known investors, and legitimate financial advisory firms.

192. Within the WhatsApp group, scammers posed as financial advisor representatives and communicated with users regarding the club's operations, including the timing of stock recommendations. For example, the purported financial advisor representatives in one group communicated that they would recommend 1-2 short-term high-quality stocks per week, with a holding period of 10-15 days and expected returns of 15%-25%. In addition, from time to time, they would recommend "VIP institutional stocks" with a holding period of approximately 30 trading days and expected returns of more than 160%.

193. Users were offered a free trial period (typically 60 to 90 days) to try out the investment club, after which they would be charged commissions based on the returns they realized.

194. The scammers created dozens of fake accounts, posing as club members within the WhatsApp group and touting their prior successes following the advisors' recommendations, which created the appearance of legitimacy and reliability that helped lure victims into the scheme.

195. Then, over a period of weeks or months, the scammers communicated with users in the WhatsApp group, providing investment recommendations and friendly communications to build trust.

196. Beginning on or around March 21, 2025, and increasingly between March 25 and 27, the scammers, posing as financial advisor representatives, began recommending that WhatsApp group members purchase shares of JYD as one of their "VIP institutional stock" recommendations. They predicted that the price of JYD stock would appreciate significantly in the near future, and they promised to reimburse investors for losses on the JYD investment.

197. The scammers instructed victims to make purchases of JYD shares at specified price points, which increased from day to day, based on claims that JYD was poised for strong growth. In reality, the scammers were using the victims' purchases to create a market for JYD insiders and other co-conspirators to begin unloading their holdings by entering sell orders at prices matching those fed to victims in the WhatsApp groups.

198. The scammers supported their recommendations with purported analysis of JYD business capabilities and prospects, including its supposedly strong reputation in the international logistics market. The scammers also claimed that JYD was in the process of negotiating a strategic partnership or business combination with U.S.-based logistics company, Matson, Inc. (or MATX),

which they projected would lead to 36% profit growth, fueling further increases in the JYD's stock price.

199. The scammers pressured victims to buy quickly, claiming that waiting even a few days would cause them to miss out on the stock's rise.

200. At least two U.S. telephone numbers associated with the promoter network have been identified in publicly available materials: +1 (304) 419-3395 and +1 (314) 667-9627.



~Administrator +1 (304) 419-3395

🥳🥳🥳12.19 VIP short-term stock profit🎉🎉🎉

Stock code: JYD

Specified selling price: $1.93
Specified selling price: $1.93
Specified selling price: $1.93

Please all investors submit (limit order) to sell at the specified price of $1.93 to avoid large fluctuations in stock prices. After you submit (limit order) at the specified price of $1.93, wait patiently for the order to be executed 10:15 AM

This week, the VIP short-term US stocks we traded have successfully achieved our rising target. This VIP short-term trading has achieved a total return on investment of 11.5%, which means that if the funds you participate in are 100k US dollars, you have already made a profit of 11.5K US dollars. But this is only a small amount of funds we use to participate in the transaction. When we start to formally carry out VIP value investment, we will get a higher return on investment. However, this is a staged victory we have achieved so far. We should all congratulate the success of this VIP short-term US stock trading and look forward to the official start of VIP value investment. 10:45 AM




201. Plaintiffs' investigator was unable to obtain subscriber identification through commercially available, pre-filing means. Indeed, the FBI Chicago Division has publicly characterized WhatsApp ramp-and-dump operations as routinely conducted through VOIP services that obscure subscriber identity, consistent with the inference that the persons who operated these numbers did so with deliberate anonymity. Subscriber identification of these numbers, and of the WhatsApp accounts associated with the promotion campaign, are discovery-

stage subpoena targets for Meta Platforms, Inc., WhatsApp Inc., and the relevant U.S. telecommunications carriers.

202. Because hundreds, if not thousands, of victims across hundreds of WhatsApp groups were making purchases, JYD's stock price rose rapidly. With the promised returns seemingly materializing, victims were falsely reassured and continued to make additional purchases, further inflating the stock price.

203. The promotion campaign had the hallmarks of a coordinated manipulation scheme: (a) a low-float stock with no institutional following and no analyst coverage; (b) a price increase of approximately 4,000% in five months without any corresponding fundamental development; (c) the existence of 68.5 million newly issued shares placed with undisclosed buyers at deep discounts in the four months immediately preceding the promotion; and (d) the industry-wide pattern of structurally identical pump-and-dump schemes.

204. The WhatsApp promotion provides the demand-side mechanism of the pump-and-dump scheme and connects the artificial demand for Jayud shares to promotion rather than business performance, providing the mechanism by which the discounted-share holders could sell into an inflated market.

**B. The Price Appreciation Was Inconsistent with Any Business Catalyst.**

205. Jayud's stock-price run-up could not be explained by the Company's public business fundamentals. Rather, between approximately December 10, 2024 (the December Placement's expected closing date) and March 31, 2025, the Company's Class A ordinary share price ran from approximately $0.20 to a peak of almost $8.00—an appreciation of 4,000%—on a stock whose underlying business was generating operating losses and was subject to a

contemporaneous going-concern qualifier. There was no contemporaneous business catalyst supporting this price action. The H1 2024 Form 6-K filed October 25, 2024 (and amended November 27, 2024) disclosed revenues up 59.6% year-over-year but a gross margin that remained negative (-1.0%, worse than the prior period's -0.4%) and continued operating and pre-tax losses; the Company also recognized additional impairments of long-lived assets during the first half of 2024. This confirms that the price increase was artificial and promotion-driven rather than a market reaction to real business improvement.

### V. <u>The Truth Emerges and JYD Crashed 95% in Aftermarket Hours.</u>

206. The scheme ended when Jayud's stock collapsed and trading volume suggested that the discounted-share block had been monetized into the crash.

207. On the trading session following JYD's April 1, 2025 closing high of $7.97 USD per share, the stock collapsed by approximately 95% in aftermarket hours, wiping out the bulk of public investors' capital. As detailed below, the April 1 to April 2, 2025 collapse extinguished approximately 95% of the Company's market capitalization in a single trading session; the April 2 trading volume approximated the entire 50-million-share December placement, indicating that the December 3, 2024 buyers exited their remaining positions into the crash; and despite the magnitude of those dispositions, the seven February 4, 2025 Schedule 13G filers did not file Schedule 13G/A amendments reporting the sale of their holdings, a defect that is indicative of both the insider-connected nature of their original positions and the coordinated "group" character of their selling.

#### A. The April 1–2, 2025 Crash.

208. On April 1, 2025, JYD stock reached a closing price of $7.97 per share, with an intraday high of $8.00 per share. At that time, the Company had approximately 90 million Class A shares outstanding, implying a market capitalization of approximately $720 million for a Company

with negative gross margins and an accumulated deficit of over $13 million.

209. During aftermarket hours on April 1, 2025, JYD stock crashed approximately 95%. By April 2, 2025, the stock traded as low as $0.35 per share. The crash wiped out more than 95% of the value of the Company's outstanding equity. On April 3, 2025, the Company issued a brief press release, signed by Matthew Abenante of Strategic Investor Relations, LLC, that declined to comment on the stock movement and offered no explanation for the crash, no identification of the promotional activity, and no disclosure of the share blocks held by the December Placement investors.

### B. The April 2 Trading Volume Approximated the Entire December Block.

210. The April 2 trading volume connects the crash to the December 50 million-share block. Indeed, on April 2, 2025, approximately 45.8 million Jayud shares traded in a single session, a volume figure that closely approximates the 50 million-share December block placed at $0.20 four months earlier. The trading-volume evidence is consistent with December Placement holders selling or transferring-and-selling their shares into the April 1–2 trading window. Thus, this volume provides evidence that the discounted-share holders monetized their positions into the crash.

### C. The Absence of 13G/A Amendments from the Connected-Buyer Cohort.

211. The lack of amended beneficial-ownership reports supports the inference of undisclosed selling or reporting non-compliance. Not one of the seven February 4, 2025 Schedule 13G filers has filed any Schedule 13G/A amendment to reflect any material change in beneficial ownership since February 4, 2025. The December Placement increased outstanding Class A shares

from approximately 40 million to approximately 90 million; the July 17, 2025 placement (detailed below) increased outstanding shares further to approximately 131 million. Under SEC rules effective September 30, 2024, passive 13G investors must amend within 45 days of calendar quarter-end if there is a material change in beneficial ownership. The absence of any amendment from any of the seven is consistent with either (a) actual disposal that was not timely reported or (b) deliberate non-compliance with reporting obligations.

212. None of the three October cohort filers (Cheng, Zhang, Yu/Long Hing) has filed any 13G/A amendment either. The absence of exit reports across the entire connected-party cohort is a pattern of Section 13(d) disclosure violations and obscured whether these large connected holders still owned Jayud shares or had exited during the collapse.

**D. Analysts Confirm the Jayud Scheme.**

213. On April 3, 2025, penny stock trader and blogger Timothy Sykes published the article "Jayud Global (JYD): Another Penny Stock Pump-and-Dump Fail" on his website detailing how the scam worked to educate investors on how to not fall for the next one. Specifically, in the section "How the JYD Pump Worked" he explains:

> JYD was a low-float Chinese logistics penny stock that traded under $1 for most of late 2024.
>
> Then came the run.
>
> From December through March, JYD climbed slowly on the back of vague PRs and acquisition news — but the real pump didn't begin until late March 2025. That's when the stock started going vertical.
>
> It hit $8 on April 1, capping a 1,100% climb in 5 months.
>
> Volume surged. Discord servers, WhatsApp groups, and YouTube "analysts" started pushing wild price targets — $13, $20, even $27. These were fake projections made using Fibonacci extensions (not kidding) by people either completely clueless… or deeply involved in the scheme.

> Then the dump hit.
>
> After-hours on April 1, the bottom fell out. By the next morning, it was already down 79%. By market close on April 2, it had lost over 95% of its value.
>
> Just like CLEU [(another pump and dump stock scam)], this was a pump with zero real support and an inevitable crash baked in.

214. Sykes goes on to list the following characteristics as key evidence the stock price was manipulated by Defendants: (1) skyrocketing price with no justification; (2) massive insider ownership; and (3) no institutional support or analyst coverage.

215. On June 16, 2025, Khac Phu Nguyen of GuruFocus wrote an article entitled, "The $480 Million Scam Playbook: Chinese Microcap IPOs Are Bleeding U.S. Investors" that summarized the Jayud scheme and other near identical, trending fraud:

> A growing number of U.S. investors are getting caught in what looks like the perfect setup for fraud small Chinese companies like Jayud Global Logistics (NASDAQ:JYD) and China Liberal Education (CLEUF) going public on Nasdaq, only to crash in spectacular fashion weeks later.
>
> What starts as a convincing ad on Facebook or WhatsApp quickly turns into a pump-and-dump operation.
>
> Investors like Utah-based college professor Braden Lindstrom [Jayud investor] were encouraged by supposed financial "advisers" to buy into these obscure names, only to watch their life savings vanish.
>
> Jayud, for example, spiked to $8 in April before plummeting below $1 just after retail interest peaked. One commercial property manager in California lost $320,000. Support group of nearly 100 victims says their total losses top $9 million.
>
> The playbook? Simple. A company raises funds from private investors. China Liberal raised $21 million from 30 insiders then shares move quietly to U.S. brokerages. Promoters hype the stock online, targeting individuals with promises of a "sure thing."
>
> After the shares are dumped, prices crash. In China Liberal's case, seven traders from Malaysia and Taiwan were charged after allegedly unloading over 50 million shares for $480 million in profit. The DOJ seized $214 million, and trading in the stock was halted

> by Nasdaq on June 3. Meanwhile, Net Class rode the same wave and its shares soared from $5 to $51 before collapsing to just above $2.
>
> Regulators are under pressure. FINRA had already warned back in 2022 that many of these ultra-small IPOs often raising less than $15 million showed signs of manipulative trading. Nasdaq has since sped up delistings for companies trading under $1. But even with stricter rules, these schemes continue. The Justice Department has now prioritized tackling this fraud, while Meta says it's testing tools to block deceptive stock ads.
>
> Still, the damage is done. As trader Nathan Michaud put it, these setups are dangerous even for short sellers because once the squeeze starts, even the bears can get buried.

## VI. Post-Crash Conduct Confirms the Scheme's Continuity.

216. Defendants' conduct after the crash confirms that the April 2025 collapse was part of a continuing scheme, not a one-time market accident.

### A. Jayud Admits its Stock Was Manipulated and its Financials Are Unsound.

217. Jayud's post-crash disclosures and public commentary acknowledged that the stock movement was disconnected from business fundamentals.

218. On April 3, 2025, the Company issued a press release in response. They stated:

> While it is the Company's practice not to comment on any stock movement, we must caution investors and all other persons to rely solely on statements and filings with the United States Securities and Exchange Commission issued by the Company itself or its authorized representatives. The Company does not intend to make further statements regarding this matter.

The press released was signed by Matthew Abenante, President of Strategic Investor Relations, LLC, as the contact for the Company.

219. On April 22, 2025, the Company filed its Form 20-F detailing financial results for the year ended December 31, 2024 (the "2024 20-F").

220. In this filing, the Company expanded their "Risks Related to the Class A Ordinary Shares" in the 2024 20-F to include the following:

Risks Related to the Class A Ordinary Shares .

Our Class A ordinary shares have recently experienced extreme price and volume volatility. Over the past two weeks, our share price has undergone periods of rapid appreciation followed by substantial and sudden declines. For example, the closing price of our shares was $7.97 on April 1, 2025 with approximately 7 million shares traded. On April 2, 2025, our stock traded as low as $0.35 with approximately 45.8 million shares traded. By contrast, our stock closed at $3.63 per share on March 3, 2025. ***To our knowledge, there have been no material changes to our financial condition, results of operations, or business fundamentals that would explain such extreme fluctuations in our stock price. We believe this volatility is not attributable to our operating performance or industry conditions***. This disconnect between our share price and our actual business performance may expose investors to significant risk, particularly if the market price declines sharply without a corresponding change in our business. Investing in our shares under these conditions involves substantial risk, including the potential for rapid and significant losses.

In addition, unusual trading activity may have been influenced by short squeezes—situations where investors who have sold shares short are forced to repurchase shares at higher prices, potentially contributing to abnormal price increases followed by sharp declines. These market dynamics are not necessarily related to our company's performance and may harm investors who buy shares during or after such events.

***In some cases, trading activity may be driven by speculation or misinformation disseminated through social media or messaging platforms, which are outside of the company's control and may mislead investors***. Certain investors may have made investment decisions based on inaccurate or overly optimistic expectations regarding the future performance of our share. These expectations were not issued or endorsed by the Company.

We cannot guarantee that similar volatility or trading disruptions will not occur again. Continued volatility may result in reputational harm, potential regulatory inquiries, shareholder litigation, and reduced investor confidence, all of which could adversely impact our ability to raise capital or execute our business strategy.

221. Jayud's statements thus confirm that the stock's rise and fall were not caused by operating performance but by speculation, misinformation, and abnormal trading.

222. The 2024 Form 20-F also contained the Company's admission that the underlying transactions giving rise to the recovered VAT refunds were supported by forged documentation:

> Shenzhen Jia Yu Da Trading Co., Ltd. ('JYD SM'), one of our PRC subsidiaries, received certain Tax Matter Notices from local tax authorities in Shenzhen in early 2025, requesting JYD SM to provide certain accounting records and other documents for inspection and recover certain refunded and exempted VAT incurred during the fiscal years of 2018 and 2021 due to the finding that the VAT invoices issued by certain third-party supplier are forged.

223. The "forged" VAT invoices admission showcases that the underlying 2018 and 2021 transactions giving rise to the recovered tax refunds were supported by false documentation, and confirms the inference that the 2021 export and trading transactions reflected in the Company's IPO-year financial statements (as audited by Defendant Friedman and certified into the IPO Registration Documents) were not bona fide---calling into question the reliability of Jayud's historical revenues, tax refunds, controls, and IPO financial statements.

224. The 2024 Form 20-F also represented:

> During the year ended December 31, 2024, there was a triggering event of negative cash flows and operating losses at the freight forwarding and warehousing assets group level that indicated the carrying amounts of the Group's long-lived assets may not have been recoverable. In accordance with ASC 360, regarding the long-lived assets, management of the Group performed an undiscounted cash flow analysis and concluded that the carrying value of the asset group was recoverable. For the year ended 2024, no impairment were recognized based on the management's assessment.

225. The 2024 Form 20-F contained three internally inconsistent statements about 2024 impairment:

> See Note 6 — Property and Equipment, net in the Notes to Consolidated Financial Statements for additional information related to the impairment charge during the year ended December 31, 2024.

> For the year ended 2024, no impairment were recognized based on the management's assessment.

> No impairment charges was recorded for the year ended December 31, 2024 based on the management's assessment.

226. The foregoing impairment-related statements in the 2024 Form 20-F were misleading because Jayud's H1 2024 filing reported a RMB 396,850 impairment charge, but the 2024 Form 20-F stated that no full-year impairment was recognized and included internally inconsistent impairment language---suggesting Jayud either reversed or omitted an impairment charge and reinforced concerns about financial-reporting reliability. The impairment statements were material because they went to whether Jayud's assets were impaired and whether management and Marcum Asia were applying GAAP consistently. A company whose interim filing recognized impairment (but whose annual report reported no impairment) created an inconsistency investors would consider important in evaluating asset values, auditor reliability, and financial-reporting integrity.

227. The 2024 Form 20-F continued to disclose the same three material weaknesses, now accompanied by an explicit Company admission:

> As of December 31, 2024, the Company has identified three material weaknesses in our internal control over financial reporting [as previously disclosed]. These material weaknesses create a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. We are in the process of taking, or plan to take, steps designed to remediate these material weaknesses.

228. This repeated that Jayud was taking or planning remediation steps even though the same weaknesses had persisted across multiple annual reports. The weaknesses were not abstract; they related to the very reporting failures at issue, including related-party disclosures, credit losses, prepaid-asset presentation, impairment accounting, and forged-invoice detection. In addition, this persistent failure to remediate undercuts each assurance that remediation was underway.

**B. Jayud Undergoes a 50-to-1 Reverse Stock Split to Maintain Listing Status.**

229. On May 23, 2025, the Company disclosed that NASDAQ had notified it on May

15, 2025 of a Listing Rule 5550(a)(2) minimum bid-price deficiency (closing bid price below $1.00 for 30 consecutive business days). On September 10, 2025, the Company announced a 50-to-1 reverse stock split effective for trading on October 13, 2025. The Company's pre-split price was approximately $0.09 per share.

230. The reverse split mathematically restored bid-price compliance without restoring underlying equity value, implying this was purely a cosmetic remediation. Considered together with the May 2024 and June 2024 Nasdaq deficiency letters and the December 2024 placement's engineered conversion of negative shareholders' equity to positive equity, the post-crash reverse stock split confirms the pattern: the Company was structurally incapable of maintaining Nasdaq listing requirements based on its actual business operations and depended on cosmetic capital-structure maneuvers to maintain its listing.

**C. Jayud Transitions Auditors.**

231. On June 30, 2025, just three months after the April 1, 2025 crash and contemporaneously with the onset of securities litigation against the Company, Jayud dismissed Defendant Marcum Asia as its independent registered public accounting firm. The Company's replacement auditor, Enrome LLP, is a defendant in a securities class action alleging that Enrome issued clean audit opinions despite known material misstatements and market manipulation in another Chinese small-cap NASDAQ issuer, Smart Digital Group Limited (NASDAQ: SDM), in conduct that closely parallels the conduct alleged against Marcum Asia and Friedman.

232. The Company's Form 6-K filed June 30, 2025 announcing Marcum Asia's dismissal attached, as required by Item 16F of Form 20-F, a separate letter from Marcum Asia to the SEC dated June 30, 2025. The Marcum Asia letter states in its entirety: "We have read the statements made by Jayud Global Logistics Limited in its Form 6-K dated June 30, 2025. We agree

with the statements concerning our Firm in such Form 6-K; we are not in a position to agree or disagree with other statements of Jayud Global Logistics Limited contained therein."

233. A registrant's decision to replace one defendant-auditor with another defendant-auditor at the precise moment securities litigation arose (when other clean-record auditors were available in the marketplace) is consciousness-of-guilt evidence as to the Company and Defendant Geng

**D. Defendant Geng Re-Ran the Same Playbook in July 2025.**

234. On July 17, 2025, Defendant Geng re-ran the December 2024 playbook. Jayud closed a registered direct offering of 42,857,143 Class A ordinary shares at $0.14 per share, for gross proceeds of approximately $6 million (the "July Placement"). Defendant Geng signed the share purchase agreement on behalf of Jayud. Two participants are identified by Schedule 13G filings: Wu Yun (a U.K. resident at Flat 9, Rutland Court, 21–23 Draycott Place, Chelsea, London SW3 2SQ) who acquired 11,428,571 shares (8.7%); and Hongkong Boyatong Supply Chain Management Corporation Limited (the same Hong Kong vendor alleged at Section IV.F above) which acquired 11,947,899 shares (9.1%). The remaining approximately 19,480,673 shares from the July Placement were sold to unidentified buyers.

235. Both Wu Yun and Hongkong Boyatong filed Schedule 13G/A reports on March 26, 2026 disclosing complete exit positions as of February 2026. Boyatong exited on February 3, 2026 and Wu Yun on February 10, 2026. The Boyatong transactions are the single strongest round-trip-transaction in the case. In the same fiscal year (2025), the Company paid Hongkong Boyatong approximately RMB 176.4 million (US$24.7 million) for "products and other services" equivalent to 30.4% of the Company's 2025 cost of revenues. No transactions with Boyatong had been recorded in fiscal years 2023 or 2024. Simultaneously, Boyatong acquired 11,947,899 Class

A ordinary shares of Jayud in the July Placement at $0.14, a 9.1% equity stake. At the same time (a) becoming the largest related-party vendor (by COGS percentage) and (b) acquiring a near-10% equity stake in the same fiscal year, combined with rapid exit by February 2026, is consistent with a circular cash-and-stock arrangement: the Company directs cash to Boyatong as "cost of revenues," Boyatong directs cash back to the Company as "placement proceeds," and the durable consequence is the insider-favorable allocation of the equity issuance.

236. The replication of the December 2024 placement's operational structure—i.e., a registered direct offering at a steep discount, signed by Defendant Geng, to a mix of identified and undisclosed accredited investors—followed by post-placement Schedule 13G filings by some buyers (Boyatong and Wu Yun) with the remainder hidden, and complete disposition of the disclosed buyers' positions within approximately six months—within three months of the April 2025 crash, while securities litigation arising from the December 2024 placement was already in motion, is evidence that Defendant Geng knew the December 2024 placement's mechanics and could execute them again on demand. Thus, the pre-placement-to-disposition is an operational template, not an improvised response to market conditions, supporting the inference that the same actors and mechanisms continued after the crash.

## VII. <u>Federal Prosecutors Have Indicted Operators of Two Structurally Identical Pump-and-Dump Schemes Against Other Chinese-Issuer NASDAQ Stocks</u>.

237. The pump-and-dump scheme did not occur in isolation. As set forth below, federal prosecutors and the SEC have brought enforcement actions against the operators of two structurally identical pump-and-dump schemes targeting other Chinese-issuer NASDAQ stocks during the same period, the CLEU and OST schemes, each of which features the same characteristic markers present here: concentration of free-trading shares in insider-connected hands at steep discounts, coordinated promotion, a sharp run-up unsupported by any business

catalyst, and a sudden collapse during which the insider-connected holders monetized their positions into retail buyers' panic-selling.

**A. The CLEU Pump-and-Dump Scheme.**

238. From November 2024 to January 2025, a pump-and-dump scheme was orchestrated involving shares of China Liberal Education Holdings, Ltd. (NASDAQ: CLEU), a Cayman Islands company providing educational services in China. The scheme operated on the same template as the Jayud scheme: shares of CLEU stock were placed directly with co-conspirators at deeply discounted prices before public offerings; impersonators posing as U.S.-based investment advisors solicited retail investors through WhatsApp and social media; promoters promised returns of up to 380%; and the conspirators dumped their shares into the resulting artificial demand. On January 30, 2025—a mere 61 days before the Jayud crash—the CLEU stock dropped dramatically, and seven individuals (five Malaysian nationals and two Taiwanese nationals) were subsequently indicted for wire fraud in *United States v. Lim Xiang Jie Cedric et al.*, Case No. 1:25-cr-00161 (N.D. Ill.). The FBI Chicago Division has conducted public victim outreach in connection with the CLEU prosecutions.

239. The factual overlap between the CLEU scheme and the Jayud scheme is not coincidental; it is structural. Both involved: (1) a Cayman Islands holding company with Chinese operations listed on NASDAQ; (2) shares secretly placed with connected parties at deeply discounted prices in non-public transactions before or during the promotional campaign; (3) impersonators posing as U.S.-based financial advisors operating through WhatsApp groups, promising returns of 150% to 380%; (4) coordinated buying instructions directing retail investors to purchase shares at specified price points; and (5) a catastrophic stock collapse when the scheme concluded, leaving retail investors with near-total losses. The CLEU scheme collapsed January

30, 2025, just 61 days before the Jayud crash on April 1, 2025.

240. By February 2025, the CLEU scheme was national news, the FBI had issued a public call for victims, and the DOJ had announced criminal charges describing this precise operational template. Defendant Geng and the other Individual Defendants, who were simultaneously operating Jayud as a NASDAQ-listed Cayman Islands Chinese company whose stock was being promoted through an identical WhatsApp campaign, were on notice that the template being used to promote Jayud shares had already resulted in federal criminal indictments.

### B. The OST Pump and Dump Indictment Names Jayud As Part of A Criminal Syndicate.

241. On September 10, 2025, the U.S. Attorney for the Eastern District of Virginia charged Yan Zhao (also known as "Hank Shi," "Hank Shu," "Altman," and "Bob") and Lai Kui Sen in connection with a $110 million pump-and-dump scheme involving Ostin Technology Group Co., Ltd. in *United States v. Zhao*, No. 1:25-cr-00259-MSN (the "OST Indictment").

242. The OST Indictment alleges that Yan Zhao worked with the same criminal syndicate to carry out the schemes involving OST, CLEU (referred to as "Company A" in the indictment), and Jayud (referred to as "Company B" in the indictment).

243. Additionally, the OST Indictment alleged that Yan Zhao and Sen funneled tens of millions of shares to fifteen co-conspirators through non-bona fide transactions, then launched a coordinated campaign to inflate the price and trading volume before dumping the shares, generating over $110 million while investors saw the company lose more than $950 million in market capitalization.

244. More specifically, the OST Indictment alleges that, in or around March 2025, Yan Zhao "introduced [a U.S. registered broker-dealer working at a New Jersey-based brokerage firm]

to a client who owned [Jayud] shares," that the broker-dealer "opened an account at [the New Jersey-based brokerage firm] in the name of Yan Zhao's client and initiated a transfer of the [Jayud] shares into this account," and that "in or around April 2025, [Jayud's] stock price crashed"—the April 1–2, 2025 Jayud crash. The OST Indictment further alleges that Yan Zhao "directed sales of his clients' [CLEU] and [Jayud] stock to [two other registered broker-dealers working at a New York-based brokerage firm], including at or around the time that [CLEU] and [Jayud] stock prices were crashing." The OST Indictment thus identifies, in the form of sworn federal-grand-jury allegations, that the criminal syndicate it charges with the OST scheme is the same syndicate that monetized the Jayud share positions held by insider-connected purchasers during the April 1–2, 2025 Jayud crash.

245. The OST Indictment also identifies four of Zhao's named "co-conspirators" (CC-1, CC-2, CC-3, and CC-4) by nationality: CC-1 and CC-4 are Singaporean nationals, and CC-2 and CC-3 are Indonesian nationals. That geographic profile matches the geographic profile of Jayud's December Placement Defendants: Charles Tjang, Heng Lip Huat, and Leo Reggan are Indonesian; Richard Lau Lik Chai, Tang Kok Yong, Loh Lik Ren, and Tong Tien Seng are Malaysian.

246. The OST Indictment further alleges that, with most of the proceeds of the OST stock sales, Yan Zhao and his co-conspirators "purchased Treasury ETFs and transferred these securities out of the United States to a brokerage firm in Hong Kong," and that "CC-1, CC-2, CC-3, and CC-4 had virtually the same account balances in their Hong Kong-based brokerage accounts during the same period of time." The matching Hong Kong account balances among four nominally independent Southeast Asian co-conspirators are the hallmark of coordinated group action by a common arranger. This is similar to the coordination of Jayud's December Placement

Defendants, e.g., as round-million-share lot sizes, repeating-digit ownership percentages (6.66%, 7.77%, 8.88%), an identical December 4, 2024 event date, an identical 90,112,868-share outstanding-share denominator, and a single coordinated February 4, 2025 Schedule 13G filing date.

247. The OST Indictment also alleges that on July 18, 2025, OST announced a 1-for-25 reverse share split (effective August 5, 2025), which "result[ed] in the OST stock price going above $1.00 per share, a NASDAQ threshold beneath which companies were frequently delisted." On September 9, 2025, less than two months after the OST reverse split was announced and for the same purpose, Jayud's board approved a 1-for-50 reverse share split (effective October 13, 2025). The use of cosmetic reverse-stock-split capital-structure maneuvers to restore nominal NASDAQ bid-price compliance in the wake of a coordinated dump is, on the public record now before this Court, the same playbook the Yan Zhao syndicate employed for OST, deployed by the same syndicate to maintain Jayud's NASDAQ listing after the April 1–2, 2025 Jayud crash.

**C. The Regulatory Response Validates the Scheme Theory.**

248. The regulatory response to the pattern of Chinese-issuer pump-and-dump fraud confirms the case theory. On September 3, 2025, NASDAQ proposed new listing standards specifically targeting the structural vulnerability that made the Jayud scheme possible, including a $15 million minimum market value of public float and a $25 million minimum public offering proceeds requirement for companies principally operating in China. Jayud raised only $4.86 million net in its April 2023 IPO, less than 20% of that new threshold.

249. On September 5, 2025, the SEC announced the formation of a Cross-Border Task Force within its Division of Enforcement, specifically focused on investigating "pump-and-dump" and "ramp-and-dump" schemes involving foreign-based issuers, with China identified by name as

a jurisdiction of heightened risk. The Task Force's mandate explicitly includes heightened scrutiny of "gatekeepers, particularly auditors and underwriters, which help these companies access the U.S. capital markets."

250. Since September 2025, the SEC has suspended trading in the securities of multiple companies, many with ties to mainland China or Hong Kong, due to suspicious trading patterns consistent with the Jayud scheme. A coalition of more than 40 State Attorneys General has formally called on the SEC to take additional measures against fraud by U.S.-listed Chinese companies. The regulatory response (encompassing NASDAQ listing-standard tightening, an SEC Cross-Border Task Force, and DOJ prosecutions of operationally identical schemes) collectively confirms that the risk of pump-and-dump manipulation through low-float Chinese NASDAQ IPOs was foreseeable, was known to the market participants who structured and enabled Jayud's IPO, and was a material fact that should have been disclosed to investors who purchased Jayud shares at artificially inflated prices. Indeed, these facts support the foreseeability and materiality of the manipulation risk that Defendants failed to disclose and demonstrate that the Jayud pattern was recognizable, foreseeable, and consistent with schemes already attracting criminal and regulatory scrutiny.

251. In October 2025, it was announced that the Financial Industry Regulatory Authority ("FINRA") is investigating broker-dealer firms involved in taking small foreign companies public. The investigation compels firms that have served as underwriters, bookrunners, or placement agents in small-cap offerings for companies with operations overseas to provide details about written supervisory procedures, compliance policies, training materials and due diligence processes of offerings conducted between January 2023 and September 2025. The regulator also wants firms to provide a list of every small-cap offering in which they've participated, the total

number of shares sold and to how many customers, as well as how much money the firm earned. The investigation focuses on initial public offerings that raise $25 million or less with share prices between $4 and $8.

## VIII. Marcum Asia and Friedman Signed Clean Opinions Despite Red Flags.

252. The outside auditors enabled the scheme by issuing clean opinions despite related-party, going-concern, impairment, and internal-control red flags apparent from Jayud's books. Throughout the conduct described above, two PCAOB-registered accounting firms, Defendants Friedman and Marcum Asia, served as Jayud's outside auditors and issued unqualified audit opinions on financial statements that contained the very misstatements and omissions previously identified. As set forth below, the Auditor Defendants' engagement was continuous throughout the Class Period; Marcum Asia's 2023 and 2024 audits failed to detect improper accounting for impairments of prepaid expenses and long-lived assets which included an impermissible 2024 mid-year reversal of a previously recorded impairment loss that ASC 360-10-35-20 categorically prohibits; the June 2023 SEC enforcement order against Marcum LLP, part of the same global Marcum network of which Marcum Asia is a member, is relevant context for the conduct alleged here; and the September 2025 PCAOB sanction against Marcum Asia in a separate matter confirms a pattern of audit-quality failures plaguing Marcum Asia's work for Jayud.

### A. The Auditor Defendants' Continuous Engagement Throughout the Class Period.

253. Friedman and Marcum Asia's audit opinions remained in the offering documents throughout the Class Period.

254. Defendant Marcum Asia (and Defendant Friedman, as Marcum Asia's pre-merger predecessor on the 2020 and 2021 audits) issued unqualified audit opinions for fiscal years 2020 through 2024. Those opinions were incorporated into the IPO Registration Statement, the June

2024 Form F-3 Shelf, and the December 2024 prospectus supplement under which the Company conducted the $10 million discount placement to seven undisclosed Southeast Asian buyers. The Auditor Defendants certified in each opinion that "in our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company …. and the results of its operations and its cash flows for each of the years [presented] … in conformity with accounting principles generally accepted in the United States of America" and that the audits were conducted "in accordance with the standards of the PCAOB." The continued presence of clean audit opinions helped investors rely on financial statements that contained the red flags.

**B. Marcum Asia's 2024 Audit Certified an Impermissible Mid-Year Impairment Reversal in Categorical Violation of ASC 360.**

255. Marcum Asia certified a 2024 financial statement that could not be reconciled with the Company's mid-year impairment disclosure.

256. Defendant Marcum Asia certified the 2024 Form 20-F filed April 22, 2025. The 2024 Form 20-F contained materially inconsistent accounting for impairment of long-lived assets that violates U.S. GAAP under ASC 360-10-35-20, which categorically prohibits the reversal of previously recognized impairment losses on long-lived assets held and used. The Company's H1 2024 Form 6-K disclosed that during the six months ended June 30, 2024, the Company had identified "a triggering event of negative cash flow and operating losses at the freight forwarding and warehousing asset group level that indicated the carrying amounts of the Company's long-lived assets may not be recoverable" and that the Company had "recognized an impairment charge within operating expenses of RMB 396,850 (US$ 55,684) against the property and equipment." The 2024 Form 20-F, in contrast, reported (page F-11) that "no impairment were recognized based on the management's assessment" for the year ended December 31, 2024—an impossibility given

Jayud's own contemporaneous disclosures, unless the H1 2024 impairment charge was reversed in the second half of 2024.

257. The 2024 Form 20-F further contains three internally inconsistent statements about 2024 impairment within the same filing: page F-10 references "the impairment charge during the year ended December 31, 2024"; page F-11 states that "no impairment were recognized based on the management's assessment" for 2024; and page F-24 states "No impairment charges was recorded for the year ended December 31, 2024 based on the management's assessment." Marcum Asia's audit opinion on the 2024 financial statements certified those statements as prepared in accordance with U.S. GAAP, notwithstanding the impermissible impairment reversal and the internal inconsistencies within the same Form 20-F. Marcum Asia's certification of a year-end financial statement reversing an impairment of which it had ongoing knowledge, including by virtue of Marcum Asia's review of the H1 2024 interim financial information, was a knowing or reckless violation of PCAOB AS 1015 (Due Professional Care in the Performance of Work) and AS 3105 (Departures from Unqualified Opinions and Other Reporting Circumstances).

**C. The June 2023 SEC Enforcement Order Against Marcum LLP for "Systemic Quality Control Failures" Put Marcum Asia on Heightened Notice.**

258. Prior SEC and PCAOB actions against Marcum placed the firm on heightened notice of quality-control risks.

259. On June 21, 2023 (i.e., before Marcum Asia issued its audit opinions on Jayud's fiscal 2023 and 2024 financial statements, and during the same calendar year as its audit opinion on Jayud's fiscal 2022 financial statements), the SEC entered an enforcement order against Marcum LLP (the U.S. parent firm sharing the Marcum brand with Defendant Marcum Asia) based on findings of "systemic quality control failures and violations of audit standards in connection

with audit work for hundreds of special purpose acquisition company (SPAC) clients beginning at the latest in 2020." In the same order, the SEC found that Marcum LLP's deficiencies "were not limited to SPAC clients, but… reflected systemic quality control failures throughout the firm." Marcum LLP agreed to pay a $10 million civil penalty and to be censured. The PCAOB on the same day separately fined Marcum LLP $3 million and required the firm to make functional changes to its supervisory structure related to its quality-control system.

260. Although Marcum LLP and Marcum Asia CPAs LLP (formerly Marcum Bernstein & Pinchuk LLP) are formally distinct legal entities, the two firms share a brand, a U.S. supervisory umbrella, and common quality-control infrastructure. The SEC's public findings of systemic firm-wide quality-control failures at Marcum LLP placed Marcum Asia, as the China-practice affiliate of the same brand, on heightened notice of the need for enhanced diligence in its audits of PRC-based issuers. A reasonable auditor with such institutional notice would have conducted Jayud's audits with heightened diligence, including specifically with respect to the related party transactions, the going-concern presentations, disclosures in the notes to the financial statements, and the three persistent material weaknesses in internal control over financial reporting.

**D. The September 2025 PCAOB Sanction Against Marcum Asia in Gridsum.**

261. A later PCAOB sanction against Marcum Asia corroborates a pattern of audit-quality failures involving Chinese issuers.

262. On September 23, 2025, after the end of the Class Period and after the April 2025 crash, the PCAOB sanctioned Defendant Marcum Asia CPAs LLP with a $100,000 civil penalty in connection with its audits of Gridsum Holding Inc., a Beijing-based U.S.-listed Chinese issuer, for violation of AS 2610's requirements for communications between predecessor and successor

auditors.

263. The Gridsum order, while post-crash, corroborates the same firm-wide pattern of inadequate audit procedures applicable to PRC-based issuers that the 2023 SEC and PCAOB orders had already documented at the Marcum parent firm. Marcum Asia's engagement-level performance with respect to Gridsum (another Marcum Asia audit relationship) was therefore concurrent with Marcum Asia's engagement-level performance with respect to Jayud and supports the inference that the failures were not isolated incidents of professional judgment but a pattern of deficient engagement-level performance by the firm with respect to U.S.-listed Chinese-issuer audits during the Class Period.

264. This supports the inference that Marcum Asia's Jayud audit failures were not isolated professional-judgment errors but part of a broader engagement-quality problem.

**E. Both Auditors Have Troubling PCAOB Inspection Reports.**

265. The Auditor Defendants in this action are not run-of-the-mill professional service firms whose work-product Defendants and investors could fairly assume would meet PCAOB standards. To the contrary, each of the three audit firms whose engagements bear on the Jayud audit trail, Marcum Asia CPAs LLP, its U.S. parent Marcum LLP, and the predecessor Friedman whose Jayud engagement Marcum Asia acquired effective September 1, 2022, were during the period leading up to and overlapping the Class Period, the subject of PCAOB inspection reports documenting deficiency rates and types of failures that no reasonable issuer, audit committee, or Section 11 due-diligence defendant could responsibly ignore.

266. In its 2023 inspection of Marcum Asia CPAs LLP, the PCAOB reviewed five Marcum Asia audits and identified Part I.A audit deficiencies (defined by the PCAOB as deficiencies "of such significance that we believe the firm, at the time it issued its audit report(s),

had not obtained sufficient appropriate audit evidence to support its opinion(s)"—*in 5 of 5 audits reviewed, for a 100% deficiency rate*. The deficiencies were not isolated to a single subject-matter area. They included, among other things: (i) on an audit in which Marcum Asia had identified a fraud risk over revenue, a failure to perform procedures to evaluate whether the issuer had met its performance obligations before revenue was recognized, and whether the transaction prices used to recognize revenue were appropriate, in violation of AS 2301.08 and .13; (ii) failures to test the completeness of inventory roll-back transactions, in violation of AS 1105.27 and AS 2510.12; (iii) on a different audit in which Marcum Asia had again identified a fraud risk over revenue, failure to test the accuracy and completeness of issuer-prepared sales data used in the audit procedures, in violation of AS 1105.10 and AS 2305.16; and (as most relevant here) (iv) on the audit of "Issuer E" in the Consumer Discretionary sector, where the firm had identified a fraud risk over revenue, concluding "the firm did not perform procedures to evaluate whether the issuer met its performance obligations before certain revenue from related parties was recognized," in violation of AS 2410.17 (Related Parties). Marcum Asia's failure on that sample audit to perform the very procedures AS 2410 requires for related-party revenue—performed on a Marcum Asia engagement during its 2022 and 2023 audits of Jayud's financial statements—is evidence of the same audit deficiency that allowed Jayud's concealed related-party relationships to evade the related-party scrutiny the auditing standards required. The PCAOB also identified non-compliance findings against Marcum Asia under AS 1301 (audit committee communications, in two of five audits), AS 2101 (audit planning and independence procedures), AS 3101 (auditor's report), PCAOB Rule 2200, and PCAOB Rule 3211 (Form AP).

267. The audit-quality picture at Marcum Asia's U.S. parent, Marcum LLP, is no better. In its 2021 inspection of Marcum LLP for fiscal-2021 audits, the PCAOB identified Part I.A

deficiencies in 15 of 25 audits reviewed, a 60% deficiency rate. The PCAOB's 2022 inspection report for fiscal-2022 audits found Part I.A deficiencies in 14 of 25 audits reviewed, a 56% deficiency rate, with 12 of those audits classified as having "multiple deficiencies." The 2022 report also identified 19 separate instances of potential non-compliance with the auditor-independence rules across 10 different issuers. Such a 56-60% Part I.A deficiency rate, sustained over consecutive PCAOB inspection cycles, combined with 19 independence violations across 10 issuers, shows a record of systemic audit-quality failure.

268. Friedman presented the same pattern. In its 2020 inspection of Friedman for fiscal-2019 audits, which was published less than six months before Friedman handed off the Jayud engagement to Marcum Asia, the PCAOB identified Part I.A deficiencies in 4 of 7 audits reviewed, a 57% deficiency rate, on top of a 50% deficiency rate in the prior 2018 inspection. The Friedman deficiencies again clustered on revenue and inventory testing, including (i) failures to test IT general controls over revenue-recognition applications, in violation of AS 2201.42, .44, and .50; (ii) failures to perform substantive procedures over the accuracy and completeness of issuer-prepared revenue data, in violation of AS 1105.10; (iii) failures to evaluate the terms of revenue contracts between the issuer and its customers, in violation of AS 2301.08; and (iv) failures to test reserves for accounts receivable and inventory, in violation of AS 2501.07 and .09–.12. The type of deficiencies the PCAOB found at Friedman—e.g., failure to test the accuracy and completeness of issuer-prepared revenue data, failure to evaluate the substance of revenue contract terms, and failure to test reserves—is precisely the type of audit failure that, if repeated on the Jayud engagement, would have allowed the Company's reported revenue, related-party characterizations, and credit-loss reserves to escape the testing the auditing standards required.

269. Taken together, the PCAOB inspection record of Marcum Asia (100% Part I.A

deficiency rate; specific AS 2410 related-party failure on a contemporaneous engagement), Marcum LLP (56–60% Part I.A deficiency rates over consecutive cycles; 19 independence violations across 10 issuers), and Friedman (50–57% Part I.A deficiency rates over consecutive cycles; revenue and inventory testing failures) describes a chain of audit firms whose public regulatory record put every securities-law gatekeeper on notice that opinions issued by these firms were materially more likely than industry norm to rest on procedures that did not satisfy the standards Section 11(b)(3) treats as the floor of a due-diligence defense.

## MATERIALLY FALSE AND MISLEADING STATEMENTS/OMISSIONS ISSUED DURING THE CLASS PERIOD

270. In connection with its April 2023 initial public offering, Jayud filed: (a) a Form F-1 Registration Statement declared effective by the SEC on April 18, 2023; (b) a Form F-1/A Pre-Effective Amendment filed March 21, 2023; and (c) a final prospectus dated April 20, 2023 and filed pursuant to Rule 424(b)(4) on April 21, 2023 (collectively, the "IPO Registration Documents"). The IPO Registration Documents were signed by Defendant Geng on behalf of the Company; incorporated audit reports issued by Defendant Friedman (for fiscal year 2020 and 2021 financial statements); and were underwritten by Defendant Benchmark.

271. The IPO Prospectus's 'Prospectus Summary — Overview' opened with the following representation about the Company's market position:

> We are one of the leading Shenzhen-based end-to-end supply chain solution providers in China, with a focus on providing cross-border logistics services. According to the Frost & Sullivan Report, in 2021, we ranked fifth in terms of the revenues generated from providing end-to-end cross-border supply chain solution among all end-to-end supply chain solution providers based in Shenzhen…. A well-connected transportation network enables us to significantly increase efficiency and reduce transportation costs. As one of the most open and dynamic regions in China, Shenzhen is home to renowned enterprises and the gathering place of cross-border e-commerce market players, which provides us with a large customer base and enables us to develop long-term in-depth relationships with our customers.

272. The IPO Prospectus represented specific growth metrics for the periods leading up to the IPO:

….[W]e experienced a rapid growth in 2020 and 2021 as well as the six months ended June 30, 2022. Our gross profit increased by RMB19.1 million, or 161.4%, from RMB11.8 million for the six months ended June 30, 2021 to RMB30.9 million (US$4.6 million) for the six months ended June 30, 2022. Our gross profit increased by RMB13.5 million, or 64.1%, from RMB21.0 million for the year ended December 31, 2020 to RMB34.5 million (US$5.4 million) for the year ended December 31, 2021. Our revenue generated from end-to-end cross-border logistics services increased from approximately RMB210.8 million for the year ended December 31, 2020 to approximately RMB390.2 million (US$61.2 million) for the year ended December 31, 2021, representing a year-on-year increase of 85.1%.

273. The IPO Prospectus catalogued the Company's 'competitive strengths' as follows:

**OUR STRENGTHS**

• One of the leading end-to-end supply chain solution providers based in Shenzhen
• Strong and integrated logistic service capabilities
• Customized logistic solutions comprising a wide range of integrated logistics and freight forwarding services
• R&D capabilities in proprietary IT systems' development contributing to increased operational efficiency
• Long-standing relationships with a wide and diversified customer base
• Visionary and experienced management team with a proven track record

**OUR STRATEGIES**

We aim to execute the following business strategies:

• Further enhance our distribution network

• Adapt our logistic services and customized solutions to different industry verticals in China

• Further invest in our intelligent logistic IT systems

• Further invest in our human capital

• Develop our business and service capacities through investments or acquisitions
IPO Prospectus.

274. The IPO Prospectus's 'Liquidity and Capital Resources' section represented:

We believe our current working capital is sufficient to support our operations for the next

twelve months.

275. The IPO Registration Documents related-party transactions note represented:

> RELATED PARTY TRANSACTIONS
>
> Before the completion of this offering, we intend to adopt an audit committee charter, which will require the committee to review all related-party transactions on an ongoing basis and all such transactions be approved by the committee. Set forth below are material related-party transactions during the fiscal years ended December 31, 2020 and 2021 and the six months ended June 30, 2022.

276. The foregoing business-description, growth-metric, financial and competitive-strength, industry-overview, and customer-concentration statements were materially false and misleading because they sold investors a growth-and-market-leadership story while omitting the most important contrary facts: Jayud hid pre-IPO insider payouts; Jayud was generating large related-party losses, including approximately RMB 429.9 million in cumulative negative gross profit on related-party transactions from 2020 through 2022; its customer and revenue base was weaker and more concentrated than the "wide and diversified" language suggested; Jayud inflated revenue with forged supplier invoices; and its post-IPO results quickly showed deteriorating revenue and negative gross margins. These statements were misleading not only because later results deteriorated, but because the IPO documents presented Jayud's growth and market position without disclosing that a material portion of the Company's historical economics depended on related-party transactions that transferred value away from the Company. A reasonable investor would have viewed the "leading provider," "long-standing relationships," "wide and diversified customer base," and growth statements differently if told that the apparent growth was accompanied by persistent related-party losses, weak collectability, and unremediated financial-reporting weaknesses. These omitted facts would have changed how a reasonable investor assessed whether Jayud's growth was sustainable, arm's-length, and fairly valued.

277. The IPO Prospectus also disclosed the post-offering share structure and voting control as follows:

> Upon the completion of this offering, our issued and outstanding share capital will consist of 14,840,400 Class A ordinary shares and 6,409,600 Class B ordinary shares…. Each Class A ordinary share will be entitled to one (1) vote, and each Class B ordinary share shall be entitled to ten (10) votes…. [O]ur founder and chief executive officer, Mr. Xiaogang Geng… will be able to exercise approximately 81.2% of the total voting power of our issued and outstanding ordinary shares immediately after the consummation of this offering.

278. The IPO Prospectus's 'Reorganization' note represented:

> In anticipation of an initial public offering ('IPO') of its equity securities, the Company incorporated Jayud Global Logistics (Hong Kong) Limited ('JYD HK') under the laws of Hong Kong, PRC, as its direct wholly-owned subsidiary, on June 24, 2022. In September 2022, JYD HK directly invested in JYD WLKJ, as its direct wholly-owned subsidiary. Due to the fact that the Company and its subsidiaries were effectively controlled by the same shareholders immediately before and after the reorganization completed on September 6, 2022, as described above, the reorganization was accounted for as a recapitalization. As a result, the Group's consolidated financial statements have been prepared as if the current corporate structure has been in existence throughout the periods presented

279. The IPO Prospectus's 'Shares Eligible for Future Sale' section described post-IPO insider holdings and the six-month lock-up:

> Lock-up. Our directors and officers and holders of more than 5% of our outstanding shares as of the effective date of this registration statement will enter into customary 'lock-up' agreements in favor of the underwriters for a period of six (6) months from the date of this offering.
> Shares Eligible for Future Sale (at 186): "LOCK-UP AGREEMENTS. We have agreed, for a period of three (3) months from the closing of this offering, we will not to (i) offer, sell, or otherwise transfer or dispose of, directly or indirectly, any capital shares of us or any securities convertible into or exercisable or exchangeable for capital shares of us, or (ii) file or caused to be filed any registration statement with the SEC in relating to the offering of any capital shares of us or any securities convertible into or exercisable or exchangeable for capital shares of us. Furthermore, our directors, officers and holders of more than 5% of our outstanding shares as of the effective date of this registration statement will enter into customary 'lock-up' agreements in favor of the underwriters for a period of six (6) months from the date of this offering. The restrictions described in the preceding paragraphs will be automatically extended under certain circumstances

280. The foregoing voting structure, reorganization, and lock-up statements were materially false and misleading because they omitted that the IPO had already triggered a RMB 35 million cash payment to the Initial Shareholders and that Defendant Geng had signed a separate US$6 million financing or contribution commitment. Those facts mattered because investors were evaluating Jayud's cash sufficiency, related-party conflicts, insider monetization, and whether the IPO proceeds would fund operations and growth rather than replenish cash paid to pre-IPO owners. The omission of the RMB 35 million payment and the Geng commitment letter made the IPO look like a straightforward capital raise for corporate growth when, as later disclosed to the SEC, the IPO also triggered a cash payout to pre-IPO owners and depended on a contingent insider financing commitment. That omitted context mattered to liquidity, use of proceeds, related-party fairness, and whether insiders had already monetized value before public investors bought shares. The voting-structure representation was materially false and misleading because it omitted that the structure made the stock particularly susceptible to price manipulation.

281. The IPO Registration Documents disclosed three material weaknesses and represented as to remediation:

> In connection with the audits of our consolidated financial statements for the years ended and as of December 31, 2020 and 2021, we and our independent registered public accounting firm identified three 'material weaknesses' in our internal control over financial reporting, as defined in the standards established by the PCAOB, and other control deficiencies.
>
> A 'material weakness' is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.
>
> The material weaknesses identified are related to:

> (i) Lack of formal internal control policies and internal independent supervision functions to establish formal risk assessment process and internal control framework;
>
> (ii) Lack of accounting staff and resources with appropriate knowledge of generally accepted U.S. GAAP and SEC reporting and compliance requirements to design and implement formal period-end financial reporting policies and procedures to address complex U.S. GAAP technical accounting issue in accordance with U.S. GAAP and the SEC requirements; and
>
> (iii) Information technology general control, or ITGC, in the areas of: (1) Risk and Vulnerability Assessment and Management; (2) Third-Party (Service Organization) Vendor Management; (3) System Change Management; (4) Backup and Recovery Management; (5) Access to Systems and Data; (6) Segregation of Duties, Privileged Access, and Monitoring; (7) Password Management.

282. The IPO Prospectus's 'Risk Factors' section addressed material weaknesses through the following representation:

> In response to the material weaknesses identified prior to this offering, we are in the process of implementing a number of measures to address the material weakness identified, including but not limited to (i) hiring additional qualified accounting and financial personnel with appropriate knowledge and experience in U.S. GAAP accounting and SEC reporting; and (ii) organizing regular training for our accounting staffs, especially training related to U.S. GAAP and SEC reporting requirements. We also plan to adopt additional measures to improve our internal control over financial reporting, including, among others, creating U.S. GAAP accounting policies and procedures manual, which will be maintained, reviewed and updated, on a regular basis, to the latest US GAAP accounting standards, and establishing an audit committee and strengthening corporate governance.

283. The foregoing internal-control and risk-factor statements were materially false and misleading because Jayud repeatedly said it was addressing material weaknesses while the same weaknesses persisted year after year. Those weaknesses were not abstract; they related to the precise problems at issue here, including related-party transaction disclosure, credit-loss reserves, prepaid-asset presentation, tax-refund collectability, and detection of forged invoices. These internal-control statements were material because they bore on the reliability of every financial statement investors were asked to trust. The persistence of the same weaknesses across later annual

reports supports the inference that the remediation language created a misleading impression of progress while the accounting, related-party, and invoice-control problems continued.

284. The IPO Prospectus's "Risk Factors" section addressed price volatility and manipulation risk through the following representations:

> The trading price of our Class A ordinary shares is likely to be volatile, which could result in substantial losses to investors. Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with a number of recent initial public offerings, especially among companies with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Class A ordinary shares.
>
> Moreover, the volatility and fluctuation of the trading price of our Class A ordinary shares may happen because of broad market and industry factors, like the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. A number of Chinese companies have listed or are in the process of listing their securities on U.S. stock markets. The securities of some of these companies have experienced significant volatility, including price declines in connection with their initial public offerings.
>
> In addition, if the trading volumes of our Class A ordinary shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Class A ordinary shares. This low volume of trades could also cause the price of our Class A ordinary shares to fluctuate greatly, with large percentage changes in price occurring in any trading day session.

285. The foregoing volatility and manipulation risk-factor representations were materially false and misleading because they framed the structural vulnerabilities in Jayud's IPO architecture as generic, industry-wide hazards Jayud might passively "experience," when those vulnerabilities were instead specific, engineered, and known features of an intentionally constructed manipulation-enabling capital structure. The Risk Factor failed to disclose: (a) that

the IPO's 1,250,000-share public float and the 10-to-1 Class B supervoting structure were deliberately engineered by Defendant Geng to produce exactly the "small public float" condition the Risk Factor identified as creating heightened susceptibility to "extreme price run-ups," "rapid price declines," and price movement "by persons buying or selling in relatively small quantities"; (b) that the undisclosed related party transactions and false financials created a heightened risk of these general warnings impacting Jayud (c) that Defendant Geng and the Company intended to issue 68.5 million additional Class A ordinary shares to insider-connected purchasers, thereby creating exactly the discounted-share concentration the Risk Factor's "extreme stock price run-ups followed by rapid price declines" language presupposes as the supply-side precondition for coordinated dumping; (d) that reference to volatility "by persons buying or selling in relatively small quantities" failed to disclose Jayud's exposure to the specific manipulation vector through social-media-based promotion; and (e) that the Company had no intention of, and took no measures consistent with, structuring its post-IPO disclosure or transactional conduct to minimize the specific structural risks the Risk Factor enumerated, because those structural risks were the Company's and Defendant Geng's intended operating model. A reasonable investor evaluating Jayud's IPO would have considered the Risk Factor's disclosure of generic volatility, low-float, and "Chinese-issuer-listed-in-U.S." risks materially different from a disclosure that the issuer itself had engineered the precise structural conditions the Risk Factor identified as creating those risks and intended to exploit them through planned post-IPO insider-connected discounted placements followed by social-media-driven coordinated promotion.

286. Defendant Friedman issued the following unqualified audit opinion on the Company's 2020 and 2021 consolidated financial statements:

> In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2021, and the results

> of its operations and its cash flows for each of the years in the two-year period ended December 31, 2021, in conformity with accounting principles generally accepted in the United States of America…. We conducted our audits in accordance with the standards of the PCAOB.

287. The foregoing Friedman audit opinion was materially false and misleading because it gave apparent independent validation to financial statements that contained the core defects pleaded here: obscured related-party economics, under-reserved receivables, improper presentation and accounting for impairment of prepaid-assets, improper presentation and accounting for impairment of long-lived assets, omitted disclosure of the undisclosed subsequent events (reorganization agreements with the Initial Shareholders and controlling shareholder's commitment letter), and lack of contingency disclosure related to the later-disclosed forged-invoice issues. The clean audit opinion was material because it gave outside-auditor credibility to the very financial statements used to sell the IPO and later offerings. Without the clean opinion, reasonable investors would have had far greater reason to question Jayud's reported growth, liquidity, related-party economics, and ability to continue as a going concern.

288. On May 15, 2023, three weeks after the IPO closed, the Company filed its Form 20-F for fiscal year 2022 (the "2022 Form 20-F"), signed by Defendant Geng. The 2022 Form 20-F included an unqualified audit opinion from Defendant Marcum Asia and was subsequently incorporated by reference into the June 2024 Form F-3 Shelf Registration Statement.

289. The 2022 Form 20-F's 'Liquidity and Capital Resources' section represented:

> As of December 31, 2022, we had cash of RMB28.4 million (US$4.1 million) and working capital of approximately RMB0.4 million (US$0.1 million). We believe our current working capital is sufficient to support our operations for the next twelve months.

290. The 2022 Form 20-F included Marcum Asia's unqualified audit opinion on the Company's 2022 consolidated financial statements:

> In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America. ….We conducted our audit in accordance with the standards of the PCAOB.

291. The 2022 Form 20-F continued to disclose the same three material weaknesses and represented as to remediation:

> The Company has identified three material weaknesses in our internal control over financial reporting …. we are in the process of implementing a number of measures to address the material weakness identified…..

292. The foregoing statements in the 2022 Form 20-F were materially false and misleading because the filing described Jayud's working capital as sufficient even though the same filing showed negative operating cash flow, only approximately RMB 0.4 million in working capital, and positive pre-tax income that depended entirely on a transitory foreign-exchange gain. The filing also continued the core IPO-era omissions, including the RMB 35 million payment, Defendant Geng's US$6 million commitment, persistent control weaknesses, and the accounting and presentation issues. Together, those omissions overstated Jayud's liquidity and financial reliability. The 2022 Form 20-F was especially important because it was filed only weeks after the IPO and then incorporated into the later shelf registration statement. The opinions also omitted the 2022 going-concern warning that should have appeared, thereby masking the financial fragility that made the later promotion possible. Its "sufficient working capital" statement, clean audit opinion, and repeated remediation language reassured investors at the precise time the Company's cash-flow statement, FX-driven income, omitted insider payment, and continuing control weaknesses showed that the IPO narrative was unreliable.

293. On April 26, 2024, the Company filed its Form 20-F for fiscal year 2023 (the "2023 Form 20-F"), signed by Defendant Geng. The 2023 Form 20-F included Marcum Asia's

unqualified audit opinion with a going-concern explanatory paragraph.

294. Marcum Asia's 2023 audit opinion contained the following going-concern paragraph:

> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 3, the Company has a significant working capital deficiency, has incurred significant losses and needs to raise additional funds to meet its obligations and sustain its operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

295. In the same 2023 Form 20-F, the Company represented:

> Based on the approved management plan and shareholder financing, the Company concluded that substantial doubt is raised but is alleviated by management's Plans.

296. The 2023 Form 20-F continued to disclose the old carrying values for its property and equipment without adjusting them for impairment:

> Property and equipment is stated at cost less accumulated depreciation and impairment, if any, and depreciated on a straight-line basis over the estimated useful lives with an estimated residual value of the assets …

297. The 2023 Form 20-F continued to disclose the same three material weaknesses and represented:

> [W]e and our independent registered public accounting firm identified three material weaknesses in our internal control over financial reporting…. In response to the above-mentioned material weaknesses (i) and (ii) identified, we implemented a number of measures to address the material weakness identified, including but not limited to (i) recruitment of a chief financial officer with appropriate knowledge and experience in U.S. GAAP accounting and SEC reporting; and (ii) established of an audit committee and internal control department. In addition, we are in the process of (i) setting up formal internal control policies and internal independent supervision functions…and (ii) organizing regular training for our accounting staffs….

298. The foregoing statements in the 2023 Form 20-F were materially false and misleading because the filing said two opposite things about going concern: the audit opinion and

Note 3 to the financial statements disclosed substantial doubt, while page 88 stated that management's plans alleviated that doubt. The SEC flagged the inconsistency, and Jayud later agreed to revise the disclosure to say that substantial doubt "cannot be alleviated" by management's plans. The filing also continued to obscure asset-quality and control problems, including the RMB 18.2 million credit-loss provision and the same unremediated material weaknesses. The 2023 Form 20-F's going-concern inconsistency was material because it presented opposite messages in the same filing on a core survival issue: whether Jayud could continue as a going concern. A reasonable investor would view a company differently if management's plans could not alleviate substantial doubt, as opposed to if those plans had alleviated the doubt.

299. On September 23, 2024, in response to the SEC Staff's July 22, 2024 Comment Letter, the Company filed an amended 2023 Form 20-F (the "2023 Form 20-F/A").

300. The 2023 Form 20-F/A's revised disclosure regarding the RMB 35 million payment represented:

> The Company entered into a supplemental agreement (the 'Supplemental Agreement') with the Initial Shareholders on September 7, 2022. This Supplemental Agreement stipulated that if the IPO was successfully completed within one year of the reorganization date, the Company would pay RMB 35 million to the Initial Shareholders; otherwise, no payment would be made. In January and February 2023, anticipating the imminent completion of the IPO, the Company voluntarily settled and made the payment of RMB 35 million to the Initial Shareholders pursuant to the Agreements and the Supplemental Agreement.

301. The foregoing statement in the 2023 Form 20-F/A was materially false and misleading because, although it finally disclosed the RMB 35 million payment, it still did not identify the recipients, quantify each recipient's share, explain the business purpose, or explain why the IPO-triggered cash payment to pre-IPO owners had been omitted from the IPO documents

and the 2022 Form 20-F. The amendment therefore only partially corrected the omission and still withheld information necessary to evaluate insider self-dealing and liquidity. The amended disclosure was still incomplete because it admitted the payment only after SEC intervention but did not identify who received the money, how the recipients were related to Jayud, why the payment was triggered by IPO completion, or whether Defendant Geng received a portion. Those omissions prevented investors from assessing the extent of insider value extraction and the related-party nature of the transaction.

302. In June 2024, the Company filed a Form F-3 Shelf Registration Statement (the "Form F-3 Shelf"). The Form F-3 Shelf was the registration statement under which the Company conducted its December 3, 2024 registered direct offering.

303. The Form F-3 Shelf represented:

> The following documents filed with the SEC are incorporated by reference into this registration statement: (a) our Annual Report on Form 20-F for the fiscal year ended December 31, 2022; (b) our Annual Report on Form 20-F for the fiscal year ended December 31, 2023; and (c) all subsequent annual reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act, and all reports on Form 6-K that we identify in such reports as being incorporated by reference into this registration statement.

304. On October 28, 2024, the Company filed a Form 6-K bundling and disclosing seven 'Transactions' that had taken place in the preceding weeks, including the October 2024 PIPE financing of 14,793,335 Class A shares at US$0.45 per share, the October 2024 acquisition cluster of 7,290,267 Class A shares, and the September 2024 convertible-debenture conversions.

305. The October 28, 2024 Form 6-K represented:

> During the period from October 21, 2024 to October 28, 2024, the Company consummated (i) the acquisition of a 20% stake in a 70,000 square feet warehouse located in Rialto, California, (ii) the acquisition of a 49% stake in a 50,000 square feet warehouse located in Chino, California, (iii) acquisition of a 10% stake in a licensed customs broker established in 2016, (iv) the acquisition of a 95% stake in a 28,320 square feet warehouse located in Houston, Texas, (v) the acquisition of a 20% stake in a 60,000 square feet warehouse

> located in Somerset, New Jersey, (vi) a private placement offering (the 'PIPE') of its Class A ordinary shares in the aggregate amount of $6,657,000, and (vii) the conversion of convertible notes issued in September 2024 and October 2024 (collectively, the 'Transactions'). The Company believes that, as of the date of this report, it has regained compliance with the Stockholders' Equity Requirement based upon the Transactions.

306. The foregoing statement in the October 28, 2024 Form 6-K was materially false and misleading because it presented the October transactions as ordinary financing and acquisition activity while omitting the most important context: the transactions were used to regain Nasdaq stockholders' equity compliance, issued millions of discounted shares, involved buyers and sellers with ties to Jayud's U.S. operations, and included trading-oriented SPA provisions. That context mattered because it showed the transactions were not ordinary arm's-length expansion transactions, but part of the discounted-share stockpile. The October 28 disclosure was misleading because it grouped acquisition consideration, a PIPE, and debenture conversions together as compliance-restoring "Transactions" while omitting the identity and related-party connections of the share recipients. That omission mattered because the transactions materially changed the ownership and trading inventory of a low-float issuer shortly before the promotion campaign.

307. On October 21, 24, and 28, 2024, the Company entered into three Share Purchase Agreements (collectively, the "October SPAs") for the sale of 14,793,335 Class A ordinary shares at US$0.45 per share in the October 2024 PIPE. Defendant Geng signed each of the October SPAs on the Company's behalf.

308. The October SPA contained the following representation and covenant:

> Notwithstanding the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that . . . no Purchaser shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced . . . ; and . . . no Purchaser shall have any duty of confidentiality or duty not to trade in the securities of the Company to the Company, any of its Subsidiaries, or any of their respective officers,

directors, employees, Affiliates or agent, after the issuance of the initial press release . . .

309. The foregoing October SPA disclosures were materially false and/or misleading because: (a) Section 4.11's express acknowledgment that the buyers retained the right to engage in "any transactions" in Jayud securities "from and after the time that the transactions contemplated by [the October SPA] are first publicly announced" is structurally incompatible with any genuine investment intent—no genuinely passive accredited investor needs an explicit Company acknowledgment that the buyer retains the right to trade and short-sell after the placement is publicly announced; (b) the October 28, 2024 Form 6-K accompanying the SPA exhibits characterized the October PIPE purchasers only as "certain accredited investors," concealing the identities of buyers Echo Cheng, Weiliang Zhang, and Lisheng Yu (through Long Hing Wholesale Express, LLC); and (c) the October SPAs failed to disclose that Echo Cheng and Weiliang Zhang were already co-managers of HYTX Warehouse No. 10 LLC with Jayud's wholly-owned U.S. subsidiary Joyed Logistics Services Inc., and that Lisheng Yu received 2,219,828 Class A ordinary shares in the same week as consideration for the Yukon Flooring Bellaire LLC acquisition, making each of the three October PIPE buyers a Section 13(d)/Item 7.B related-party transaction counterparty whose pre-existing business relationship with Jayud's U.S. operations was required to be disclosed.

310. On October 25, 2024, the Company filed a Form 6-K announcing its H1 2024 results without a full set of financial statements or management's discussion and analysis. The Company filed an amended Form 6-K on November 27, 2024 including the missing information.

311. The H1 2024 Form 6-K disclosed:

> During the six months ended June 30, 2024, there was a triggering event of negative cash flow and operating losses at the freight forwarding and warehousing asset group level that indicated the carrying amounts of the Company's long-lived assets may not be recoverable. In accordance with ASC 360, the Company performed an undiscounted cash flow analysis

> and concluded that the carrying value of the asset group was not recoverable. Accordingly, the Company recognized an impairment charge within operating expenses of RMB 396,850 (US$ 55,684) against the property and equipment for the six months ended June 30, 2024. Revenues increased approximately 59.6% year-over-year. Gross margin remained negative (worsening from approximately negative 0.4% to approximately negative 1.0%).

312. The foregoing statement in the H1 2024 Form 6-K was materially false and misleading because it disclosed a mid-year impairment charge and negative margin trends without adequately connecting those facts to Jayud's worsening operating condition and later inconsistent full-year impairment disclosures. The filing also omitted the SEC comment-letter issues and the continuing related-party and accounting disclosure problems, all of which would have undercut the market's ability to evaluate the later stock run-up. The H1 2024 disclosure was material because it showed that the Company's business remained loss-generating and asset values were under pressure immediately before the discounted placements and price run-up. Those facts would have undermined any inference that later price appreciation was driven by fundamentals.

313. On December 3, 2024, the Company filed (a) a Form 6-K announcing a registered direct offering of 50,000,000 Class A ordinary shares at US$0.20 per share, and (b) a Form 424B5 prospectus supplement to the June 2024 Form F-3 Shelf documenting the same offering. The offering raised US$10 million gross with no underwriter, no placement agent, and no public-market access.

314. The December 3, 2024 Form 6-K and Form 424B5 represented:

> The closing of the Offering is expected to occur on or about December 10, 2024, subject to customary closing conditions.

315. The Form 424B5's 'Recent Developments' section represented:

> Recent Developments. On July 22, 2024, the board of directors of the Company approved and adopted the Company's 2024 Share Incentive Plan, which became effective on August 15, 2024. On September 13, 2024, the Company entered into securities purchase

agreements with certain accredited investors, pursuant to which the Company received net proceeds of $800,000 in consideration of the issuance of Convertible Debentures in the principal amount of $800,000. On October 22, 2024, the investors converted the entire principal amount and accrued interest under the Convertible Debentures into 2,069,382 Class A ordinary shares of the Company. On October 21, 2024, the Company acquired a 20% equity interest in HYTX Warehouse No.3 LLC by issuing 1,680,016 Class A ordinary shares as consideration. . . . On October 21, 2024, the Company acquired a 49% stake in HYTX Warehouse No.10 LLC by issuing 1,568,457 Class A ordinary shares as consideration. . . . On October 26, 2024, the Company acquired a 20% equity interest in HYTX Warehouse No.11 LLC by issuing 1,704,851 Class A ordinary shares as consideration. . . . On October 21, 2024, the Company acquired a 10% equity interest in LD Global Logistics Inc., a licensed customs broker based in Georgia, USA, by issuing 117,115 Class A ordinary shares as consideration. On October 25, 2024, the Company acquired a 95% equity interest in Yukon Flooring Bellaire LLC, which owns a 28,320 sq.ft. warehouse and the related land located in Houston, Texas. The Company issued 2,219,828 Class A ordinary shares as consideration for the acquisition. On October 28, 2024, the Company issued in a private placement an aggregate of 14,793,335 Class A ordinary shares to certain [accredited investors]. . . .

316. The Form 424B5's 'Use of Proceeds' section represented:

USE OF PROCEEDS. We estimate the net proceeds from this offering will be approximately US$9.9 million, after deducting the estimated offering expenses payable by us. We plan to use the net proceeds from this offering as follows: • Approximately 40% of the net proceeds from this offering for supplementing our operating cash flow and general corporate use; • Approximately 30% of the net proceeds from this offering for repayment of outstanding loans, which had annual interest rates ranging from zero to 6% and maturity dates from December 2024 to September 2025; • Approximately 20% of the net proceeds from this offering for overseas investments and potential mergers and acquisitions in the future; and • Approximately 10% of the net proceeds from this offering for the registration and operation of our overseas business entities, branches and offices. However, our management will have significant flexibility and discretion in applying the net proceeds of this offering.

317. The foregoing statements in the December 3, 2024 Form 6-K and Form 424B5 were materially false and misleading because they omitted key context about the 50 million-share offering: the buyers were undisclosed, the offering was priced at US$0.20 per share, and the filings did not identify that proceeds would repay Defendant Geng's approximately US$1.05 million

personal loans. Those facts mattered because the December offering doubled the Class A share count and supplied the low-cost block later tied to the crash volume. The December offering documents were misleading because they disclosed a 50 million-share financing but did not identify the buyers, the pre-existing relationships, the coordinated 13G pattern, or the extent to which proceeds were used to repay Defendant Geng. Those omissions concealed both the supply side of the dump and the insider motive for completing the discounted offering.

318. The Share Purchase Agreement for the December 3, 2024 registered direct offering (the "December SPA") was filed with the SEC as Exhibit 10.1 to the December 3, 2024 Form 6-K. The December SPA contained the following materially false and/or misleading statements:

319. The December SPA represented:

> The contact between the Company and each Purchaser was made directly through an existing relationship. No broker, investment banker or other person is entitled to any broker's, finder's or other similar fee or commission in connection with the execution and delivery of this Agreement or the consummation of any of the transactions contemplated by this Agreement based upon arrangements made by or on behalf of each Purchaser.

320. The December SPA also contained additional purchaser representations, stating:

> Each Purchaser is acquiring the Shares for its own account for investment purposes only and does not have any direct or indirect arrangement, or understanding with any other persons to distribute, or regarding the distribution of the Shares.
>
> Such Purchaser represents and warrants to the Company that at no time prior to the date of this Agreement has any of the Purchaser, its agents, representatives or affiliates engaged in or effected, in any manner whatsoever, directly or indirectly, any (i) 'short sale'… or (ii) hedging transaction, which establishes a net short position with respect to the Ordinary Shares.
>
> Such Purchasers shall not (i) engage in any short-selling activities involving the Ordinary Shares, or (ii) lend the Shares to any third party.
>
> Such Purchaser shall not make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated by this

> Agreement or otherwise communicate with any news media without the prior written consent of the Company.

321. The October SPAs contained an express short-selling carveout; the December SPA, by contrast, contained anti-shorting and anti-lending covenants:

> Notwithstanding the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that (i) no Purchaser makes any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced . . .; (ii) no Purchaser shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced . . .; and (iii) no Purchaser shall have any duty of confidentiality or duty not to trade in the securities of the Company to the Company, any of its Subsidiaries, or any of their respective officers, directors, employees, Affiliates or agent, after the issuance of the initial press release as described in Section 4.6.

322. The foregoing SPA disclosures were materially false and misleading because Jayud filed blank form agreements while omitting the buyer identities and the nature of their "existing relationship" with the Company. The October SPA also contained a short-selling/trading carveout, and the December SPA contained buyer restrictions that became important in light of the post-placement trading. Investors were therefore denied the information needed to assess whether the placements were arm's-length and whether the low-cost buyers could profit from, or were restricted in connection with, later market activity. The December SPA provisions were misleading because the filed agreement confirmed pre-existing Company contacts and restrictive purchaser covenants while simultaneously concealing the purchaser identities. Investors therefore could not test whether the purchasers were independent, whether they were connected to insiders, or whether their later trading was consistent with the representations they made to obtain 50 million discounted shares.

323. On February 4, 2025, each of the seven December Placement Defendants (Charles Tjang, Heng Lip Huat, Leo Reggan, Richard Lau Lik Chai, Tang Kok Yong, Loh Lik Ren, and Tong Tien Seng) filed a separate Schedule 13G beneficial-ownership report with the SEC. Each Schedule 13G was filed under Rule 13d-1(c), the "passive investor" rule, and each contained the following certification at Item 10:

> By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect . . . .

324. The foregoing Rule 13d-1(c) "passive investor" certifications in each of the seven February 4, 2025 Schedule 13G filings were materially false and/or misleading because the seven filers had in fact acquired their Jayud Class A ordinary shares as a coordinated group of buyers within the meaning of Section 13(d)(3) of the Exchange Act, 15 U.S.C. § 78m(d)(3), and in connection with a transaction (the December 3, 2024 registered direct offering) that doubled the Company's outstanding Class A ordinary share count and that materially financed Defendant Geng's personal-loan recovery from the Company. The structural makeup of the seven Schedule 13G filings—identical round-million-share lot sizes, repeating-digit ownership percentages of 6.66%, 7.77%, and 8.88%, an identical December 4, 2024 event date, an identical 90,112,868-share outstanding-share denominator, identical Schedule 13G template language, identical February 4, 2025 filing date, and no prior or subsequent EDGAR appearance by any of the seven filers—is consistent only with coordinated action by a group of buyers acting in concert under a common arranger acting on behalf of the Company or Defendant Geng. The seven filers' Rule 13d-1(c) certifications that they had not acted in concert with any other person, that their securities had not been acquired in connection with any "transaction having that purpose or effect" of

changing or influencing control of the Company, and that they were entitled to file on the passive-investor Schedule 13G form rather than on a coordinated-group Schedule 13D form, were each materially false and misleading. Each of the seven Schedule 13G filings was a Class Period false statement made by, and traceable to, the December Placement Defendants individually and jointly, in connection with the same coordinated December Placement scheme orchestrated by Defendant Geng and the Individual Defendants.

325. The foregoing Schedule 13G certifications were additionally materially false and/or misleading because, despite the magnitude of the December Placement Defendants' combined 55.49% beneficial ownership of the December 4, 2024 outstanding Class A ordinary shares (a controlling-block-sized position that, if held by a Section 13(d)(3) group, would have required filing on a single joint Schedule 13D rather than on seven separate Schedule 13Gs) none of the seven Schedule 13Gs (i) checked the Item 2 group-designation box; (ii) was accompanied by a Joint Filing Agreement; or (iii) identified any other reporting person as a co-filer. The omissions of these three required Section 13(d)(3) group disclosures rendered each of the seven Rule 13d-1(c) passive-investor certifications independently materially misleading at the time it was made.

## **JAYUD'S CLASS PERIOD FILINGS VIOLATED SEC DISCLOSURE REQUIREMENTS**

326. Jayud's SEC filings identified above also failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Jayud's operating performance.

327. Item 303 of Regulation S-K required that Jayud's Class Period Registration Statement and F-20 disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

328. Similarly, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required

in the "Risk Factors" section of filings "a discussion of the [most significant] factors that make [the offering] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk."

329. In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. As the interpretative guidance states:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract…..
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

330. The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

331. Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

> Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

332. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11

of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure….
> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

333. Thus, Jayud's MD&A and risk disclosures were materially false and misleading because they omitted the known trends and uncertainties that mattered most to investors: deteriorating margins and cash flow, persistent going-concern doubts, related-party transfers, discounted share placements, unresolved control weaknesses, and the risk that the stock price was disconnected from fundamentals. Those omissions deprived investors of a clear, high-level explanation of the risks that later materialized. The known trends and uncertainties included related-party value transfers, declining margins, negative operating cash flow, going-concern doubt, unremediated controls, delayed acquisition-termination disclosure, and the 50 million-share discounted overhang. These were not abstract risks; they were existing conditions that were already affecting Jayud's financial condition and were reasonably likely to affect revenues, margins, liquidity, dilution, and market trading.

**UNDISCLOSED ADVERSE FACTS**

334. As a result of the materially false and/or misleading statements and omissions

alleged herein, Jayud's securities traded at artificially inflated prices during the Class Period. Specifically, Defendants failed to disclose to investors:

(a) That Jayud's stock price was being artificially inflated by a coordinated WhatsApp "investment" groups promotion scheme involving impersonators posing as financial advisors;

(b) That the December 2024 registered direct offering placed 50 million freely tradeable shares with undisclosed accredited investors at $0.20 per share -- a 70% discount to market -- without any public access, creating a massive overhang of low-cost shares that could be used to profit from artificial price inflation;

(c) That insiders and/or affiliates, including through offshore BVI entities, may have used the non-public share placements and/or connected persons to facilitate the coordinated dumping of shares during the price inflation campaign;

(d) That the Company had substantial going concern doubts -- as explicitly stated in the December 2024 Prospectus Supplement -- that were not adequately disclosed in contemporaneous public filings;

(e) That the Company's public statements and risk disclosures throughout the Class Period omitted any mention of the false rumors and artificial trading activity that the Company knew was driving its stock price; and

(f) That the IPO Registration Statement, Shelf Registration, and December Prospectus Supplement contained materially false or incomplete financial statements and business descriptions.

## ADDITIONAL SCIENTER ALLEGATIONS

### I. Pre-IPO Premeditation and Foundational Disclosure Failures (September 2022 – April 2023)

335. ***Geng's involvement at each operational stage***. Geng signed and certified the IPO documents and each annual report, executed the October and December SPAs, confirmed pre-existing purchaser relationships in the December SPA, loaned the Company approximately US$1.05 million and was repaid from December Placement proceeds, participated in the SEC response conceding that the RMB 35 million payment should have been disclosed, and signed the delayed Form 6-K disclosing the NO.11 termination. Combined with his voting control through Europa, those facts show more than title-based access; they show his personal involvement in the

challenged filings, placements, related-party disclosures, and concealment events.

336. ***The September 7, 2022 dual self-dealing arrangements.*** On September 7, 2022, Defendant Geng signed both (a) the Supplemental Agreement obligating Jayud to pay the Initial Shareholders RMB 35 million in cash if the IPO closed within twelve months and (b) a personal commitment letter undertaking either to raise or contribute at least US$6 million within 36 months post-IPO. Both arrangements were signed the day after the September 6, 2022 reorganization that concentrated voting control in three British Virgin Islands shell entities at a common Tortola address. The fact that Geng signed both arrangements on the same day, before the F-1 was even drafted, supports the inference that the IPO was structured from the outset to extract a cash payment to the Initial Shareholders contingent on a successful offering and to commit the Controlling Shareholder to a personal capital backstop and that Geng was aware of both arrangements when the IPO Registration Documents' "sufficient working capital" representation was made without disclosing either.

337. ***The RMB 35 million was paid out before the F-1/A was filed.*** Jayud paid the RMB 35 million to the Initial Shareholders in January and February 2023. The F-1/A was filed March 21, 2023. The IPO was declared effective April 18, 2023 and closed April 21, 2023. Each of those filings was made after the cash had been disbursed out of working capital. As Defendant Geng signed the F-1/A and the final prospectus, the "sufficient working capital" representation (made in the present tense, weeks after the RMB 35 million payment) necessarily required Defendant Geng either to have omitted from disclosure a completed cash payment of which he had personal knowledge or to have affirmatively misrepresented the Company's liquidity position. Indeed, the temporal sequence eliminates any inference that the omission was purely inadvertent.

338. ***The IPO Registration Statements rested on a financial foundation that***

***Defendants knew was false.*** The audited financial statements for fiscal years 2020 through 2022 were riddled with irregularities that the Company has since admitted: (i) forged VAT invoices embedded in the 2018 and 2021 books and records; (ii) the September 7, 2022 dual arrangements through which Defendant Geng simultaneously held the Company's pre-IPO equity and the entire RMB 35 million Cargo Link receivable; (iii) the January–February 2023 payout of approximately RMB 35 million in undisclosed connected-party transactions, completed before the F-1/A was filed; and (iv) the same material weaknesses in internal control over financial reporting that the Company would later admit had persisted across every reporting period since the IPO. Defendant Geng signed the Registration Statements, orchestrated the underlying transactions, and personally received the RMB 35 million payout. The chasm between the financial picture the Registration Statements painted and the Company's subsequent admissions confirms that Defendants either knew, or were severely reckless in disregarding, that the IPO disclosures were materially false and misleading when made.

339. ***Friedman's audit failures and May 2024 consent support recklessness as to the IPO-era financial statements.*** Friedman certified the 2020 and 2021 financial statements and later consented to their use in the F-3 shelf, even though those statements contained buried related-party losses, understated credit-loss reserves, improper prepaid-asset presentation, omitted subsequent-event disclosure of the RMB 35 million payment, and 2021 export transactions later implicated by forged VAT invoices. By re-permitting use of those audit reports during the Class Period, Friedman reaffirmed the reliability of foundational financial statements that contained red flags a reasonable auditor should have addressed.

## II. Early Class Period Filings and Auditor-Network Notice (May 2023 – July 2023)

340. ***Marcum Asia's 2022 audit opinion omitted a going-concern warning despite severe liquidity indicators.*** Jayud's 2022 financial statements showed approximately RMB 0.4

million in working capital, negative operating cash flow of approximately RMB 15.2 million, and pre-tax income dependent on a transitory foreign-currency gain. By 2023, Marcum Asia included a going-concern paragraph based on conditions substantially present in 2022. These facts support the inference that Marcum Asia recklessly failed to confront going-concern indicators before the later discounted placements and promotional campaign.

341. ***Marcum's broader audit-quality history reinforces the inference of recklessness.*** The June 2023 SEC and PCAOB proceedings involving Marcum LLP placed the Marcum network on heightened notice of audit-quality risks, and the later PCAOB sanction against Marcum Asia in Gridsum involved another U.S.-listed Chinese issuer. Those matters provide context showing that Marcum Asia should have exercised heightened care in auditing Jayud. Against that backdrop, Marcum Asia's clean opinions despite Jayud's related-party, going-concern, impairment, and internal-control red flags support a strong inference of recklessness.

342. ***Strategic Investor Relations LLC's pattern of associated stock collapses.*** On July 12, 2023, the Company announced its engagement of Strategic Investor Relations LLC, principal Matthew Abenante, IRC, as its investor-relations firm. Strategic Investor Relations LLC has been associated with at least two other Chinese small-cap NASDAQ issuers that experienced dramatic stock-price declines following the firm's engagement: VisionSys AI Inc. (NASDAQ: VSA), engaged September 30, 2025, which fell from approximately US$170 to under US$1 in the following months; and Curanex Pharmaceuticals Inc. (NASDAQ: CURX), engaged October 22, 2025. Strategic Investor Relations LLC's own website advertises (without identifying the underlying clients) an "Average Volume Increase" of 320% and an "Average Price Appreciation" of 132%, with a "100% Client Satisfaction Rate." Those promotional metrics measure trading-volume and share-price outcomes rather than disclosure or governance services. The Company's

continued engagement of Strategic Investor Relations LLC through the pre-crash run-up supports an inference that Defendants knew or recklessly disregarded the IR firm's association pattern.

## III. SEC Comment Letter and Nasdaq Listing Deficiencies (April 2024 – August 2024)

343. ***The 2023 Form 20-F's going-concern inconsistency.*** The same filing stated, on the one hand, that substantial doubt existed about Jayud's ability to continue as a going concern, while also stating elsewhere that the doubt was alleviated by management's plans. The SEC flagged that contradiction, and the Company agreed to revise the disclosure to say that the doubt could not be alleviated. A CEO and CFO certifying that filing, and an auditor whose own opinion contradicted the MD&A disclosure, would have known or recklessly disregarded that the filing told investors two opposite things about a core survival issue.

344. ***The HYTX acquisition pattern was inconsistent with ordinary business expansion.*** Jayud described HYTX Warehouse Inc. as a prominent logistics company, but the later termination filing identified a Nevada corporation formed only three months before the acquisition announcement and controlled by Haiyong Geng. The HYTX network also involved multiple entities tied to the same Azusa address and Geng-surnamed individuals, none disclosed as related parties. The timing, entity confusion, and share-consideration structure support the inference that the HYTX transactions were used to issue Jayud equity to connected parties rather than to acquire bona fide operating assets.

345. ***The May 1 and June 6, 2024 Nasdaq deficiency letters supplied motive for the discount stockpile.*** On May 1, 2024, the Nasdaq Listing Qualifications Department notified the Company of non-compliance with the US$2,500,000 minimum stockholders' equity requirement of Nasdaq Listing Rule 5550(b)(1). On June 6, 2024, Nasdaq separately notified the Company of non-compliance with the US$1.00 minimum bid price requirement of Nasdaq Listing Rule 5550(a)(2). The Company's October 28, 2024 Form 6-K then characterized the September and

October 2024 transactions (the convertible debentures, the October PIPE, and the acquisition cluster) as having "thereby restored compliance with the Nasdaq stockholders' equity requirement." That self-characterization documents that the placements and acquisitions were not undertaken for ordinary business-expansion purposes; they were aggregated to satisfy regulatory delisting threats on two separate Nasdaq listing rules.

346. ***The Initial Shareholders' beneficial owners and the per-recipient allocation of the RMB 35 million payment have never been disclosed***. The Initial Shareholders' beneficial owners and the per-recipient allocation of the RMB 35 million payment have never been disclosed. The SEC's July 22, 2024 Comment Letter expressly requested the identities of the recipients of the reorganization payments and their relationships to Jayud, but Jayud's August 12, 2024 response identified them only as "the Initial Shareholders." The F-1/A's "History of Securities Issuances" identifies nine BVI entities that received Jayud's ordinary shares on June 10, 2022, but the beneficial owners of four of those entities are not disclosed anywhere in Jayud's SEC filings, and the per-recipient allocation of the RMB 35 million has never been disclosed. To the extent any portion of the RMB 35 million flowed to BVI shells controlled by Defendant Geng, Defendant Huang, Defendant Zhao, or Defendant Geng's spouse Xiaohua Jia—each of whom controls one of the nine Initial Shareholder entities—the payment was a pre-IPO insider cash distribution. The Company's continuing refusal, after a specific SEC inquiry, to identify the recipients or the per-recipient allocation supports an inference that the Company concealed the recipients to obscure the related-party character of the payment.

347. ***Jayud's August 2024 SEC admission.*** The SEC asked why the RMB 35 million payment was not disclosed and requested the identities and relationships of the payment recipients, and Jayud responded that it should have disclosed the RMB 35 million payment arrangement in

both the F-1/A and the Form 20-F, and also agreed to correct the 2023 going-concern inconsistency. Because that response was made during the Class Period and with notice to senior management, it shows that Defendants were aware of the omitted, related-party payment and the contradictory going-concern disclosure, not merely that those issues were identified in hindsight.

## IV. Discount Stockpile and Concealed Buyer Identities (September 2024 – December 2024)

348. ***The December Placement repaid Defendant Geng's loans to the Company.*** In September and November 2024, Geng loaned the Company approximately RMB 7,487,100 (approximately US$1,050,555) at 6% interest. The December 3, 2024 Prospectus Supplement disclosed that those loans were fully repaid as of the prospectus date and that approximately 30% of the placement proceeds would be used to repay outstanding loans bearing interest between zero and 6%. Thus, the December Placement functioned in part as a pass-through: undisclosed investors supplied $10 million to Jayud, Jayud repaid Geng, and the purchasers received 50 million shares at $0.20 per share. That structure gave Geng a personal benefit and gave the purchasers an enormous economic incentive if the stock could be driven upward. Because Geng also signed filings acknowledging operating losses, going-concern doubts, and persistent material weaknesses, these facts support a strong inference that he knew the later price increase was not supported by Jayud's business fundamentals.

349. ***Geng's use of blank 'Form of' SPAs to conceal purchaser identities.*** The October and December SPAs were filed with blank purchaser signature pages and without buyer names, addresses, investment amounts, or share allocations, even though Geng had access to the executed agreements and signed them for Jayud. The December SPA also represented that each purchaser had an existing relationship with the Company. By filing blank templates while withholding the identities and relationships of the discounted-share purchasers, Geng denied investors the information needed to assess whether the placements were arm's-length, related-party, coordinated, or connected to later trading.

350. ***The December SPA's "pre-existing relationship" representation contradicts the Forms 6-K and Form 424B5.*** The December Share Purchase Agreement, filed with the SEC as Exhibit 10.1 to the Company's December 6, 2024 Form 6-K, contained an express representation that each Purchaser "has had a pre-existing relationship with the Company." Defendant Geng countersigned the Share Purchase Agreement on the Company's behalf. The December 3, 2024 Form 6-K and the December 3, 2024 Form 424B5 prospectus supplement, however, identified the Purchasers only as "certain accredited investors" and disclosed neither the existence of the pre-existing relationships nor the identity, nature, or duration of those relationships. Defendant Geng's signature on the Share Purchase Agreement representation, paired with the Company's public-filing characterization of the same persons as anonymous accredited investors, supports an inference that Defendant Geng knew the public Forms 6-K and 424B5 were materially incomplete when made.

351. ***The HYTX Warehouse No. 10 LLC co-management***. Echo Cheng and Weiliang Zhang were co-managers of HYTX Warehouse No. 10 LLC with Joyed Logistics Services Inc., Jayud's wholly owned U.S. subsidiary, before they received discounted Jayud shares in the

October PIPE. That relationship was not disclosed in Jayud's public filings. The same relationship also continued after the crash through Labelbridge Logistics LLC, where Cheng and Joyed Logistics again appeared together. These facts support the inference that Geng knew the October PIPE buyers were connected counterparties and deliberately placed discounted shares with persons tied to Jayud's U.S. operations. The HYTX Warehouse No. 10 LLC co-management evidence shows that two October PIPE buyers were pre-existing business associates of Jayud's own subsidiary, not arm's-length strangers.

## V. <u>Coordination Markers, CFO Transition, and the April 2025 Crash (February 2025 – April 2025)</u>

352. ***The seven February 4, 2025 Schedule 13G filings exhibit pattern markers of coordinated "group" action.*** All seven Schedule 13G filings reported the December Share Purchase Agreement event date as December 4, 2024, just one calendar day after the Share Purchase Agreement was signed and six calendar days before the publicly represented December 10, 2024 closing date. All seven filings were made on the same date, February 4, 2025. All seven filings used identical Schedule 13G template language. The seven filers, taken together, held the substantial majority of the 50-million-share December Placement at the time of their filings. Pattern markers of this character (e.g., the common counterparty, common timing, common filing-form, and common beneficial-ownership cut-off) satisfy the threshold for inferring "group" action within the meaning of Section 13(d)(3) of the Exchange Act. Defendant Geng countersigned the December Share Purchase Agreement representing that each Purchaser had a pre-existing relationship with the Company. The pattern markers, combined with the public Forms 6-K and Form 424B5's characterization of the same Purchasers as anonymous accredited investors, support an inference of scienter as to the December Placement-related disclosures.

353. ***The April 2, 2025 trading volume approximated the entire December Placement.***

On April 2, 2025, the trading session immediately following the April 1, 2025 closing high of US$7.97, approximately 45.8 million Jayud shares traded in a single session. That figure approximates the entire 50-million-share December 2024 registered direct offering. The proportionality between the December placement size and the April 2 single-session volume supports the inference that the December placement participants exited their positions into the April 2 crash. Coupled with (a) the December SPA's express "pre-existing relationship" representation, (b) the seven February 4, 2025 Schedule 13G filings' pattern markers of coordinated group action, and (c) the absence of any Schedule 13G/A amendments from the seven filers reporting the disposition of those holdings, the April 2 volume match supports an inference that the December placement was structured and timed in coordination with, or at minimum, least in awareness of, the trading activity that would follow.

354. ***Jayud's post-crash 2024 Form 20-F admissions confirm that key risks existed before the crash and were not disclosed.*** After the April 2025 collapse, Jayud admitted that the stock had experienced extreme volatility, that the volatility was not attributable to operating performance or industry conditions, that trading may have been driven by WhatsApp "investment" groups misinformation, that substantial doubt existed about the Company's ability to continue as a going concern, and that certain VAT invoices were forged. These admissions do not merely describe events after the fact; they confirm that the market price had become disconnected from fundamentals and that the Company possessed material information about going concern, misinformation-driven trading, and suspect prior transactions that investors would have considered important during the run-up.

355. ***The Company's admission that its pre-IPO books contained forged VAT invoices***. In the 2024 Form 20-F, Jayud disclosed for the first time that its subsidiary had received Tax

Matter Notices in "early 2025" from Shenzhen tax authorities demanding the recovery of refunded and exempted VAT for fiscal years 2018 and 2021 because "the VAT invoices issued by certain third-party supplier are forged." This admission suggests that Jayud insiders inflated the revenues underlying the IPO documents. In addition, the notices arrived in "early 2025," yet insiders said nothing until the post-crash Form 20-F. The Company also called the matter "not expected to have any material impact" in the same filing in which it warned that forged supplier invoices "may further face penalties under severe circumstances, resulting in material financial liabilities and reputational damage"—confirming Defendants knew the disclosure they buried was material.

356. ***Marcum Asia's 2024 audit opinion certified financial statements that were internally inconsistent on impairment.*** Jayud's H1 2024 Form 6-K reported an impairment charge of RMB 396,850, while the 2024 Form 20-F stated that no impairment was recognized for the full year and contained inconsistent impairment language on pages F-10, F-11, and F-24. Reversing or omitting the interim impairment violated ASC 360. Because the inconsistency was clear from Jayud's own filings, Marcum Asia's clean audit opinion supports an inference that Marcum recklessly failed to apply due professional care.

357. ***The CFO transition timing***. Bao resigned as CFO shortly before the crash, Hu became CFO during the final run-up and crash, and Guan's Co-CEO tenure overlapped with the December Placement, the crash, the auditor transition, and the beginning of securities litigation. The timing of those changes brackets the placement, promotion, crash, and post-crash response, supporting the inference that senior management was closely involved in the events at issue.

## VI. Post-Crash Continuing Conduct (July 2025 – February 2026)

358. ***The July 2025 placement.*** Three months after the crash and while securities litigation was underway, Geng signed another registered direct offering at a steep discount: 42,857,143 shares at $0.14 per share. As with the December Placement, some buyers were later

identified by Schedule 13G filings, others remained undisclosed, and the identified buyers exited within months. Repeating the same discounted-placement structure after the April 2025 collapse supports the inference that Geng understood the mechanics of the December Placement and could replicate them when needed.

359. ***The Boyatong vendor-and-shareholder round trip.*** In 2025, Boyatong became a major related-party vendor, receiving RMB 176.4 million, or 30.4% of Jayud's cost of revenues, while also acquiring 11,947,899 Jayud shares in the July 2025 placement and exiting by February 2026. A counterparty that is both a major vendor and a near-10% placement buyer in the same fiscal year is not comparable to an ordinary commercial vendor. This supports the inference that related-party vendor payments and discounted share placements were part of a connected network known to Jayud's insiders.

360. ***The Boyatong vendor-and-shareholder pivot is the same operational template the December Placement followed, accelerated to a shorter timeline.*** In fiscal year 2025, Hongkong Boyatong Supply Chain Management Corporation Limited absorbed approximately RMB 176.4 million in payments (or *30.4%* of Jayud's total cost of revenues) as a related-party vendor. Tellingly, Boyatong's fiscal-year-2023 and fiscal-year-2024 transactions with Jayud were zero, meaning Boyatong's emergence as the single largest vendor occurred in a single fiscal year. In July 2025, three months after the April 2025 crash and immediately following the Marcum-to-Enrome auditor transition, Boyatong subscribed to 11,947,899 Jayud Class A ordinary shares in a registered direct offering at US$0.14 per share, becoming a significant Jayud equityholder. Boyatong then exited the holding by February 2026. The single-entity sequence (i.e., where a counterparty that began the fiscal year as a previously-inactive party, then became Jayud's single largest vendor, then became a Class A shareholder via a registered direct offering, then dumped

within months) replicates the December 2024 placement architecture in compressed form. The replication, combined with Defendant Geng's personal signature on each of the post-crash July 2025 registered direct offering documents, supports an inference that the discount-stockpile-and-related-party-vendor architecture is the Company's operating model rather than a series of isolated transactions.

361. ***The 50-to-1 reverse stock split provides post-crash context for Jayud's reliance on capital-structure maneuvers rather than business performance.*** After the crash, Jayud faced a Nasdaq minimum-bid-price deficiency and effected a 50-to-1 reverse split to restore nominal bid-price compliance. In context with earlier stockholders' equity and bid-price deficiency issues and the December Placement's pro forma balance-sheet effect, the reverse split supports the inference that Jayud repeatedly used structural fixes to preserve its listing despite weak underlying operations.

362. ***Defendants twice reported a 51%-owned PRC subsidiary that does not exist in any public corporate registry***. Jayud's 2024 Form 20-F and 2025 Form 20-F each list Shenzhen JNT International Logistics Co., Ltd. (purportedly acquired on January 18, 2024) as a consolidated 51%-owned subsidiary. However, Plaintiffs' investigator could find no record of JNT in Qichacha, Tianyancha, the Shenzhen Administration for Market Regulation, or any other PRC registry. Defendant Geng signed both Forms 20-F, the CFO certified the consolidated financial statements, and Marcum Asia issued clean opinions on financials that include JNT's purported assets and revenues.

363. ***The persistence of the same material weaknesses across multiple annual reports***. Jayud repeatedly disclosed material weaknesses involving internal controls, U.S. GAAP and SEC-reporting resources, and information-technology controls, while also repeatedly stating that

remediation was underway or planned. Those same weaknesses persisted through later annual reports. Because the weaknesses related to the very problems described here—related-party disclosure, accounting presentation, credit losses, tax-refund collectability, and detection of forged invoices—the repeated certifications of those filings support an inference that the Individual Defendants knew or recklessly disregarded that Jayud's financial reporting remained unreliable.

364. ***PCAOB inspection record***. The Auditor Defendants signed off on Jayud against a public PCAOB inspection record that establishes their recklessness. The PCAOB's 2023 inspection of Marcum Asia found audit deficiencies in 5 of 5 audits reviewed—a 100% deficiency rate—including a specific finding that Marcum Asia failed to "perform procedures to evaluate whether the issuer met its performance obligations before certain revenue from related parties was recognized," in violation of AS 2410.17 (Related Parties), the very procedure required to test Jayud's related-party revenue. The parallel inspection records of Marcum LLP (60% and 56% deficiency rates in the 2021 and 2022 cycles; 19 independence violations across 10 issuers) and the predecessor Friedman (57% deficiency rate in 2020, clustered on revenue, reserves, and inventory) put the Auditor Defendants on notice that the precise audit procedures Jayud's financial statements demanded were the procedures their firms were chronically failing to perform.

## LOSS CAUSATION

365. Defendants' wrongful conduct directly and proximately caused the economic loss Plaintiffs and the Class sustained. Throughout the Class Period, Defendants' material misstatements and omissions concerning Jayud's reported revenue, related-party economics, financial condition, engineered low-float capital structure, and concealed connected-party share placements caused Jayud's Class A ordinary shares to trade at artificially inflated prices. The price of the Company's securities declined significantly when the truth was revealed through the April 2025 crash.

## CLASS ACTION ALLEGATIONS

366. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired Jayud securities between April 21, 2023, and April 2, 2025, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

367. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Jayud's shares actively traded on NASDAQ. Millions of Jayud shares were traded publicly during the Class Period. Plaintiffs believe there are at least hundreds or thousands of members in the proposed Class.

368. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including: (a) whether Defendants violated the federal securities laws; (b) whether statements made by Defendants during the Class Period omitted or misrepresented material facts; (c) whether the IPO Registration Statement, Shelf Registration, and December Prospectus Supplement contained material misstatements or omissions; and (d) the extent of damages sustained by Class members and the proper measure of damages.

369. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members may be relatively small, making individual litigation impracticable.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

370. The market for Jayud's securities was open, well-developed, and efficient at all relevant times. On April 1, 2025, the Company's share price closed at a Class Period high of $7.97 per share. As a result of the materially false and/or misleading statements and omissions alleged herein, Jayud's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other Class members are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because: (a) Jayud's shares were listed and actively traded on NASDAQ; (b) Jayud filed periodic reports with the SEC; (c) Jayud communicated with investors through press releases and other public disclosures; and (d) the market for JYD shares promptly incorporated publicly available information into the stock price.

371. A class-wide presumption of reliance is also appropriate under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims are, in large part, grounded on Defendants' material omissions. Positive proof of reliance is not required where, as here, Defendants had a duty to disclose material information and failed to do so.

## CLAIMS FOR RELIEF

### FIRST CLAIM Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

372. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

373. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and did, deceive the investing public, including Plaintiffs and other Class members, and caused Plaintiffs and other members of the Class to purchase Jayud's securities at artificially inflated prices. In furtherance of this unlawful plan, Defendants, and each

of them, took the actions set forth herein.

374. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Jayud's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

375. The Defendants employed devices, schemes and artifices to defraud and deceive Class Period purchasers of JYD securities by: (i) initiating, endorsing, executing and/or completing the IPO on JYD's behalf and permitting trading in JYD securities on a national securities exchange while knowing or acting in reckless disregard to the fact that JYD was not a legitimate business; (ii) initiating, endorsing, executing and/or completing the IPO on JYD's behalf and permitting trading in JYD securities on a national securities exchange while knowing or acting in reckless disregard to the fact that JYD was the target of a market manipulation and promotional scheme; and/or (iii) attempting to manufacture artificial inflation by triggering volatility trading via false and misleading statements.

376. At the time, Plaintiffs and other members of the Class were ignorant of the identified Defendants' deceptions. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the deceptive acts and schemes, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their JYD securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

377. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange

Act and Rule 10b-5(a) & (c) promulgated thereunder.

378. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

379. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

380. The Individual Defendants acted as controlling persons of Jayud within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, ownership interests, participation in, and awareness of the Company's operations, and intimate knowledge of the false and misleading statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

381. Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same

382. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected

383. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of

the Company's securities during the Class Period.

**THIRD CLAIM Violation of Section 11 of the Securities Act Against Jayud, Xiaogang Geng, Dun Zhao, Feiyong Li, Steven Gu, Jian Wang, The Benchmark Company, Friedman, Marcum Asia, Cogency Global, and De Vries**

384. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who acquired Jayud securities pursuant or traceable to the IPO Registration Statement (including the IPO Prospectus) or the Shelf Registration Statement (including the December Prospectus Supplement). This claim does not sound in fraud and does not require proof of scienter.

385. Plaintiffs and the Class members assert standing to bring this Third Claim under Section 11 of the Securities Act because they acquired Jayud securities pursuant or traceable to the IPO Registration Statement (including the IPO Prospectus) and/or the Shelf Registration Statement (including the December 3, 2024 Prospectus Supplement).

386. The IPO Registration Statement, at the time it became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, as alleged herein. Specifically, the IPO Registration Statement:

(a) Failed to disclose that the Company's low-float IPO structure was designed to facilitate price manipulation;

(b) Failed to disclose the Company's intention to issue tens of millions of additional shares to undisclosed investors at steep discounts in the months following the IPO;

(c) Incorporated financial statements that did not comply with GAAP and PCAOB requirements, as attested to by the Auditor Defendants; and

(d) Contained materially false or misleading statements about the Company's competitive position and financial prospects.

387. The Shelf Registration Statement and December Prospectus Supplement, at the time they became effective and at the time of the December Offering, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements not misleading, as alleged herein. Specifically, the Shelf Registration and December Prospectus Supplement:

(a) Incorporated by reference materially false and misleading public filings, including the 2023 20-F and the 2023 20-F/A;

(b) Failed to disclose the going concern doubts in the Company's contemporaneous public filings, while disclosing them only in the private offering document;

(c) Failed to disclose the identities of the investors purchasing the 50 million shares or their connections to any promotion scheme; and

(d) Incorporated financial statements certified by Marcum Asia that failed to comply with GAAP and PCAOB requirements.

388. The defendants named in this Third Claim are liable under Section 11 as follows:

(a) Jayud, as the issuer of the securities, has absolute liability for any material misstatement or omission in the IPO Registration Statement, the Shelf Registration, and the December Prospectus Supplement;

(b) Benchmark, as the underwriter of the IPO, is liable for material misstatements and omissions in the IPO Registration Statement unless it can establish that after reasonable investigation it had reasonable grounds to believe that the statements therein were true and complete;

(c) Friedman, as the accounting firm that certified the financial statements for fiscal years 2020 and 2021 incorporated into the registration statements, and which affirmatively consented to the incorporation of its prior audit reports in the June 2024 Shelf Registration by filing a signed consent dated May 24, 2024, is liable for material misstatements in those financial statements;

(d) Marcum Asia, as (1) the accounting firm that succeeded to Friedman's Jayud audit engagement under the Friedman-Marcum merger effective September 1, 2022, a merger that the IPO Registration Statement disclosed and that Marcum Asia subsequently confirmed in its 2022 Form 20-F audit report stating that Marcum Asia "served as the Company's auditor since 2022 (such date takes into account the acquisition of certain assets of Friedman by Marcum Asia CPAs LLP effective September 1, 2022)," and (2) the accounting firm that directly certified the fiscal year 2022 and fiscal year 2023 audited

financial statements incorporated by reference into the June 2024 Shelf Registration Statement and the December 3, 2024 prospectus supplement, is liable under Section 11 of the Securities Act as follows: (i) for material misstatements and omissions in the IPO Registration Statement, on a successor-liability theory by virtue of Marcum Asia's acquisition of the Friedman audit practice (including Friedman's Jayud audit engagement and the Jayud audit working papers) effective September 1, 2022, and on each alternative theory by which Marcum was named in or had a hand in preparing or certifying any part of the IPO Registration Statement within the meaning of Section 11(a)(4) of the Securities Act; and (ii) for material misstatements and omissions in the fiscal year 2022 and fiscal year 2023 audited financial statements that Marcum Asia directly certified, and which Marcum Asia consented to be incorporated by reference into the June 2024 Shelf Registration Statement and the December 3, 2024 prospectus supplement under which the Company conducted its December 2024 registered direct offering;

(e) Cogency Global, as the registered agent and U.S. representative of Jayud whose employee (De Vries) signed both registration statements in that capacity and whose name and role appear in those registration statements, participated in the offering process and is subject to liability under Section 11;

(f) De Vries, as a statutory signatory of both the IPO Registration Statement and the Shelf Registration Statement under Section 11(a)(1) of the Securities Act, 15 U.S.C. § 77k(a)(1), bears strict liability for material misstatements and omissions contained in those registration statements without any showing of scienter;

(g) Defendant Geng, as Founder, Chief Executive Officer, Controlling Shareholder, and Director of the Company who signed the IPO Registration Statement on Form F-1 and the F-1/A Pre-Effective Amendment in his capacities as Chief Executive Officer and Director, and who was the Company's Chief Executive Officer and a Director at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement; and additionally, as the Chief Executive Officer and Director of the Company who signed the June 2024 Form F-3 Shelf Registration Statement and the December 3, 2024 Form 424B5 prospectus supplement, bears liability for material misstatements and omissions contained therein;

(h) Defendant Bao, as Chief Financial Officer of the Company who signed the IPO Registration Statement on Form F-1 and the F-1/A Pre-Effective Amendment in her capacity as Chief Financial Officer, who was the Company's Chief Financial Officer at the time the IPO Registration Statement became effective on April 18, 2023, who signed the June 2024 Form F-3 Shelf Registration Statement in her capacity as Chief Financial Officer, and who signed the December 3, 2024 Form 424B5 prospectus supplement in her capacity as Chief Financial Officer, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material

misstatements and omissions contained in the IPO Registration Statement, the Form F-3 Shelf Registration Statement, and the December 3, 2024 prospectus supplement, as well as for material misstatements and omissions contained in the 2022 Form 20-F, the 2023 Form 20-F, and the 2023 Form 20-F/A to the extent each was incorporated by reference into the Form F-3 Shelf Registration Statement and the December 3, 2024 prospectus supplement;

(i) Defendant Guan, as Co-Chief Executive Officer of the Company who signed the December 3, 2024 Form 424B5 prospectus supplement to the June 2024 Form F-3 Shelf Registration Statement in his capacity as Co-Chief Executive Officer, and who was the Company's Co-Chief Executive Officer at the time the December 3, 2024 prospectus supplement was filed, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the December 3, 2024 prospectus supplement;

(j) Defendant Huang, as Chief Operating Officer of the Company who was named with her consent in the IPO Registration Statement on Form F-1 as the Company's Chief Operating Officer upon the registration statement's effectiveness, and who served as Chief Operating Officer at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Section 11(a)(3) of the Securities Act, 15 U.S.C. § 77k(a)(3), as a person named with her consent in the IPO Registration Statement as being or about to become a person performing functions similar to those of a director of the Company, and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement;

(k) Defendant Zhao, as a director of the Company who signed the IPO Registration Statement on Form F-1 in his capacity as a director and Chief Marketing Officer and was a director at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement;

(l) Defendant Li, as a director of the Company who signed the IPO Registration Statement on Form F-1 and was a director at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement;

(m) Defendant Gu, as a director of the Company who signed the IPO Registration Statement on Form F-1 and was a director at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Sections 11(a)(1) and

(a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement; and

(n) Defendant Wang, as a director of the Company who signed the IPO Registration Statement on Form F-1 and was a director at the time the IPO Registration Statement became effective on April 18, 2023, is a statutory defendant under Sections 11(a)(1) and (a)(2) of the Securities Act, 15 U.S.C. § 77k(a)(1)–(2), and bears liability for material misstatements and omissions contained in the IPO Registration Statement and in the Shelf Registration Statement and December Prospectus Supplement to the extent they incorporated material misstatements from the IPO Registration Statement.

389. Plaintiffs and other members of the Class acquired Jayud securities pursuant or traceable to the IPO Registration Statement, Shelf Registration, and December Prospectus Supplement and sustained damages as a direct result of the material misstatements and omissions therein.

390. At the time they acquired Jayud securities, Plaintiffs and other Class members did not know of the untrue statements and omissions alleged herein, and could not have discovered them through the exercise of reasonable diligence.

**FOURTH CLAIM Violation of Section 15 of the Securities Act Against the Individual Defendants**

391. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

392. The Individual Defendants, by virtue of their positions as officers and/or directors of Jayud and their ownership and contractual rights, participation in, and awareness of the Company's operations, were controlling persons of Jayud within the meaning of Section 15 of the Securities Act at the time of the IPO Registration Statement, Shelf Registration, and December Prospectus Supplement. Defendant Geng, as CEO and majority voting shareholder, had direct supervisory control over all of the Company's SEC filings and public statements and had the power to prevent their issuance or cause them to be corrected.

393. By reason of the conduct alleged herein, the Individual Defendants are liable pursuant to Section 15 of the Securities Act for the violations of Section 11 alleged in the Third Claim. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Jayud securities traceable to the registration statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: June 5, 2026

**POMERANTZ LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II (*pro hac vice*)
Samantha Daniels
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (pro hac vice)
Mollie Chadwick (pro hac vice)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law

*Additional Counsel for Plaintiffs*